# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

ANESTHESIA ASSOCIATES OF ANN
ARBOR, PLLC,

               Plaintiff,

   -against-

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

             Defendant.

Civil Action No. 2:20-cv-12916

Hon. Terrence G. Berg

Mag. Anthony P. Patti

## PLAINTIFF ANESTHESIA ASSOCIATES OF ANN ARBOR, PLLC'S MOTION TO DISMISS DEFENDANT BLUE CROSS BLUE SHIELD OF MICHIGAN'S COUNTERCLAIM

Plaintiff Anesthesia Associates of Ann Arbor, PLLC ("A4") by and through its undersigned attorneys, respectfully moves the Court to enter an order dismissing, with prejudice, the Counterclaim filed by Defendant Blue Cross Blue Shield of Michigan ("BCBS"), which is on the docket at ECF 26, PageID.887-909.

Pursuant to Local Rule 7.1, A4 contacted BCBS on June 21, 2019, inquiring if BCBS would agree to dismiss its Counterclaim. The parties met-and-conferred on June 24, 2021, but were unable to reach agreement on A4's request. A4's reasons for dismissal are set out in the accompanying memorandum of law.

Date:  June 29, 2021

Respectfully submitted,

*/s/ Richard A. Feinstein*

BOIES SCHILLER FLEXNER LLP
Jonathan Schiller, Esq. (*admission forthcoming*)
David Barillari, Esq. (*admission forthcoming*)
55 Hudson Yards
New York, NY 10001
(212) 446-2300
jschiller@bsfllp.com
dbarillari@bsfllp.com

Richard A. Feinstein (*admitted in E.D. Mich.* D.C. Bar 324848)
Andrew D. Lowdon (*admission forthcoming*)
1401 New York Ave., NW
Washington, D.C. 20005
(202) 895-5243
rfeinstein@bsfllp.com
alowdon@bsfllp.com

RILEY SAFER HOLMES & CANCILA LLP
Gregory L. Curtner (P12414)
Matthew Kennison (P79653)
121 W. Washington Street, Suite 402
Ann Arbor, MI 48104
(734) 773-4900
gcurtner@rshc-law.com
mkennison@rshc-law.com

*Counsel for Anesthesia Associates of Ann Arbor, PLLC*

2

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

ANESTHESIA ASSOCIATES OF ANN ARBOR, PLLC,

                  Plaintiff,

    -against-

BLUE CROSS BLUE SHIELD OF MICHIGAN,

              Defendant.

Civil Action No. 2:20-cv-12916

Hon. Terrence G. Berg

Mag. Anthony P. Patti.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF ANESTHESIA ASSOCIATES OF ANN ARBOR, PLLC'S MOTION TO DISMISS DEFENDANT BLUE CROSS BLUE SHIELD OF MICHIGAN'S COUNTERCLAIM

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................. I

CONCISE STATEMENT OF ISSUES PRESENTED ............................ III

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................ IV

TABLE OF AUTHORITIES ................................................... V

PRELIMINARY STATEMENT .................................................. 1

BACKGROUND .................................................................. 4

ARGUMENT ..................................................................... 9

I.    The Alleged Agreements Are Not Actionable under the Federal
      Antitrust Laws. ..................................................... 9

      A.    Agreements Between a Medical Service Provider and Its Doctors Are
            Not Actionable. ............................................... 9

      B.    Agreements Between a Hospital and Its Staff are Not Actionable. ..... 10

II.   Neither Per Se nor Quick Look Analysis is Appropriate Here. ......... 11

III.  BCBS Has Failed to Allege any Violation of the Rule of Reason. ..... 14

      A.    BCBS Has Failed to Allege Market Power. ........................ 14

      B.    BCBS Has Failed to Allege that the Agreements Were Unreasonably
            Enforced. ..................................................... 15

      C.    BCBS Has Failed to Allege that the Agreements' Pro-Competitive
            Aspects Are Outweighed by Any Anti-Competitive Effects. ......... 16

      D.    BCBS Fails to Allege any Plausible Harm to Market Competition. .... 18

            1.  BCBS Cannot Aggregate the Agreements. .................... 18

            2.  The Agreements Do Not Restrain Competition in Michigan. ....... 19

IV.   BCBS's Has Failed to Allege that it Has Suffered Any Injury—Let
      Alone Antitrust Injury. ............................................. 23

**V.     Count II Is Preempted by Contract and Michigan Law. ...................24**

CONCLUSION ....................................................................................................25

## CONCISE STATEMENT OF ISSUES PRESENTED

1. Does the Counterclaim fail to allege a per se violation of Section 1 of the Sherman Act?

   **Plaintiff's answer: "Yes."**

2. Does the Counterclaim fail to allege a violation of Section 1 of the Sherman Act under quick look review?

   **Plaintiff's answer: "Yes."**

3. Does the Counterclaim fail to allege a violation of Section 1 of the Sherman Act under the rule of reason?

   **Plaintiff's answer: "Yes."**

4. Has the Counterclaim failed to state a claim for declaratory relief?

   **Plaintiff's answer: "Yes."**

5. Has the Counterclaim failed to state a claim for injunctive relief?

   **Plaintiff's answer: "Yes."**

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 718 (6th Cir. 2019).

*Nurse Midwifery Assocs. v. Hibbett*, 918 F.2d 605, 614 (6th Cir. 1990), opinion modified on reh'g, 927 F.2d 904 (6th Cir. 1991).

*Smith v. N. Michigan Hosps., Inc.*, 703 F.2d 942, 951 (6th Cir. 1983).

*Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612 (6th Cir. 2004)

# TABLE OF AUTHORITIES

## Cases

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 19

*Borg-Warner Protective Servs. Corp. v. Guardsmark, Inc.*,
946 F. Supp. 495 (E.D. Ky. 1996) ........................................................................ 10

*Caudill v. Lancaster Bingo Co.*,
2005 WL 2738930 (S.D. Ohio Oct. 24, 2005) ...................................................... 12

*Compass Const. v. Indiana/Kentucky/Ohio Reg'l Council of Carpenters of United Bhd. of Carpenters & Joiners of Am.*,
890 F. Supp. 2d 836 (S.D. Ohio 2012) ................................................................. 24

*Deslandes v. McDonald's USA, LLC*,
2018 WL 3105955 (N.D. Ill. June 25, 2018) ....................................................... 15

*Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.*,
833 F.2d 606 (6th Cir. 1987) ............................................................................... 10

*Douglas v. Daviess Co. Fiscal Ct.*,
2018 WL 1863656 (W.D. Ky. Apr. 18, 2018) ...................................................... 24

*Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*,
459 F.2d 138 (6th Cir. 1972) ............................................................................... 18

*Innovation Ventures, L.L.C. v. Custom Nutrition Lab'ys, L.L.C.*,
451 F. Supp. 3d 769 (E.D. Mich. 2020) ......................................................... 15, 20

*Kelly Servs. v. Eidnes*,
530 F. Supp. 2d 940 (E.D. Mich. 2008) ............................................................... 20

*Kelly Servs., Inc. v. Noretto*,
495 F. Supp. 2d 645 (E.D. Mich. 2007) ............................................................... 20

*Lektro-Vend Corp. v. Vendo Co.*,
660 F.2d 255 (7th Cir. 1981) .......................................................................... 16, 19

*Lifeline Ltd. No. II v. Connecticut Gen. Life Ins. Co.*,
 821 F. Supp. 1201 (E.D. Mich.)..............................................................22

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
 922 F.3d 713 (6th Cir. 2019) ............................................ 11, 12, 13, 18

*Murray v. Chrysler Grp., LLC*,
 2013 WL 5340782 (E.D. Mich. Sept. 23, 2013)...................................19

*Nurse Midwifery Assocs. v. Hibbett*,
 918 F.2d 605 (6th Cir. 1990) ............................................. 2, 9, 10, 11

*Ogden v. Little Caesar Enterprises, Inc.*,
 393 F. Supp. 3d 622 (E.D. Mich. 2019) ..................................... passim

*Ohio v. Am. Express Co.*,
 138 S. Ct. (2018).................................................................................15

*Perceptron, Inc. v. Sensor Adaptive Machines, Inc.*,
 221 F.3d 913 (6th Cir. 2000) .............................................................12

*Radio One, Inc. v. Wooten*,
 452 F. Supp. 2d 754 (E.D. Mich. 2006) ...................................... 16, 17

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
 792 F.2d 210 (D.C. Cir. 1986) (Bork, J.)............................................13

*Saltzman v. I.C. Sys., Inc.*,
 2009 WL 3190359 (E.D. Mich. Sept. 30, 2009)...................................24

*Sancap Abrasives Corp. v. Swiss Indus. Abrasives Grp.*,
 68 F. Supp. 2d 853 (N.D. Ohio 1999) .................................................10

*Smith v. N. Michigan Hosps., Inc.*,
 703 F.2d 942 (6th Cir. 1983) ...............................................................9

*Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*,
 477 F.3d 854 (6th Cir. 2007) ..............................................................23

*Stigar v. Dough, Inc.*,
 No. 2:18-cv-00244-SAB (Mar. 8, 2019) .............................................13

*St. Clair Med., P.C. v. Borgiel*,
715 N.W.2d 914 (Mich. Ct. App. 2006) ................................................................16

*Trollinger v. Tyson Foods, Inc.*,
370 F.3d 602 (6th Cir. 2004) ................................................................................23

*United States v. Empire Gas Corp.*,
537 F.2d 296 (8th Cir. 1976) ......................................................................... 16, 18

*Weiss v. York Hosp.*,
745 F.2d 786 (3d Cir. 1984) .................................................................................11

**Statutes**

MCL §§ 333.24507-08 ................................................................................... 8, 25

MCL § 450.4904 ...................................................................................................9

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed.) ...................................................................... 13, 15, 18

Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 Antitrust L.J. 135
(1984) ....................................................................................................................15

Plaintiff Anesthesia Associates of Ann Arbor, PLLC ("A4") respectfully submits this memorandum of law in support of its Motion to Dismiss Defendant Blue Cross Blue Shield of Michigan's Counterclaim.

## PRELIMINARY STATEMENT

Michigan is suffering from a severe shortage of anesthesiologists, as hospitals struggle to find doctors willing to work for the statewide reimbursement rate imposed by Michigan's dominant insurer, Defendant Blue Cross Blue Shield of Michigan ("BCBS").[1]  Without enough anesthesiologists to keep patients safe and in comfort during surgery, Michigan hospitals are shuttering operating rooms, forcing patients to delay surgery or travel far from home to get the care they need. *See id.*  Despite having one of the best medical schools in the nation, Michigan cannot rely on new graduates to solve the problem: over half of the University of Michigan's anesthesiologist graduates leave the state, rather than work for BCBS's rate, the third lowest anesthesiology rate in the nation.  *See id.*

Instead of addressing this problem constructively, BCBS has exacerbated it: retaliating against anesthesiologists and seeking to drive them out of the state if they reject BCBS's rate, leading to even greater shortages.   BCBS's meritless

---

[1] *See* Rick Ganzi, *Michigan is Facing an Anesthesiologists Shortage, Due to Minimal Reimbursement*, Lansing State Journal (Apr. 27, 2021), https://www.lansingstatejournal.com/story/opinion/contributors/viewpoints/2021/04/27/gap-reimbursement-rates-anesthesiologists-hurts-health-care/7201393002/.

Counterclaim is the latest example. It implausibly and baselessly tries to shift blame for Michigan's shortage onto the very doctors who continue to make sacrifices to remain in-state and serve Michigan patients. The Counterclaim fails to state any claim for relief, and serves only to tie up the resources of an underpaid and overworked Michigan anesthesiology practice in the middle of a pandemic.

*First*, BCBS claims that alleged non-compete agreements (between A4 and its employed doctors) and non-solicit agreements (between A4 and the hospitals where it practices) violate Section 1 of the Sherman Act; however, these allegations fail to reveal any conspiracy or agreement among independent actors. There can "be no conspiracy among a number of physicians operating in a group practice." *Nurse Midwifery Assocs. v. Hibbett*, 918 F.2d 605, 614 n.4 (6th Cir. 1990), *opinion modified on reh'g*, 927 F.2d 904 (6th Cir. 1991). Likewise, "the intracorporate conspiracy doctrine prevents a finding of conspiracy between a hospital and its medical staff," whether that staff is employed or, as here, is "independent." *Id.*

*Second*, even leaving aside the bar on claims of intracorporate action, BCBS has failed to plead any violation of Section 1. BCBS focuses on the faulty assumption that vertical agreements between a professional provider and its members, or a hospital and its medical staff, are subject to per se or quick look analysis. However, BCBS's allegations do not fit into the narrow categories the Sixth Circuit has reserved for such review. Instead, according to the Counterclaim

2

and the documents cited therein: certain Michigan hospitals sought exclusive anesthesiology providers to handle the anesthesiology work needed for their thousands of hospital beds; this outsourcing increases patient care and reduces costs; A4 provides that outsourcing by contracting with doctors to join its practice; and A4 uses narrow non-compete and non-solicit agreements as part of offering those services and to prevent misappropriation of its goodwill with the hospitals and their referring doctors.  Because these alleged non-compete and non-solicit provisions are both vertical and ancillary, neither per se nor quick look review is appropriate.

*Third*, the Counterclaim comes nowhere close to pleading a plausible claim under the rule of reason.  Perhaps recognizing this deficiency, BCBS never attaches nor quotes in detail the very agreements that are central to its claim, despite conceding that it has knowledge of their provisions, and despite having already *attached one of them to its Motion to Dismiss.*  The limited non-compete restrictions with A4's members last for just one year and are limited to a 15-mile radius.  Given the procompetitive benefits of enabling A4 to offer the services demanded by Michigan hospitals, these limited restraints are on their face reasonable as a matter of law, and BCBS, in a dispositive omission, fails to allege that they have ever been enforced unreasonably.  Additionally, the fact that a doctor may have to travel an additional 20-minutes to work does not harm competition where, as here, BCBS alleges that the market for anesthesiology *is statewide*.

3

The alleged hospital agreements are likewise reasonable, and the only current agreement between Trinity and A4—which Trinity forced A4 to accept as part of its conspiracy with BCBS—provides that should A4 go out of network with BCBS, all applicable non-compete and non-solicit restrictions will be eliminated, thus precluding BCBS's entire theory of competitive harm. The other alleged hospital agreements do not put any restriction on anesthesiologist employment and therefore cannot provide the basis for any claim by BCBS.

BCBS has separately failed to allege any antitrust injury or standing, as it concedes that it voluntarily raised its rates *after A4 had agreed to accept them as is*. BCBS's attempts to salvage its injury claim with vague and conclusory assertions of an "implied threat" of A4 leaving BCBS's network. But courts in this circuit routinely reject such allegations as too nebulous to state a claim.

Finally, BCBS's claims for declaratory and injunctive relief are precluded by Michigan law. The very issue at the center of BCBS's theory of competitive harm—surprise billing—has been outlawed in Michigan since October 22, 2020. BCBS therefore lacks any basis for seeking prospective relief.

For these reasons, and those discussed below, BCBS's Counterclaim should be dismissed with prejudice.

## BACKGROUND

"A4 is a professional limited liability corporation based in Ann Arbor,

4

Michigan," which serves as the "exclusive provider of anesthesiology services" at certain Michigan hospitals with thousands of patient beds.  Counterclaim ¶ 11, ECF 26, P.891 ("CC").   BCBS alleges that A4 provides these services through its physician "members" (*i.e.*, owners), which BCBS also calls A4's "Affiliated Anesthesiologists." *Id.* ¶ 35, P.897.[2]  The alleged agreements that BCBS challenges identify these doctors as employees of A4.  *See, e.g.*, Ex. I at 1 ("Coffman Agm't").[3]

A4 has limited non-compete agreements with its member-employees, which restrict them, for one year after their employment, from practicing within "15 miles of any health care facility where Physician provided services during the term of his or employment."  *Id.* § 7.2(a).  BCBS alleges that the market for anesthesiology services is statewide, but A4's practice is alleged to be in southeastern Michigan only.  CC ¶¶ 42, 63, ECF 26, P.899, 905.  Michigan spans over 96,000 square miles.  BCBS does not allege that these agreements have ever been enforced.  (While BCBS does not challenge any agreements A4 entered into with non-member employees, these include similar non-compete provisions.  *See, e.g.*, Ex. D § XIII(A) ("Shah Agm't"); Ex. N § XIII(A) ("Blair Agm't").)

A4 also entered into agreements with the hospitals where it provided exclusive

---

[2] As a PLLC, A4 must be owned by "member[s]" that are "licensed" physicians; rendering BCBS's assertion that A4 is owned by a private equity company both legally impossible and inconsistent with BCBS's allegations.  MCL § 450.4904(1).

[3] "Ex." references are to the exhibits to this Motion; "P." references are to PageID.

5

services.  CC ¶ 3, ECF 26, P.889.  One of those agreements is the Master Service Agreement ("MSA") between A4 and Trinity Health Corporation,[4] which BCBS previously filed in this litigation.  *See* ECF 13-4, PageID.284.  Under this agreement, Trinity hospitals may obtain A4's "specialist services" pursuant to follow-on agreements referred to as Orders.  Ex. F § I(A).  The MSA refers to A4's employee non-compete agreements, stating that (a) upon "termination" of such "Order" or (b) upon "termination" of any A4 doctor's "employment/contract with A4," then (c) A4 "will release each [doctor] from any restrictive covenant without penalty provided that a mutually acceptable fee for such release based on the investment by Group in recruiting and training the Provider may be specified in the Order."  *Id.* § XII(I).

By April 2019, A4 had entered into multiple agreements with Trinity hospitals.  A4 entered into the Saint Joseph Mercy Health System Order ("SJMHS Order"), which provided that A4 would be the exclusive provider of anesthesiology services at SJMHS hospitals for an initial term ending June 30, 2020.  Ex. H at 1; *id.* § 7.  It also provided that SJMHS could not "[d]uring the term of this Order and/or the MSA," including if terminated early by SJMHS, "solicit" or "hire" any A4 "employee or independent contractor."  *Id.* § 13; *see also* Ex. L ("SJMHS Am.").

A4 also served as the exclusive anesthesiology provider to Trinity's Mercy

---

[4] Except where otherwise indicated, "Trinity" herein refers to Trinity Health Corporation, Trinity Health Michigan, and their affiliated hospitals in Michigan.

Health Saint Mary's hospital ("MHSM") pursuant to a three-year agreement beginning September 1, 2016.  Ex. E at 1, §§ 2.1, 10.1 ("MHSM Order").  Trinity and A4 agreed "in light of the facts and circumstances of the exclusive relationship between them," not to, during the agreement "and for one (1) year thereafter . . . take any action to induce any Member or employee" of the other party "to cease his or her employment."  *Id.* §§ 11.3-4.

A4 also served as the exclusive anesthesiology provider at certain Beaumont hospitals in Michigan under a three-year agreement beginning October 1, 2017.  Ex. G §§ 1.1, 7.1 ("Beaumont Agm't").  The parties agreed that "during the term . . . and for a period of two (2) years thereafter," neither party "will solicit for employment or other engagement (in the case of [Beaumont]) any [A4] Physician or (in the case of [A4]) any key employee of the hospitals or in any manner seek to induce such persons to leave his or her employment or terminate his or her employment relationship with the other party."  *Id.* § 10.4.  Like the MHSM Order, this agreement does not prevent Beaumont from soliciting or hiring A4 doctors after they leave A4.

BCBS is a health insurer in Michigan.  Anesthesiologists who agree to join BCBS's network are all compensated at the same rate pursuant to a statewide "fee schedule," regardless of their location in Michigan or the cost of care.  CC ¶ 31, ECF 26, P.896.  A4 has requested that BCBS increase its anesthesiology rate, but BCBS refused to negotiate.  *Id.*; *see id.* ¶ 6, P.889.  In April 2019, A4 announced that it

7

planned on leaving BCBS's network.  *Id.* ¶ 51, P.902.  Subsequently, A4 revoked that intention and agreed to remain in BCBS's network and to accept BCBS's non-negotiable fee schedule.  *Id.*  BCBS does not allege any subsequent attempt or threat by A4 to leave BCBS's network, nor does it allege that A4 threatened, at any time, to stop serving BCBS's patients.

In September 2019, Trinity and A4 extended the SJMHS Order's term and amended it (1) to provide that if A4 left BCBS's network, A4's applicable non-solicit and non-compete rights would terminate, and (2) to release MHSM, and the A4 doctors who had worked there, from their respective non-solicit and non-compete obligations as they applied to MHSM.  Ex. O §§ I, IV ("3d SJMHS Am.").

After A4 agreed to accept BCBS's rate and amended the SJMHS Order, BCBS, "[n]evertheless" decided to increase its rate.  CC ¶ 51, P.902; *see id.* ¶¶ 52, 55, P.902-03.  BCBS alleges that it did so out of fear that A4 *might* leave BCBS's network in the future, and that if A4 then continued to serve BCBS's insureds, A4 *might* bill those out-of-network patients directly for "the difference" between A4's charges and what BCBS is willing to pay—a practice BCBS refers to as "balance billing" or "surprise billing"—thereby creating the potential for "disrupt[ion]."  *Id.* ¶¶ 26, 52, P.895, 902.

In November 2020, Michigan's ban on surprise billing went into effect.  MCL §§ 333.24507-08.  On April 30, 2021, BCBS brought its Counterclaim.

## ARGUMENT

I. **The Alleged Agreements Are Not Actionable under the Federal Antitrust Laws.**

BCBS attempts to challenge "A4's collective action with its Affiliated Anesthesiologists" and with the hospitals where A4 provides or provided services. CC ¶ 4, ECF 26, P.889. However, Sixth Circuit law bars antitrust claims alleging activities within an organization or between a hospital and its staff.

### A. Agreements Between a Medical Service Provider and Its Doctors Are Not Actionable.

The Sixth Circuit has recognized that "there could be no conspiracy among a number of physicians operating in a group practice," because they are not "independent practitioners competing among themselves but [a]re *members of a professional corporation* operating toward one economic goal." *Hibbett*, 918 F.2d at 614 n.4 (emphasis added). Those are the same facts BCBS alleges here: A4 is a "professional limited liability company" that provides "anesthesiology services" through the physician "members" under A4's "control." CC ¶¶ 10, 35-37, ECF 26, P.890, 897-98. Section 1 does not apply to the "concerted activity" of "members" of a "professional corporation," such as A4. *Smith v. N. Michigan Hosps., Inc.*, 703 F.2d 942, 951 (6th Cir. 1983).

This rule is part of the blackletter law in the Sixth Circuit that "affiliates . . . cannot conspire with each other for purposes of a § 1 claim." *Sancap Abrasives*

*Corp. v. Swiss Indus. Abrasives Grp.*, 68 F. Supp. 2d 853, 859 (N.D. Ohio 1999);

*see Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606, 611 (6th Cir.

1987) (holding that an agreement does "not qualify" for antitrust review unless the

parties are "separate enterprises for the purposes of section 1."). The Sixth Circuit

has steadfastly refused to entertain claims of intracorporate Section 1 violations:

noting the "substantial policy reasons for not adopting" any exceptions to that rule.

*Hibbett*, 918 F.2d at 613.

This rule renders irrelevant BCBS's central allegation: that "A4's collective

action with its Affiliated Anesthesiologists . . . is a cartel." CC ¶ 4, ECF 26, P.889.

Section 1 does not apply to such intracorporate action, even when it involves non-

compete agreements, because "employees . . .  are not acting as independent

economic forces with any reason to restrain trade." *Borg-Warner Protective Servs.*

*Corp. v. Guardsmark, Inc.*, 946 F. Supp. 495, 500 (E.D. Ky. 1996), *aff'd*, 156 F.3d

1228 (6th Cir. 1998) (endorsing the "reasoning" of the district court).

## B. Agreements Between a Hospital and Its Staff are Not Actionable.

Failing for the same reason are BCBS's attacks on the non-solicit agreements

between A4 and the hospitals where A4 is the exclusive provider of anesthesiology

services. CC ¶¶ 37-41, ECF 26, P.897-98. A4's alleged role qualifies it as "medical

staff," which "are not salaried employees of the hospital but are independent medical

practitioners." *Hibbett*, 918 F.2d at 614. "The intracorporate conspiracy doctrine

prevents a finding of conspiracy between a hospital and its medical staff." *Id.* This is because "the staff as an entity ha[s] no interest in competition with the hospital." *Weiss v. York Hosp.*, 745 F.2d 786, 817 (3d Cir. 1984). Here too, BCBS alleges that these hospitals have chosen not to provide anesthesiology services themselves but instead to outsource their anesthesiology needs to a single exclusive provider. CC ¶¶ 37-43, ECF 26, P.897-900; *cf. id.* ¶ 20, P.893 (explaining that other hospitals have chosen to employ anesthesiologists directly). Thus A4's competitors are not the hospitals but instead would be other provider groups capable of offering hospital-wide anesthesiology services. *See Weiss*, 745 F.2d at 816-17 (explaining that while "individual doctors in competition" might conspire, a "hospital" and its staff cannot).

Because BCBS's claims fail under the single-entity doctrine, its Counterclaim can be dismissed, without even considering the Counterclaim's other failings.

## II.     Neither Per Se nor Quick Look Analysis is Appropriate Here.

Even if BCBS had alleged actions by independent entities (it has not), BCBS has failed to state a claim for per se or quick look review. "To be per se illegal, a defendant's conduct has to be so obviously anticompetitive that it has no plausibly procompetitive features—a high hurdle for plaintiffs . . . ." *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 718 (6th Cir. 2019). *Atrium* refused to apply per se treatment for a non-compete agreement tied to the "purchase" of a hospital, because "this circuit, as well as the common law, have long recognized that

11

'[l]egitimate reasons exist to uphold noncompetition covenants.'"   *Id.* at 730-31 (quoting *Perceptron, Inc. v. Sensor Adaptive Machines, Inc.*, 221 F.3d 913, 919 (6th Cir. 2000)).

Here, BCBS alleges two sets of vertical relationships: service agreements between the hospitals and A4; and agreements between A4 and the doctors it recruits to provide anesthesiology services at those hospitals.   These relationships are vertical: an individual doctor cannot compete with A4 in offering hospital-wide services; and the hospitals at issue have chosen not to offer anesthesiology services themselves, thereby not competing with A4 either.   CC ¶¶ 10, 35-37, ECF 26, P.890, 897-98.   *Atrium* therefore demands that BCBS's per se claim be rejected.

The same result applies even if A4's relationships are deemed, contrary to BCBS's allegations, horizontal.   In *Ogden v. Little Caesar Enterprises, Inc.*, the court refused to apply per se analysis to a claim that fast food franchisees had agreed to implement non-compete provisions in their employee contracts, because non-compete and non-solicit agreements do not constitute "agreement[s] either to fix wages or to divide the labor market into any discernible exclusive territories . . . the only two narrow categories of agreements to which the Sixth Circuit has applied" per se review.   393 F. Supp. 3d 622, 632 (E.D. Mich. 2019); *see* Ex. A *Caudill v. Lancaster Bingo Co.*, 2005 WL 2738930, at *4 (S.D. Ohio Oct. 24, 2005) ("Courts have consistently held that non-competition agreements are not *per se* illegal. . . .").

Both per se and quick look review are inappropriate for another reason: the alleged agreements are ancillary to A4's provision of exclusive anesthesiology services. A restraint is ancillary if the pleadings indicate any "plausible way in which the challenged restraints contribute to the procompetitive efficiencies of" A4's agreements with doctors and hospitals. *Atrium*, 922 F.3d at 728. Because of the Sixth Circuit's "presumption against applying the per se rule," it is BCBS's burden to allege facts demonstrating that the restraints have no plausible relationship with A4's medical practice. *Id.* at 724; *see id.* at 726 (holding that "court must apply the Rule of Reason" if the restraint "arguably" had at some point some pro-competitive effect); Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1908(c) (4th ed.) (explaining that non-compete agreements that are part of larger transactions "should carry a presumption that they are ancillary to the main transaction and thus deserving of rule of reason treatment").

The Department of Justice has likewise confirmed that "a horizontal agreement ordinarily condemned as per se unlawful is '*exempt from the per se rule*' if it is ancillary to a separate, legitimate venture." Ex. M, Corrected Statement of the United States, *Stigar v. Dough, Inc.*, No. 2:18-cv-00244-SAB, at 8 (Mar. 8, 2019) (emphasis added) (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986) (Bork, J.)).

Here, BCBS's allegations demonstrate a plausible pro-competitive aspect:

multiple hospitals in Michigan rely on an "exclusive provider" model, where an outside group provides all the anesthesiology services required at the hospital.  CC ¶¶ 36-37, ECF 26, P.898.  Both Trinity and Beaumont are alleged to have *thousands* of beds for patients receiving anesthesiology care, *id.*, which is not even to mention the anesthesiology care required for outpatient procedures as well; therefore, the only plausible way for A4, or any anesthesiology group, to fulfill those hospitals' needs for an exclusive provider is to hire *and to retain* a sufficient number of anesthesiologists.  The non-compete and non-solicit provisions enable A4 to retain sufficient anesthesiologists to fulfill those hospitals exclusive provider needs. *Id.* Therefore, the agreements are ancillary and BCBS's per se claims must be rejected.

BCBS's quick look claims also fail because, as the DOJ confirmed, where an agreement is "ancillary, then, by definition, quick-look analysis is not appropriate." Ex. M at 22.  In *Ogden*, the court similarly held that "quick look" review is reserved for "near-miss *per se*" claims with "obvious[]" harm; it is not appropriate where, as here, "the agreements display . . . vertical . . . components."  393 F. Supp. 3d at 636.

## III.   BCBS Has Failed to Allege any Violation of the Rule of Reason.

BCBS devotes only three paragraphs to the rule of reason and fails to allege any plausible violation under that standard.  CC ¶¶ 61-63, ECF 26, P.904-905.

### A.   BCBS Has Failed to Allege Market Power.

"To state a claim under the rule of reason, a plaintiff must allege market

14

power in a relevant market." *Ogden*, 393 F. Supp. 3d at 631 (quoting *Deslandes v. McDonald's USA, LLC*, 2018 WL 3105955, at *8 (N.D. Ill. June 25, 2018)). Market power must be alleged even when there is "evidence of adverse effects on competition," because "[t]he possibly anticompetitive manifestations of vertical arrangements can occur only if there is market power." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018) (quoting Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 Antitrust L.J. 135, 160 (1984)). This element is particularly important here, as generally "covenants not to compete are lawful under the antitrust laws for the simple reason that the employment market is highly competitive." Areeda ¶ 2134.

BCBS alleges that the market for anesthesiology services spans Michigan, CC ¶ 63, ECF 26 at P.905; however, BCBS makes no allegation that the "A4 Cartel" possesses market power across the state and instead alleges that A4 practices in a small set of neighboring counties in southeastern Michigan. *Id.* ¶ 42, P.899. Its claim therefore must be dismissed.

## B. BCBS Has Failed to Allege that the Agreements Were Unreasonably Enforced.

Even if A4 had market power, "[t]he recognized benefits of reasonably enforced noncompetition covenants are by now beyond question." *Innovation Ventures, L.L.C. v. Custom Nutrition Lab'ys, L.L.C.*, 451 F. Supp. 3d 769, 791 (E.D. Mich. 2020) (Berg., J.) (quoting *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265

15

(7th Cir. 1981)).  BCBS, however, has not alleged that A4 has enforced the alleged agreements, let alone that such enforcement has caused any harm.  *See United States v. Empire Gas Corp.*, 537 F.2d 296, 308 (8th Cir. 1976) (rejecting claim that "3,000 contracts" with restrictive covenants restrained trade, where there was "no showing that any restraint" in itself "was unreasonable").

### C. BCBS Has Failed to Allege that the Agreements' Pro-Competitive Aspects Are Outweighed by Any Anti-Competitive Effects.

A rule of reason complaint must be dismissed when it fails to "show that any anti-competitive effects of the agreements are not negated by the pro-competitive effects." *Ogden*, 393 F. Supp. 3d at 637.  Here BCBS's own allegations demonstrate multiple pro-competitive effects; however, the Counterclaim addresses none of them.  First, as discussed *supra*, Part II, BCBS's allegations show that the alleged restraints are ancillary to A4's efforts to contract with sufficient anesthesiologists to provide turn-key anesthesiology solutions for multiple hospitals.

Second, physician groups, as a matter of law, have pro-competitive interests in using non-compete agreements to protect against loss of "goodwill," *i.e.*, the risk that a business relationship "will seek to follow a departing physician." *Radio One, Inc. v. Wooten*, 452 F. Supp. 2d 754, 758 (E.D. Mich. 2006) (quoting *St. Clair Med., P.C. v. Borgiel*, 715 N.W.2d 914, 920 (Mich. Ct. App. 2006)) (noting this interest exists even when the group does not impart "specialized skills" to its doctors).  BCBS alleges that A4's work depends on its relationships with hospitals, as well as

its relationships with surgeons and other physicians, who often make the final choice of anesthesiology provider.  CC ¶¶ 24, 36-37, ECF 26 at P.894, 898.  Further, A4's status as an exclusive-provider to Trinity and Beaumont means that the hospital-anesthesiologist relationship in each instance "was facilitated by [that] physician's association with" A4.  *Radio One, Inc.*, 452 F. Supp. at 754 (quotation omitted).  A4 thus has an interest in preventing its goodwill from being misappropriated.

Third, the SJMHS Order specifies numerous additional pro-competitive benefits arising from the very agreements BCBS is challenging.  The SJMHS Order states that Trinity is engaging in this "Exclusivity" arrangement because "of the substantial benefits which inure to SJMHS and its patients, such as:

(a) The promotion of consistency and high quality in providing [anesthesiology services];
(b) Improved administration and efficiency;
(c) Promotion of cost containment and economies of scale;
(d) Adequate physician staffing to ensure the continuous and timely provision of high quality [anesthesiology services];
(e) The ability of SJMHS to provide a more complete range of health care services to patients . . .
(g) Furtherance of SJMHS' commitment to teaching . . . ; and
(h) Efficiency and quality in SJMHS' administration of [anesthesia]."

Ex. H § 7(a)-(h).  Thus, the purported A4 Cartel is vital to "high quality" patient care, "cost containment," and expanding "health care services to patients."  *Id.* BCBS does not allege that these myriad benefits are outweighed by any alleged competitive harm.  To the contrary, it merely makes the conclusory legal assertion that A4 "does not . . . engage in any other conduct that could reasonably justify" the

alleged restraints.  CC ¶ 60, ECF 26, P. 904.  However, because the Counterclaim establishes that A4's work for hospitals is itself pro-competitive, BCBS's failure to address these facts strongly supports dismissal of its Counterclaim.

For example, BCBS never alleges that A4 could serve Trinity and Beaumont's needs *absent* the alleged restraints.  This omission is dispositive, because "the venture without the noncompetition clause is a more competitive alternative only if we can assume that two or more firms would have offered the product independently absent the venture."  Areeda ¶ 2134.  Accordingly, BCBS's claim must be dismissed.

### D. BCBS Fails to Allege any Plausible Harm to Market Competition.

#### 1. *BCBS Cannot Aggregate the Agreements.*

BCBS's claims fail for another independent reason: lack of alleged competitive harm.  *See Empire Gas*, 537 F.2d at 308 (rejecting challenge to non-competes for failure to show harm, even where the agreements were alleged to lack any justification).  BCBS asks the Court to analyze the agreements in the aggregate as if they all were part of single conspiracy, but "[t]here is no 'rim' conspiracy without alleged agreement among the parties at the rim."  *Atrium*, 922 F.3d at 732. Nor can BCBS aggregate the agreements into a "rimless wheel" conspiracy without an allegation that "each member" has "knowledge of the unlawful nature of the subject of the conspiracy."  *Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138, 146 (6th Cir. 1972).  There are no allegations that the hospitals

knew of the "A4 Cartel" or had reached any agreement with each other or with A4's doctors. And while BCBS vaguely asserts that A4's doctors "agreed . . . with one another to join A4's cartel," CC ¶ 65, ECF 26, P.905, "a conclusory allegation of agreement at some unidentified point does not supply facts" necessary to plead a conspiracy. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Accordingly, BCBS cannot aggregate the agreements when pleading harm and instead must, but does not, plausibly allege that each individual agreement caused competitive harm.

### 2. *The Agreements Do Not Restrain Competition in Michigan.*

BCBS rests its case on the conclusory assertion that A4's doctors and the hospitals would compete with A4 absent the restrictions; however, "[i]f, this was sufficient evidence of anticompetitive effect, then virtually all noncompetitive covenants . . . would violate § 1 even if reasonably enforced." *Lektro-Vend Corp.*, 660 F.2d at 269. BCBS never describes or quotes the alleged restraints in detail, despite concededly having access to the agreements at issue—BCBS attached the MSA to its motion to dismiss. *See* p.6, *supra.* BCBS's deliberate failure to provide, for any alleged agreement, "the terms of th[e] agreement, or its nature and extent, or when defendants entered into it," warrants dismissal on its own. Ex. C, *Murray v. Chrysler Grp., LLC*, 2013 WL 5340782, at *5 (E.D. Mich. Sept. 23, 2013).

Reviewing the alleged agreements themselves shows why BCBS declined to attach them: they do not restrain competition in Michigan. A4's non-compete

agreements with its member-employees, for example, restrict A4's doctors for just one year from practicing within "15 miles of any health care facility where Physician provided services during the term of his or employment." Ex. I § 7.2(a). This narrow geographic restriction *is much smaller* than A4's alleged practice area in southeastern Michigan, let alone the entire state; therefore, it does not prevent the doctors from practicing in Michigan. CC ¶ 42, ECF 26, P.899. For example, the agreements do not prevent A4 doctors at Trinity from leaving to work for Beaumont or vice-versa. Nor do they prevent A4's doctors from leaving to work anywhere else, as the 15-mile restriction area is miniscule compared to the statewide geographic market alleged by BCBS.

"Case law is clear that th[ese] time and geographical limitations are reasonable." *Kelly Servs. v. Eidnes*, 530 F. Supp. 2d 940, 950 (E.D. Mich. 2008) (one year and nine-county area); *Kelly Servs., Inc. v. Noretto*, 495 F. Supp. 2d 645, 657 (E.D. Mich. 2007) (restriction limited to one-year and "the specific geographic are" where employee "worked" is reasonable); *Innovation Ventures,* 415 F. Supp. 3d at 788 (collecting cases). (While BCBS does not challenge any agreements A4 entered into with non-"member[]" employees, CC ¶ 35, ECF 26, P.897, those contain similar one-year geographic restrictions, thereby also precluding any claim by BCBS. *See, e.g.*, Ex. D § XIII(A); Ex. N § XIII(A).)

A4's alleged hospital agreements are even less restrictive. The SJMHS Order

20

provides that "[d]uring the term of this Order and/or the MSA," including after early-termination by Trinity, SJMHS shall not "solicit" or "hire" any A4 "employee or independent contractor," without A4's "advance written consent." Ex. H § 13. This term likewise serves to prevent misappropriation of A4's goodwill. The provision also memorializes what would otherwise be implicit in the covenant of good faith and fair dealing: SJMHS cannot undercut A4's ability to provide exclusive services under the agreement by hiring away its doctors or otherwise inducing them to leave A4. The clause does not prevent A4 doctors from working for any competitors or going to other hospitals in Michigan, including other *Trinity* hospitals.

As to the MHSM Order and Beaumont Agreement, these, merely provided for a temporary non-solicitation period covering A4's current, but not former, employees. Ex. E § 11.3(b); Ex. G § 10.4. Thus, contrary to BCBS's conclusory legal assertions, if a doctor leaves A4, nothing in these agreements bars those hospitals from "directly employing" that doctor. CC ¶ 43, ECF 26, P.900. Here again, the restrictions are narrowly tailored to protect A4's goodwill and facilitate the exclusivity arrangements. *See* Ex. E § 11.4 (noting that the non-solicit provisions are included "in light of . . . the exclusive relationship" between the parties).

BCBS's conclusory assertions of competitive harm are undercut further by the contractual exceptions to the alleged restraints. For example, the MSA provides that upon termination of (i) any hospital order, or (ii) any A4 doctor providing services

at Trinity facilities, A4 "will release each [doctor] from any restrictive covenant without penalty provided that a mutually acceptable fee for such release based on the investment by Group in recruiting and training the Provider may be specified in the Order." Ex. F § XII(I); *see also* Ex. O §§ I, IV (creating exception in case A4 leaves BCBS's network and waiving non-competes and non-solicits as to MHSM).

In sum, the alleged agreements *do not prevent any doctor* from practicing medicine in the alleged relevant market, Michigan; thus BCBS has failed to show any "injury to competition in the [statewide] market." *Lifeline Ltd. No. II v. Connecticut Gen. Life Ins. Co.*, 821 F. Supp. 1201, 1210 (E.D. Mich.), *modified*, 821 F. Supp. 1213 (E.D. Mich. 1993). BCBS's contorted theory of harm is instead based on a single BCBS employee's purported belief that BCBS would be unable to find sufficient anesthesiologists willing to join BCBS's network in a specific part of Michigan, if A4 went out of network. CC ¶ 55, ECF 25, P. 903. But having alleged a statewide market, BCBS cannot show harm by alleging BCBS might have to reach outside a particular Michigan locale to find anesthesiologists.

More fundamentally, BCBS has failed to plead how the situation would be any different *absent* the alleged restraints. A4 is still alleged to be the exclusive provider at the hospitals where it practices, thus insulating it from competition at those facilities, regardless of the non-competes and non-solicits. BCBS *does not challenge* those exclusive-provider arrangements, nor does it allege that A4 would

have lost its exclusive provider status but for the competitive restraints.

## IV.   BCBS's Has Failed to Allege that it Has Suffered Any Injury—Let Alone Antitrust Injury.

Even if BCBS had sufficiently alleged harm to competition, BCBS lacks standing because it has failed to allege that it suffered any injury. To the contrary, BCBS alleges that A4, after initially suggesting it would leave BCBS's network, subsequently opted to stay in BCBS's network and to accept BCBS's uniform fee schedule. CC ¶ 51, ECF 26, P.902. "Nevertheless," BCBS raised its fees based on the perceived "risk that A4 could control the supply of anesthesiologists." *Id.* "Where a purchaser does not take advantage of a lower price or discount which is functionally available" to it, the alleged restraint "is not the proximate cause of the injury." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 866 (6th Cir. 2007). Because BCBS made the "voluntary choice" to raise its rate, it cannot claim any injury. *Id.* at 868; *see Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612 (6th Cir. 2004) (noting that private antitrust plaintiffs must show "proximate cause").

Notably, BCBS does not allege any threat by A4 *after* A4 agreed to remain in BCBS's network. Instead, BCBS vaguely asserts it was motivated by an "implicit threat." CC ¶ 55, ECF 26 P.903. However, such "conclusory assertions" of a "threat" are not sufficient and must instead be supported by "factual allegations," which BCBS never supplies. *Compass Const. v. Indiana/Kentucky/Ohio Reg'l Council of Carpenters of United Bhd. of Carpenters & Joiners of Am.*, 890 F. Supp.

23

2d 836, 842 (S.D. Ohio 2012); *see* Ex. B, *Saltzman v. I.C. Sys., Inc.*, 2009 WL 3190359, at *4 (E.D. Mich. Sept. 30, 2009) (holding that conclusory allegation of "threat" was insufficient because "it would be unfair to insist that Defendant attempt to rebut such nebulous claims"); *see also* Ex. J, *Douglas v. Daviess Co. Fiscal Ct.*, 2018 WL 1863656, at *2 (W.D. Ky. Apr. 18, 2018).

BCBS also lacks any injury, or standing, because the amended SJMHS Order contains a specific carve-out for BCBS.   In September 2019, A4 and Trinity amended the SJMHS Order to state that if A4 left BCBS's network, the applicable non-compete and non-solicit restrictions would be terminated.  Ex. O § I.  BCBS concedes that its only concern with the purported cartel is if A4 leaves BCBS's network, CC ¶ 51, ECF 26, P.902, and this agreement insulates BCBS from that risk.

Finally, BCBS also lacks standing to challenge the MHSM and Beaumont agreements, because their non-solicit provisions in no way restrict anesthesiologist employment.  If A4 doctors leave A4 and wish to work at those hospitals, the non-solicit provisions do not prevent those hospitals from hiring them.  *See* Part III.D.2, *supra*.   Even if BCBS had alleged that these provisions somehow restrained compensation in the "market for hiring of" anesthesiologists (it has not), that is not a market in which BCBS participates.  *Ogden*, 393 F. Supp. 3d at 633.

## V.    Count II Is Preempted by Contract and Michigan Law.

BCBS seeks declaratory and injunctive relief in Count II, however, BCBS has

24

failed to establish any entitlement to such relief.  BCBS claims that the agreements

put it at risk of harm because (1) A4 *might* threaten to leave BCBS's network, and

then (2) BCBS *might* have to raise its rates to prevent A4 from leaving, because (3)

if A4 were to leave and treat BCBS's patients out-of-network, they *might* be

"expos[ed] . . . to unpredictable and potentially ruinous balance billing," when those

patients "unknowingly" receive services from A4.  CC ¶¶ 24, 52, ECF 26, P.895,

903.  This theory is implausible on its face, because BCBS never alleges that A4

does, or threatened to, balance bill patients.

Count II also fails for other independent reasons.  First, the terms for A4's

service at Beaumont and MHSM have already expired, thus eliminating any

inference that A4 could cause disruption at those hospitals by going out of network.

*See* pp.7-8, *supra*.  Second, the amended SJMHS Order provides a special carve out

preventing A4 from leaving BCBS's network, *see* Part IV, *supra*.   Third, in

November 2020 a statewide ban on surprise billing went into effect.    MCL

§§ 333.24507-08.  Thus, even if A4 went out of network again, there would be no

risk of "unpredictable and potentially ruinous balance billing," eliminating any

possible claim of competitive harm.  CC ¶ 52, ECF 26, P.903.

## CONCLUSION

BCBS's Counterclaim should be dismissed with prejudice.

Date: June 29, 2021                    Respectfully submitted,

*/s/ Richard A. Feinstein*

BOIES SCHILLER FLEXNER LLP
Jonathan Schiller, Esq. (*admission forthcoming*)
David Barillari, Esq. (*admission forthcoming*)
55 Hudson Yards
New York, NY 10001
(212) 446-2300
jschiller@bsfllp.com
dbarillari@bsfllp.com

Richard A. Feinstein, Esq. (*admitted in E.D. Mich.* D.C. Bar 324848)
Andrew D. Lowdon, Esq. (*admission forthcoming*)
1401 New York Ave., NW
Washington, D.C. 20005
(202) 895-5243
rfeinstein@bsfllp.com
alowdon@bsfllp.com

RILEY SAFER HOLMES & CANCILA LLP
Gregory L. Curtner (P12414)
Matthew Kennison (P79653)
121 W. Washington Street, Suite 402
Ann Arbor, MI 48104
(734) 773-4900
gcurtner@rshc-law.com
mkennison@rshc-law.com

*Counsel for Anesthesia Associates of Ann Arbor, PLLC*

# CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on June 29, 2021, he caused a

true and correct copy of the foregoing document to be served using the Court's

electronic filing system, which will send electronic notification of such filing to all

parties that have appeared in this action.

*Richard A. Feinstein*
Richard A. Feinstein
