UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ANESTHESIA ASSOCIATES OF ANN ARBOR, PLLC**, <br><br> Plaintiff, <br><br> vs. <br><br> **BLUE CROSS BLUE SHIELD OF MICHIGAN**, <br><br> Defendant. | **2:20-CV-12916-TGB-MKM** <br><br><br> **ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIM** |

In this case, Michigan's largest physician-owned anesthesiology practice group, Anesthesia Associates of Ann Arbor (or "A4"), squares off against the state's dominant health insurer, Blue Cross Blue Shield of Michigan ("BCBS-MI") in an antitrust lawsuit.   Plaintiff A4 brought claims under the Sherman Act, Clayton Act, and state law alleging, among other things, that Defendant BCBS-MI used its dominant position as the buyer of healthcare services to pay A4's anesthesiologists artificially depressed reimbursement rates. On September 14, 2021, this Court dismissed Plaintiff's Complaint without prejudice for failure to allege a cognizable antitrust injury. ECF No. 41. In response to Plaintiff's action, BCBS-MI has filed an answer and counterclaim against A4,

1

alleging its own antitrust claims: that A4 functions as a cartel through the use of exclusive agreements with its affiliated anesthesiologists and hospitals where they work, in violation of the Sherman Act. For the following reasons, the Court dismisses BCBS-MI's Complaint with prejudice for failure to state a cognizable antirust injury.

## I.   INTRODUCTION

The Court provided a detailed summary of the facts underlying A4's allegations against BCBS-MI in its Order of September 14, 2021. (ECF No. 41). Nevertheless, to provide a full context for understanding Defendant BCBS-MI's counterclaims, the key facts will be recounted here, as alleged both in Defendant's Counter Complaint (ECF No. 26), and Plaintiff's Complaint (ECF No. 1).

The Plaintiff, A4, is a healthcare provider group and the Defendant, BCBS-MI, is a health insurer.[1] As Counter-Plaintiff, BCBS-MI brings claims against A4 to counter the claims A4 has brought against it. BCBS-MI is a not-for-profit mutual insurance company. ECF No. 26, PageID.890. BCBS-MI's principal place of business is in Detroit, Michigan. BCBS-MI has served the Michigan healthcare industry for 75 years, including currently providing network services to 152 hospitals and more than 33,000 doctors in Michigan alone. Last year, BCBS-MI

---

[1] Two other hospital systems—Trinity Health and Beaumont Health— are not parties to this suit but play roles in the events giving rise to this action.

and its subsidiaries paid $21.2 billion in claims to doctors, hospitals, and other health care providers. *Id.* Controlling at least 67% of the market in the state, Defendant is the largest commercial health insurer in Michigan. ECF No. 1, PageID.7.

Counter-Defendant A4 is a physician-owned anesthesiology practice and professional limited liability corporation based in Ann Arbor, Michigan. ECF No. 26, PageID.890; ECF No. 1, PageID.21. A4 represents anesthesiologists, certified nurse practitioners, certified registered nurse anesthetists, and physician assistants who provide anesthesiology services. *Id.* In May of 2018, private equity firm Siromed Physician Services, Inc. ("Siromed") purchased A4. *Id.*

A4 is one of the largest anesthesiology professional provider groups in Michigan. During the relevant time period, BCBS-MI estimates A4 was affiliated with approximately 150 anesthesiologists who provided services in Michigan. As a provider, A4 acts as a contracting agent for its Affiliated Anesthesiologists, also called its members. By contractual agreement, its individual members authorize A4 to represent their interests and sign BCBS-MI network agreements on their behalf. In this role, A4 represents the Affiliated Anesthesiologists in discussions with BCBS-MI about the amount that A4 Affiliated Anesthesiologists will be paid for their services. *Id.* at PageID.897. A4 also bargains with hospitals on behalf of its members for access to hospital facilities. In 2019, A4 was the exclusive provider of anesthesiology services at six Trinity Health

3

Corporation ("Trinity") hospitals, with 1,897 licensed beds for patients, and four Beaumont Health ("Beaumont") hospitals, providing 1,104 licensed beds for patients. *Id*. at PageID.898.

### a. The Core Function of A4's Alleged "Cartel"

Anesthesiology groups like A4 receive compensation from three sources: hospital stipends, insurance reimbursement, and the patient's share of that reimbursement. ECF No.1, PageID.40, 43. To agree on pricing with in-network providers, insurers can either engage in individualized negotiations with health care providers or publish a list of prices they will pay for each procedure (commonly called a "fee schedule"). ECF No. 26, PageID.896. BCBS-MI engages in individualized negotiations with hospitals, but uses a fee schedule for professional providers, including those who provide anesthesiology services, such as physicians and nurse practitioners. Because BCBS-MI maintains a statewide fee schedule for each professional provider type, it alleges that if competition among professional providers of a particular type is materially reduced in any part of Michigan, that lack of competition can eventually cause BCBS-MI to increase its fee schedule across the entire state. *Id*. at PageID.898.

BCBS-MI alleges that the "core function of A4 is to join together a large group of otherwise independent economic actors and use their collective bargaining power to achieve prices for anesthesiology services from insurers, including [BCBS-MI], that are above the level they

otherwise would have been." *Id.* at PageID.899. According to this allegation, A4 is essentially a shell organization created to shield itself from competition and promote higher fees for its members. It does so by requiring its members to sign non-compete agreements that preclude nearly 150 Affiliated Anesthesiologists from joining one of A4's competitors, or from competing independently, for one-year within 15 miles of any health care facility where the anesthesiologist provided services during their employment.[2] These agreements also prevent its Affiliated Anesthesiologists from providing services for a lower price. The counterclaim alleges, upon information and belief, that these non-competes have the intended effect of controlling a material number of the 300 anesthesiologists that work in Macomb County, Oakland County, Livingston County, Lapeer County, St. Clair County, and Wayne County and the approximately 130 anesthesiologists in Ann Arbor. *Id.* at PageID.899.

A4 also enters into "no-poach agreements" with the hospitals where A4 works that forbid the hospitals from directly hiring A4's Affiliated Anesthesiologists as hospital employees. *Id.* at PageID.889. Under these agreements, the hospital is forbidden from directly employing A4's Affiliated Anesthesiologists, and must instead contract with them only through A4. Once again, the counterclaim alleges, the purpose of these

---

[2] *See* ECF No. 33-10, § 7.2(a).

no-poach provisions is to prevent the development of lower priced anesthesiology competitors that could threaten A4's ability to extract high prices from commercial insurers. *Id.* at PageID.900.

### b. Commercial Insurers and Patients Covered by Commercial Health Insurance

Commercial insurers like BCBS-MI provide their customers with a method of financing health care transactions, among other services, by establishing networks of health care providers who are willing to provide health care services to the insurer's customers, almost always at agreed upon prices that are lower than the customers could achieve on their own. *Id.* at PageID.894. In either a fully-insured or self-insured arrangement, customers will generally choose to visit in-network providers where they pay lower out-of-pocket costs, if any, in contrast to the increased out-of-pocket costs that they may have to pay if they visit a provider that is not in the insurer's network. *Id.*

Where anesthesiology services are required, the supervising surgeon physician generally selects the anesthesiologists. Because anesthesiologists can be independent providers, on occasion patients have been charged out-of-pocket costs for unknowingly receiving services from an out-of-network anesthesiologist that may charge more than the

6

benefit. When this occurs, it is known as "balanced billing", or "surprise billing."[3] *Id.* at PageID.895.

BCBS-MI alleges that private equity firms like A4 rely on leveraging the potential out-of-network status of anesthesiologists to pressure insurers to pay higher prices without risking a loss in volume. The basic steps of this alleged strategy start with anesthesiologists working at in-network hospitals. If commercial insurers offer in-network prices below what the anesthesiologists want, BCBS-MI alleges that these anesthesiologists refuse to contract with insurers and exit the network. However, the theory goes, the anesthesiologists still treat and bill patients charging out-of-network prices, resulting in balanced or surprised billing. Faced with the risk that its insureds could be balanced billed, BCBS-MI claims that insurers would then feel additional pressure to grant price increases demanded by anesthesiology providers that they would not otherwise obtain.

### c. The Relationship between BCBS-MI and A4

In April 2019, A4 attempted to negotiate a higher reimbursement rate with BCBS-MI. ECF No. 1, PageID.7-8. A4 notified BCBS-MI that "it could not continue to accept BCBS-MI's artificially low rate" and that it sought to "bring BCBS-MI's conversion factor more in line with market realities." *Id.* When BCBS-MI refused to raise its reimbursement rate,

---

[3] Effective November 2020, balanced billing or surprise billing is banned in the state of Michigan. *See* MCL § 333.24507.

7

and declined to negotiate the matter, A4 announced that it would be leaving BCBS-MI's network. *Id*. However, A4 informed BCBS-MI that even though it was going out of network, it would continue to provide the same medical care and would *not* charge patients any more than when it was in-network. *Id*. Instead, any conflict over rates would be resolved between A4 and BCBS-MI. *Id*.

On April 22, 2019, Rob Casalou, who serves as both the CEO of Trinity's Michigan operations and as a board member on BCBS-MI's board of directors, reacted to A4's announcement in an email to BCBS-MI. *Id*. at PageID.41-42. Casalou conveyed to A4 that BCBS-MI was concerned about the impact of A4's decision to go out of network. He conveyed that BCBS-MI was considering a new process that would require anesthesiology services with its insureds to have preauthorization from surgeons. Casalou also stated that Defendant would look to "steer work away from facilities with A4." *Id*.

A few weeks later, A4 reiterated its intent to leave Defendant's network by July 15, 2019. *Id*. at PageID.42. In its statement, A4 stressed that it could not continue to operate as a business with the same reimbursement rate. This announcement caused local hospitals—such as Trinity and Beaumont—to terminate their relationship with A4, concerned that that they could not afford to lose BCBS-MI's business. *Id*. at PageID.44.

8

Soon after, Trinity filed a lawsuit against A4, alleging that A4's conduct would "seriously disrupt the provision of anesthesia care . . . broadly interfere with operations at the hospitals, deprive patients of their chosen hospitals and doctors, and harm health care competition and the provision of hospital services in these markets."[4]  However, Trinity voluntarily dismissed the case a few days later, presumably when A4 decided to reverse its decision to withdraw from BCBS-MI and extended a more favorable amended agreement with Trinity that gave up its non-solicit and non-compete rights in the event A4 left BCBS-MI's network.[5]

Although A4 ultimately withdrew its intent to leave the BCBS-MI network, BCBS-MI, at the recommendation of former chief medical officer Dr. Simmer, decided to raise its fee schedule for the years 2019 and 2020.  BCBS-MI alleges that this decision recognized the impact of A4's bargaining power and the "genuine threat A4's Cartel posed to disrupt the continuity of anesthesiology services to BCBSM's insureds." ECF No. 26, PageID.901.

---

[4] Complaint, *Trinity Health Corp. v. Anesthesia Assocs. of Ann Arbor, PLLC*, No. 2:19-CV-12145-LVP-RSW, ECF No. 1, PageID.2, ¶ 2 (E.D. Mich. July 23, 2019).

[5] In September 2019, A4 and Trinity amended the Saint Joseph Mercy Health System Order (SJMHS Order) to state that if A4 left BCBS-MI's network, the applicable non-compete and non-solicit restrictions would be terminated.  ECF No. 33, PageID.1069; ECF No. 33-16, § I.

### d. Allegations in the Counter-Complaint

BCBS-MI files this Counter-Complaint alleging that A4's collective action with its Affiliated Anesthesiologists and the accompanying non-compete and no-poach agreements with hospitals, operates as an unlawful cartel. *Id*. at PageID.889. A cartel is a combination of producers or sellers that join together to control a product's production or price. BCBS-MI alleges A4 seeks to increase the prices its providers receive for anesthesiology services by combining approximately 150 anesthesiologists, who would ordinarily compete against one another, to lock up the market and bargain together for higher prices. ECF No. 26, PageID.888, 897, 899.

BCBS-MI states that A4 has a cartel with physicians and hospitals that prevents 1) hospitals from hiring their own independent anesthesiologists because most are affiliated with A4 and would not be allowed to work at the hospitals if they terminated their contract with A4, and 2) physicians from working at the hospital independently because of the non-compete agreements. As a result, BCBS-MI claims it cannot negotiate more reasonable rates but is limited to these fee schedules. Defendant alleges that were it not for A4's cartel, it would pay lower rates. Moreover, insurers feel additional pressure to give price increases that anesthesiology providers would not otherwise obtain for fear of risking the possibility its insureds will be balanced or surprise billed. *Id*. at PageID.895.

## II.   LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal of a lawsuit where the defendant establishes the plaintiff's "failure to state a claim upon which relief can be granted." *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Consideration of a Rule 12(b)(6) motion is confined to the pleadings. *Id.* But courts may also look to "exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss" without altering this standard. *Rondigo, LLC v. Twp. Of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011). In evaluating the motion, courts "must construe the complaint, accept all well-pled factual allegations as true and determine whether the plaintiff undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)).

Though this standard is liberal, it requires a plaintiff to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" in support of her grounds for entitlement to relief. *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under *Ashcroft v. Iqbal*, the plaintiff must also plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the

11

misconduct alleged." 556 U.S. 662, 678 (2009) (citation omitted). A plaintiff falls short if she pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." *Albrecht*, 617 F.3d at 893 (quoting *Iqbal*, 556 U.S. at 678-679).

Moreover, in the context of an antitrust suit, "antitrust standing and Article III standing are not one and the same, and we not only may— but we must—reject claims under Rule 12(b)(6) when antitrust standing is missing." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007). An antitrust plaintiff "must do more than make allegations of consequential harm resulting from a violation of the antitrust laws." *Id.* (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983) (quotations omitted)). Even though a complaint may allege that the defendant had an intent to harm the plaintiff, district courts must still consider other factors, including:

(1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused;
(2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market;
(3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative;
(4) the potential for duplicative recovery or complex apportionment of damages; and
(5) the existence of more direct victims of the alleged antitrust violation.

*Indeck Energy Servs., Inc. v. Consumers Energy Co.,* 250 F.3d 972, 976 (6th Cir. 2000) (quoting *Southaven Land Co., Inc. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1085 (6th Cir.1983)). All five factors must be balanced, however, with no one factor being determinative. *Id*; *See Peck v. General Motors Corp.*, 894 F.2d 844, 846 (6th Cir.1990). Furthermore, as noted by the Sixth Circuit in *Valley Products*, "[t]he Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Id.* (quoting *Valley Prods. Co., Inc. v. Landmark, A Div. of Hospitality Franchise Sys., Inc.,* 128 F.3d 398, 403 (6th Cir.1997)).

In short, antitrust standing is a "threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement," courts must dismiss it as a matter of law. *NicSand*, 507 F.3d at 450. "Lest the antitrust laws become a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant them to be." *Id*. Antitrust standing "ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield. Co. v. USA Petroleum Co.,* 495 U.S. 328, 344 (1990) (emphasis in original).

# III.   DISCUSSION

## A. Antitrust Standing

BCBS-MI's counterclaim alleges A4 operates its business as a cartel, violating § 1 of the Sherman Act, 15 U.S.C. § 1. Generally, to state such a claim BCBSM must allege facts that, taken as true, show that A4 (1) entered a combination or conspiracy, (2) that harmed competition, and (3) that BCBS-MI's injury flowed from this anticompetitive harm. *In re S.E. Milk Antitrust Litig.*, 739 F.3d 262, 269-70 (6th Cir. 2014). Although A4 raises numerous arguments as to why the Complaint should be dismissed pursuant to Rule 12(b)(6), the Court must first focus on the pleading-stage threshold question of antitrust standing. If standing is lacking, the other arguments raised by A4 need not be addressed.

Of the various requirements for establishing antitrust standing, the two factors that concern us here are antitrust injury and causation. Antitrust injury is a "necessary, but not always sufficient," condition of antitrust standing. *NicSand, Inc.,* 507 F.3d at 450 (quoting *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 110 n. 5 (1986)). An antitrust claimant must show more than merely an "injury causally linked" to a competitive practice; it "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 701 (1977) (emphasis added)). "At a minimum, this requirement means that

14

[BCBS-MI] may not use the antitrust laws to sue [A4] merely for vigorous or intensified competition." *Id*. at 451. Additionally, BCBS-MI must at least prove that A4 has "engaged in some form of predatory pricing or illegal tying" *id*. at 451.

Second, the plaintiff must show that the antitrust injury was *caused* by the anticompetitive conduct of the defendant. "[T]o recover damages, an antitrust plaintiff must show [causation, or] (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions." *Conwood Co., L.P. v. U.S. Tobacco Co.,* 290 F.3d 768, 788 (6th Cir. 2002) (internal quotations and citations omitted). BCBS-MI "bears the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence of damages or that the violation was the proximate cause of the damage." *J.B.D.L. Corp. v. Wyeth-Ayerst Lab'ys, Inc.,* 485 F.3d 880, 887 (6th Cir. 2007) (citing *Conwood Co.,* 290 at 788 (6th Cir.2002)). A4's "actions need not be the sole proximate cause of any alleged injuries, but 'must be proved as a matter of fact and with a fair degree of certainty.'" *Id*. (quoting *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.,* 243 F.3d 980, 990 (6th Cir.2001)).

BCBS-MI alleges "A4's Cartel"—the collective action of Affiliated Anesthesiologists and the accompanying non-compete and no-poach agreements—caused BCBS-MI to overpay millions of dollars for

anesthesiology services. Through these agreements, Defendant alleges that A4's Cartel restrains competition amongst independent and hospital-employed anesthesiologists, resulting in insurers paying higher fees than they otherwise would have. ECF No. 36, PageID.1330-31.

In response, A4 argues that BCBS-MI cannot plausibly plead it has suffered an antitrust injury because BCBS-MI voluntarily raised its reimbursement fees *after* A4 revoked its termination notice and decided to remain within BCBS-MI's network.

In the particular circumstances of the health insurance market, the roles insurers play on behalf of patients "are *like* those of a buyer." *Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Michigan,* 2021 WL 4169711 at *8 (E.D. Mich. Sept. 14, 2021) ("*A4 v. BCBS*") (quoting *Kartell v. Blue Shield of Massachusetts, Inc.,* 749 F.2d 922, 926 (1st Cir. 1984) (italics in original). Although BCBS-MI does not allege this in its Counter-Complaint, it did argue in its Motion to Dismiss A4's Complaint (ECF No. 13) that lower payments for anesthesiology services lead to "lower prices for customers and patients (in the form of lower provider payments for self-insured customers and lower premiums)." *Id.* at PageID.256.[6] Thus, in liberally construing BCBS-MI's

---

[6] In its Complaint, A4 disputes that BCBS-MI is acting as a buyer in the healthcare market, or in the best interest of its insureds, because despite paying anesthesiologists less, BCBS-MI's low reimbursement rates have *not* resulted in lower premiums for consumers. ECF No. 1, PageID.17.

pleadings, on its face, BCBS-MI has established that it suffered an injury. *See also PLLC,* 2021 WL 4169711 at *7 ("Antitrust law in the healthcare setting focuses on protecting patients from prices that are too high."). But this is not enough. BCBS-MI must plead plausible facts that indicate the alleged injury is the type of harm antitrust laws are meant to protect against, and that A4's conduct is the type of misconduct that naturally would result in the alleged injury.

## A. The Nature of the Injury

BCBS-MI cites price increases in reimbursement rates for BCBS-MI and other insurers as evidence that it has experienced injury flowing from the alleged A4 Cartel. According to BCBS-MI, but for A4's Cartel and its threat of leaving the BCBS-MI network, BCBS-MI would not have increased payments to its statewide fee schedule to the extent that it did. BCBS-MI also claims it was forced to increase its prices for the sake of protecting its insureds from surprise billing that would occur should A4 leave its network.

Indeed, as BCBS-MI notes, "[r]educed competition and inflated prices caused by a conspiracy are textbook competitive harms." ECF No. 36, PageID.1331 (citing *RealComp II, Ltd. v. FTC*, 635 F.3d 815, 831-32 (6th Cir. 2010) (finding actual adverse effects on competition where the agreements prevented lower-priced competitors from developing); *In re*

---

However, the Court must review the facts in the light most favorable to BCBS-MI, notwithstanding this factual dispute.

*Cardizem CD Antitrust Litig.*, 332 F.3d 896, 911 (6th Cir. 2003) ("paying higher prices for a product due to a lack of competition in the market" is an antitrust injury); *see also S.E. Milk*, 739 F.3d at 286 (increased prices resulting from a conspiracy "is precisely the kind of injury that the Sherman Act was designed to prevent").

As the case law suggests, if it were simply the case that BCBS-MI was forced to increase its fees, in the face of A4's threat to withdraw from the network, BCBS-MI might be able to prove a textbook antitrust injury. But what happened here, A4 asserts, is that BCBS-MI raised its fee schedule *after* A4 expressed its intent to remain within the network. Therefore, BCBS-MI's decision to raise its rate was "voluntary," precluding this Court from finding that BCBS-MI suffered an anticompetitive harm flowing from A4's conduct. ECF No. 33, PageID.1068. (quoting *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 868 (6th Cir. 2007); *see Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612 (6th Cir. 2004) (noting that private antitrust plaintiffs must show "proximate cause")).

**B. Proximate Causation**

Although BCBS-MI's theory of an antitrust injury arising from it having to pay higher fees sounds somewhat convincing, because BCBS-MI increased its reimbursement rates *after* A4 expressly revoked its intent to withdraw from the BCBS-MI network, the Court is presented with the issue of causation. In other words, the Court must determine

18

whether the allegations are sufficient to show that an injury still flows from A4's allegedly unlawful agreements even if A4 ceased its threat to leave the network. More specifically, the Court must determine whether the mere existence of A4's Cartel alone (and the *possibility* that A4 could again threaten to leave its network) is enough to cause BCBS-MI to believe it has no other choice but to pay higher rates than it otherwise would have.

A4 cites to *Smith Wholesale Co.*, as an analogous case showing how BCBS-MI's choice to raise its fee schedule was voluntary, and thus no injury flowed from its conduct. In *Smith Wholesale Co.*, full-service wholesalers who were also direct distributors for defendant tobacco company brought action against the tobacco company alleging secondary-line price discrimination in violation of the Robinson–Patman Act. The Robinson–Patman Act makes it unlawful for a seller to discriminate in price between purchasers of the same or similar goods actually sold, whether to the ultimate purchaser or for resale, if the effect of such price discrimination may be to lessen competition substantially in a line of commerce or with the competitors of the seller or its customers. Robinson–Patman Price Discrimination Act, § 1(a), 15 U.S.C.A. § 13(a); *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 864 (6th Cir. 2007). Under the Robinson–Patman Act, inference of competitive injury arises from evidence that some purchasers had to pay their supplier substantially more for their goods than their competitors had to

19

pay. *Id*. The Sixth Circuit held that since defendant's best price was functionally available to each wholesaler, the company's market-share-based incentive program was lawful:

> Where a purchaser does not take advantage of a lower price or discount which is functionally available on an equal basis, it has been held that either no price discrimination has occurred, or that the discrimination is not the proximate cause of the injury.

*Smith Wholesale Co. v. R.J. Reynolds Tobacco Co*., 477 F.3d 854, 866 (6th Cir. 2007) (quoting *Shreve Equipment, Inc. v. Clay Equip. Corp.,* 650 F.2d 101, 105 (6th Cir.1981)); *See also Am. Tara Corp. v. Int'l Paper Co.,* 1981 WL 375752 at *2 (N.D. Ill. July 30, 1981) ("If the lower prices afforded its competitor were equally available to the plaintiff, any discrimination and competitive advantage suffered by the plaintiff is attributed not to the defendant's program but to the plaintiff's failure to take advantage of its opportunity to receive those prices.").

While precedent does not hold that the "functionally available" doctrine applies in the context of the Sherman Act, its analysis of competitive injury is helpful in this case. As in *Smith Wholesale,* one could argue that here, A4 and BCBS-MI engage in purchasing price negotiations for how much anesthesiologists should receive for their services and that in 2019, BCBS-MI maintained the best functionally available price, or reimbursement rate, prior to its fee schedule increase. In fact, in its Complaint Plaintiff alleges these rates were so low that

highly qualified doctors were leaving Michigan to practice in neighboring Toledo, Ohio. ECF No. 1, PageID.17. And although A4 did not affirmatively extend BCBS-MI an offer to negotiate a discounted rate, by withdrawing its termination notice, A4 did provide BCBS-MI with the option to maintain its original lower reimbursement rate, or the best functionally available price. Notably, BCBS-MI does not contest the appropriateness of its original reimbursement rate, but merely challenges the subsequent increases it has made since then. After A4 had agreed to remain in-network, BCBS-MI's preferred lower reimbursement rate, what it considered the best rate, *was functionally available* to BCBS-MI.

Therefore, the Court must determine first, whether it can be reasonably inferred based upon the facts alleged in BCBS-MI's counter-complaint that A4's initial threat to leave the network alone was "a substantial and foreseeable cause" of BCBS-MI's choice to raise its prices; second, if the connection between the raising of its prices and A4's alleged implicit threat to continue disrupting its services is "logical and not speculative," despite BCBS-MI's ability to maintain its original fee schedule. *Trollinger*, 370 F.3d at 615.

In *J.B.D.L v. Wyeth-Ayerst*, the Sixth Circuit analyzed the challenges of demonstrating class-wide causation in the context of a Sherman Act claim. Plaintiffs there bore the burden of demonstrating that defendant's alleged injurious conduct "was directly related to an

increase in the price" of the product plaintiffs purchased. 485 F.3d at 888. The court analyzed an expert report arguing, based on "'basic' economic principles," that defendant achieved larger price increases than it would have absent the offensive conduct. *Id.* at 889-90. Ultimately, the court granted defendant's motion for summary judgment, finding that the report was defective because it did not "account for the numerous alternative explanations" for the demonstrated pricing data. *Id.* at 890.

In this case, despite BCBS-MI's allegation that but-for the existence of A4's Cartel and its possible threat of withdrawal, BCBS-MI would not have increased its reimbursement rates, the chain of events pleaded within BCBS-MI's Counter-Complaint does not permit the Court to reasonably infer the existence of proximate causation between the alleged injury and A4's conduct. This is simply because BCBS-MI increased its prices (1) *after* A4 expressed its intent to remain within the network; (2) *after* A4 created a carve out release for Trinity Hospital in the event it ever left BCBS; and (3) *after* A4 agreed not to surprise bill or balance bill BCBS-MI's insureds.

Because BCBS-MI has failed to plead facts that indicate its alleged injury was the result of A4's anticompetitive conduct, rather than some other consequence of A4's actions, the Court cannot reasonably infer the existence of proximate cause.

###### i.   A4 stayed within the BCBS-MI network.

In April 2019, A4 notified BCBS-MI of its intent to terminate its participation agreement with BCBS-MI's network. In response, BCBS-MI representatives, including former chief medical officer Dr. Simmer, attempted to engage in negotiations with A4. According to BCBS-MI, "Dr. Simmer understood, that with A4's market clout, its termination of in-network status would disrupt the supply of anesthesiology services to [BCBS-MI's] insureds," ECF No. 26, PageID.902, because A4 was the exclusive anesthesiology provider at many Trinity and Beaumont hospitals. Although A4 ultimately rescinded its threat to withdraw from the BCBS-MI network, BCBS-MI, at the recommendation of Dr. Simmer, raised its fee schedule in 2019 and 2020, recognizing A4's unrestrained bargaining power and the "genuine threat A4's Cartel posed to disrupt the continuity of anesthesiology services to BCBSM's insureds." ECF No. 26, PageID.901. Specifically, Dr. Simmer considered the fact that there were few "near-term viable replacement anesthesiologists in [BCBS-MI's] network to both resist A4's demand for money and to avoid disruption for [BCBS-MI's] insureds." ECF No. 36, PageID.1325-26. BCBS-MI feared that without A4's partnership, BCBS-MI's insureds would not have access to in-network anesthesiologists at Trinity and Beaumont hospitals, resulting in some patients being surprised billed or balanced billed (where "the out-of-network anesthesiologist charges more

than the benefit, [so] the patient has to pay the difference out-of-pocket").
ECF No. 26, PageID.895.[7]

First, in light of the fact that BCBS-MI is the state's dominant
health insurer it is hardly plausible to accept that a mere threat, later
thwarted by the demands of its affiliated hospitals, who BCBS-MI alleges
has conspired with A4, would be sufficient by itself to cause BCBS-MI to
raise its prices. Once A4's affiliated hospitals informed A4 that they
would be forced to terminate their agreements if A4 withdrew from the
network, A4 opted to stay within the network.

Ironically, despite BCBS-MI's claims that hospitals are restrained
by their no-poach agreements with A4, it is the hospital's bargaining
power that prevented A4 from terminating its relationship with BCBS-
MI, and the reason A4 brought the initial claim in the first instance.[8]
Both A4 and BCBS-MI control the majority shares of market in their

---

[7] In its Answer to A4's Complaint, BCBS-MI admits that A4 reassured
BCBS-MI in 2019 that it would not balance bill any of BCBSM's insureds
even if it terminated its network agreements with BCBS-MI. ECF No.
26, PageID.866.

[8] *See Anesthesia v. BCBS*, 2021 WL 4169711at *3 (E.D. Mich. Sept. 14,
2021) ("Plaintiff's announcement [to leave BCBS-MI's network] caused
local hospitals—such as Trinity and Beaumont—to terminate their
relationship with A4. For instance, on July 5, 2019, Beaumont issued a
notice of termination with Plaintiff. *Id*. at PageID.44. After Plaintiff left
Defendant's network on July 15, Trinity, which had enjoyed a
relationship with Plaintiff for nearly fifty years, sent a termination notice
to Plaintiff. Trinity later explained that it could not afford to lose
Defendant's business. *Id*. at PageID.44.")

respective industries. When A4 attempted to bargain with BCBS-MI for higher reimbursement rates BCBS-MI refused to do so.

Second, BCBS-MI has failed to plausibly allege that its increased reimbursement rates were the foreseeable consequence of the either the Cartel's—or the collective agreements—mere existence, for the same reasons explained above. BCBS-MI argues that "A4's network status with [BCBS-MI] is irrelevant" because the reduction in competition among independent anesthesiologists results in a "material" prospective harm that guarantees BCBS-MI will have to continue raising in-network prices or dealing with A4 on an out-of-network basis since there are insufficient short-term alternatives. ECF No. 36, PageID.1345.

Under the non-compete agreements, A4's Affiliated Anesthesiologists are prevented, for one year after their employment, from practicing within "15 miles of any health care facility where Physician provided services during the term of his or her employment." ECF No. 33-10, § 7.2(a). Consequently, BCBS-MI theorizes that these agreements 1) prevent anesthesiologists from joining competitors or working independently to provide the same anesthesiology services for a lower price, and 2) restrict the employment opportunities for A4's Affiliated Anesthesiologists in Michigan, potentially forcing them to

leave the state of Michigan to seek employment. *Id.* PageID.892.[9] Under the no-poach agreements, affiliated hospitals are prohibited from directly employing A4's Affiliated Anesthesiologists, and must instead contract with them only through A4. BCBS-MI alleges that the "the purpose of these no-poach provisions is to prevent the development of lower priced anesthesiology competitors that could threaten A4's ability to extract high prices from commercial insurers." *Id.* at 900.

"While exclusive agreements in some instances may create impermissible barriers for new entrants to a market and may permit a supplier to charge monopoly prices, [BCBS-MI] has not claimed—and cannot tenably claim—that it suffered these anticompetitive effects." *NicSand, Inc.,* 507 F.3d at 454 (internal citations omitted).

In *NicSand*, the Sixth Circuit acknowledged that where companies benefit from and require exclusive agreements, such benefit is evidence that the agreements are not anticompetitive in a way that violated antitrust laws. Similarly, here, A4 points out how Trinity Hospital, a health corporation which benefits from an exclusive relationship with A4, explained in its complaint against A4 that it later dismissed:

> Typically, hospitals obtain the services of anesthesiologists either by employing them or contracting with a group which employs a significant number of anesthesiologists. In order to be able to efficiently schedule anesthesia services for the wide

---

[9] Conversely, Plaintiff alleges that BCBS-MI's below market rate reimbursement fees are the cause of anesthesiologists relocating to neighboring Toledo, Ohio. *See* ECF No. 1, PageID.17.

range of surgeries and other procedures performed in hospitals, and in order to obtain the services of anesthesiologists to address administrative and quality issues related to those procedures, it is more efficient for hospitals not employing anesthesiologists to deal with a single group in an exclusive relationship. These anesthesiologists may also serve in other roles at the hospital, including in leadership and on the medical faculty.

*Trinity Health v. Anesthesia Assoc. of Ann Arbor, PLLC*, No. 19-cv-12145-LVP-RSW, Complaint ¶ 36 (E.D. Mich. July 23, 2019). Hospitals have a choice to independently employ anesthesiologists or contract with a group. Trinity chose to do the latter and acknowledged that the exclusivity of the arrangement was a benefit to its hospitals. Accordingly, if the exclusivity of the contract gave rise to anticompetitive effects or erected barriers to hospitals' hiring of physicians, one would expect to see the hospital—the injured party—as the plaintiff here, not BCBS-MI.

Moreover, it is clear that the actions taken by the hospital affiliates prevented A4 from leaving the BCBS-MI network in the first place. Contrary to BCBS-MI's theory that the agreements provide A4 with unrestrained power over its affiliates, the hospital's ability to negotiate with A4, prevent it from leaving BCBS-MI's network and get it to agree to drop its non-compete and non-solicit restrictions if A4 did leave BCBS-MI, indicate the agreements are mutually beneficial to both parties. Finally, notwithstanding A4's exclusive control as a group provider, the fact that both hospitals and physicians were released from the restrictions of their agreements should A4 ever leave the BCBS-MI

network, undermine BCBS-MI's allegation that it lacks bargaining power.

### ii. A4 amended its non-solicitation agreements before BCBS-MI raised its fee schedule.

BCBS also lacks any injury, or standing, because the amended Saint Joseph Mercy Health System Order (SJMHS Order) contains a specific carve-out for BCBS-MI. In September 2019, A4 followed through on its promise to create a carve out releasing Trinity Hospital from any hiring restrictions should A4 withdraw from BCBS-MI:

> Trinity and A4 extended the SJMHS Order's term and amended it (1) to provide that if A4 left BCBS's network, A4's applicable non-solicit and non-compete rights would terminate, and (2) to release MHSM, and the A4 doctors who had worked there, from their respective non-solicit and non-compete obligations as they applied to MHSM. Ex. O §§ I, IV ("3d SJMHS Am.").

ECF No. 33, PageID.1053; ECF No. 33-16. A4 argues that despite knowing the concern for losing A4 providers no longer existed (at least with respect to Trinity hospitals), BCBS-MI nevertheless chose to increase its fee schedule *after* the creation of this provision, in 2019 and 2020. In fact, BCBS-MI admits that at the recommendation of Dr. Simmer, it increased its fee schedule in 2019 and 2020. And although the record does not indicate when BCBS-MI raised its fee schedule in 2019, BCBS-MI does not deny A4's assertion in its briefs.

As alleged, the chain of events here simply does not show that BCBS-MI's "injury"—the need to raise the fee schedule—was in any way

caused by either A4's non-compete agreements with its members or its no-poaching agreements with the hospitals. This is because while those agreements were in full effect, BCBS-MI had not raised its fee schedule, and indeed showed no interest in negotiating the issue with A4 when it sought an increase.  Nor did A4's threat to leave the BCBS-MI network cause any increase in the rate schedule.  Instead, it caused the hospitals to engage with A4 and take the position that they would no longer honor their no-poaching agreements and exclusive relationship with A4.  As a result of this maneuver, A4 ended up agreeing with the Trinity Hospital system (SJMHS) to adopt a *less* restrictive, and more pro-competition agreement:  one in which A4 agreed that should it leave BCBS-MI again, both A4's non-compete agreements and the hospital's non-solicit agreements *would no longer apply*. Only after this new agreement, which was less restrictive of competition, was adopted, did BCBS-MI decide to increase its fee schedule.  This chain of events does not show any proximate cause between either A-4's restrictive agreements, or its threat to leave BCBS-MI, and the fee schedule increase.

### iii.   BCBS-MI insureds will not suffer from surprise billing.

In November 2020, Michigan enacted § 333.24507, banning surprise billing and preempting BCBS-MI from being able to allege an injury related to overcharges for out-of-network providers. Under § 333.24507, in the event a patient does not have the ability to choose an

in-network provider or where it is not disclosed that a patient is being treated by an out-of-network provider:

> the nonparticipating provider shall submit a claim to the patient's carrier within 60 days after the date of the health care service and shall accept from the patient's carrier, as payment in full, the greater of the following:
>
> (a) Subject to section 24510, the median amount negotiated by the patient's carrier for the region and provider specialty, excluding any in-network coinsurance, copayments, or deductibles. The patient's carrier shall determine the region and provider specialty for purposes of this subdivision.
>
> (b) One hundred and fifty percent of the Medicare fee for service fee schedule for the health care service provided, excluding any in-network coinsurance, copayments, or deductibles.

MCL § 333.24507. Indisputably, this new law protects BCBS-MI from any risk that its patients will be left with a higher bill for receiving service from A4 providers in the event they leave the network. Therefore, A4 contends that any purported harmful effect BCBS-MI has attempted to allege on the behalf of its insureds is now prohibited by law, notwithstanding A4's agreement not to surprise bill BCBS-MI's insureds prior to enactment of the statute. As A4 notes, the fear that "A4 *might* leave BCBS's network in the future, and that if A4 then continued to serve BCBS's insureds, A4 *might* bill those out-of-network patients directly for 'the difference' between A4's charges and what BCBS is

30

willing to pay" is not only speculative and unsupported by the record, it is no longer legal under Michigan law. ECF No. 33, PageID.1053.

BCBS-MI argues that "[w]hile Michigan's statute may have taken one arrow out of A4's illegal bargaining quiver, it did not address the root of the issue, which is a lack of competition among anesthesiologists." ECF No. 36, PageID.1345. But this argument is misplaced. While the alleged anticompetitive conduct in question is A4's exclusive agreements, which are purported to cause a reduction in competition amongst anesthesiologists, this is not an injury directly suffered by BCBS-MI and its insureds. Rather, it is the alleged reduction in competition that allegedly causes the higher reimbursement payments. Without pleading facts that support a direct causal link between the exclusive agreements and the increased fee schedule, BCBS-MI essentially seeks relief for a derivative injury. Regardless of whether the agreements reduce competition, it does not follow unavoidably that BCBS-MI had to increase its schedule—it could have maintained its original fee schedule, but it chose to do otherwise.

Having carefully reviewed the record and balancing the factors laid out in *Indeck Energy Servs., Inc*., the Court finds that BCBS-MI has failed to allege a cognizable antitrust injury. Specifically, BCBS-MI has failed to plead facts that show causation: it has not adequately alleged that the injury flows from anticompetitive conduct that the antitrust law was designed to remedy. Even considering BCBS-MI's potential role as a

defender of the interests of insured patients in the healthcare industry, neither it nor its customers face the alleged injury of surprise billing, because the practice has been preempted under Michigan law, MCL § 333.24507. And the threat that A4 could withdraw from the BCBS-MI network appears to have abated, because A4's long-term viability depends on its partnerships with Trinity and Beaumont Hospitals, both of which need BCBS-MI to operate. The requirement to pay more  is not enough to give rise to an antitrust violation.  And even if the exclusivity of A4's agreements could be said to have an anticompetitive effect in the health care market, the facts alleged here suggest that parties who might rightly claim an injury arising from that effect would be either the affiliated physicians or the hospitals, not Defendant BCBS-MI.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Dismiss is **GRANTED**.


**IT IS SO ORDERED.**


Dated: March 31, 2022          s/Terrence G. Berg
                               TERRENCE G. BERG
                               UNITED STATES DISTRICT JUDGE