UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ANESTHESIA ASSOCIATES OF ANN ARBOR PLLC,<br><br>Plaintiff,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF MICHIGAN,<br><br>Defendant. | 2:20-CV-12916-TGB-APP<br><br><br><br>ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT (ECF NO. 43) |

This action arises from Plaintiff Anesthesia Associates of Ann Arbor's ("A4") allegations of a decades-long scheme by Defendant Blue Cross Blue Shield of Michigan ("BCBS-MI") to unlawfully dominate the market for buying anesthesiology services in Michigan. For the following reasons, A4's motion to amend is **DENIED in part and GRANTED in part.**

## I.    BACKGROUND

On October 29, 2020, Plaintiff Anesthesia Associates of Ann Arbor ("A4") brought suit against Defendant Blue Cross Blue Shield of Michigan ("BCBS-MI"), alleging that BCBS-MI used its dominant position as a buyer of healthcare services to pay A4's anesthesiologists artificially depressed reimbursement rates in violation of the Sherman

Act, Clayton Act, and state law. ECF No. 1. On January 4, 2021, BCBS-MI moved to dismiss A4's Complaint for failure to state a claim under Rule 12(b)(6). ECF No. 13. On September 14, 2021, this Court granted BCBS-MI's motion but permitted A4 to seek leave to amend its Complaint. ECF No. 41. A4 subsequently filed its motion for leave to amend. ECF No. 43.

Currently before the Court is A4's motion for leave to amend its Complaint. ECF Nos. 43, 43-2. In its September 14, 2021 Order dismissing A4's Complaint, the Court addressed only the issue of antitrust standing because it found that A4 failed to plausibly allege any injury "of the type that the antitrust statute was intended to forestall." ECF No. 41, PageID.1463.

A4's initial theory of liability centered around BCBS-MI acting in concert with hospitals to refuse "to deal with anesthesiologists who are out of BCBS's network." ECF No. 22, PageID.515. This alleged refusal to deal insulated BCBS-MI from competition, enabling it to require Michigan anesthesiologists to accept below-competitive rates. The Court determined, however, that A4 had not plausibly alleged a boycott or price-fixing conspiracy between BCBS-MI and its hospital affiliates, Trinity and Beaumont. ECF No. 41, PageID.1478–80. And pursuant to the First Circuit's holding in *Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F. 2d 922 (1st Cir. 1984), BCBS-MI's mere imposition of low prices—absent conspiracy—is not actionable. *Id.* at PageID.1469–70.

The Court also found that A4 did not adequately plead the requisite causation to establish antitrust standing. *Id.* at PageID.1485. Although A4 alleged that BCBS-MI's conspiracy began in April 2019 and culminated in October 2020, "its allegations of harm to competition—low reimbursement rates for anesthesiology services leads to reduced output and quality—precede[d] the time period when the conspiracy was formed." *Id.* A4 also failed to plausibly allege that BCBS-MI's "low reimbursement rates for anesthesiologists hurt consumers in the form of higher prices, reduced output, or reduced quality." *Id.* at PageID.1484. Relatedly, the Court found that A4's alleged injury was too indirect because it was derivative of the harm to healthcare consumers. *Id.* at PageID.1487. Moreover, as pled, A4's interest in seeking higher reimbursement rates directly conflicted with consumers' interest in keeping insurance premiums and provider payments low. *Id.* at PageID.1489. Therefore, A4 failed to show that its injury was causally related to the alleged antitrust law violations.

A4's proposed Amended Complaint has reduced its causes of actions from ten to nine: (1) tortious interference with a contract under Michigan law; (2) civil conspiracy to commit tortious interference with a contract under Michigan law; (3) unlawful and malicious threats under Michigan law; (4) duress under Michigan law; (5) conspiracy in violation of Section 1 of the Sherman Act; (6) monopsonization in violation of Section 2 of the Sherman Act; (7) attempted monopsonization in

3

violation of Section 2 of the Sherman Act; (8) a claim for injunctive relief under Section 16 of the Clayton Act; and (9) a claim for injunctive relief under Michigan law. ECF No. 43-2.

As A4 summarizes in its motion for leave to amend, its proposed Amended Complaint now alleges:

> (1) that A4, as a seller of anesthesiology services, is the direct victim of decades-long conspiracies by [BCBS-MI] to monopsonize the market for buying anesthesiology services in Michigan; (2) that [BCBS-MI's] actions have resulted in reduced quality and increased quality-adjusted prices for consumers; and (3) that stopping [BCBS-MI's] anticompetitive actions would result in higher quality service and lower-quality adjusted prices for consumers, even as reimbursements for certain high-quality anesthesiologists, such as A4, would go up.

Plaintiff's Motion for Leave to Amend Complaint, ECF No. 43, PageID.1507.

BCBS-MI contends that the proposed Amended Complaint suffers from the same defects as the original, such that the Court should deny leave to amend as futile. Defendant's Opposition to Plaintiff's Motion for Leave to Amend, ECF No. 46, PageID.1719.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 15, if amendment as a matter of course is unavailable, a party may amend the pleading "only with the opposing party's written consent or the court's leave." "The court should freely give leave when justice so requires." Fed. R. Civ. P.

15(a)(2). Before deciding whether to grant leave to amend, a court must consider several factors including: "[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458 (6th Cir. 2001); *see also Szoke v. UPS of Am., Inc.*, 398 F. App'x 145, 153 (6th Cir. 2010) (citation omitted). A court may deny leave to amend "for futility 'if the court concludes that the pleadings as amended could not withstand a motion to dismiss.'" *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 767 (6th Cir. 2005) (quoting *Martin v. Assoc. Truck Lines, Inc.*, 801 F.2d 246, 249 (6th Cir. 1986)).

## III.   DISCUSSION
### A. A4's Proposed Amended Complaint Cures Some of Its Antitrust Standing Issues

In granting BCBS-MI's initial motion to dismiss, the Court focused its opinion on A4's lack of antitrust standing. To address the Court's standing concerns, and without having evidence of predatory pricing, A4 now strategically pleads that it is a seller injured by BCBS-MI's conspiracies to monopsonize, rather than a competitor or consumer in the relevant market. ECF No. 43, PageID.1507. The Court finds that this amendment solves some of A4's pleading problems. But because seller-based standing is contingent upon A4's ability to plausibly plead

the existence of an underlying conspiracy, some of A4's amendments are futile.

As detailed below, the Court finds that A4's proposed Amended Complaint fails to plausibly plead a Hospital Conspiracy, such that it lacks antitrust standing to pursue claims on that theory. On the other hand, the Court finds that A4 has plausibly pled the existence of the Blues Conspiracy, thus permitting A4 to attain seller-based standing on the Blues Conspiracy theory only.

### 1. A4's Prior Antitrust Standing Issues

In its previous Order, this Court found that A4's alleged injury was not the type of harm that antitrust laws intended to prevent. First, A4 failed to adequately plead facts that would overcome the "natural inference that as a buyer of anesthesiology services on behalf of patients, Defendant has incentives to procure the best quality at the lowest price." ECF No. 41, PageID.1486. Second, A4's allegations simply did not establish that BCBS-MI conspired with hospitals to fix prices at a depressed reimbursement rate. *Id.* at PageID.1478–79. Rather, the Court determined that A4's "theory of a conspiracy center[ed] not on pricing but on an agreement to refuse to deal with providers that leave Defendant's network." *Id.* at PageID.1478. BCBS-MI's "unilateral decision on reimbursement rates for anesthesiology services" thus did not give rise to a plausible antitrust injury. *Id.* at PageID.1478–79.

Additionally, the Court found that BCBS-MI's requirement for hospitals to restrict access to only in-network anesthesiologists did not permit inferring a conspiracy between BCBS-MI and the hospitals. *Id.* at PageID.1479. Moreover, even if there was a conspiracy, A4 did not clearly show whether consumers would benefit from lower prices if BCBS-MI paid a higher reimbursement rate, making A4's claims even more unavailing. *Id.* Lastly, the Court found that A4's allegation that low reimbursement rates tend to decrease quality and output were not sufficiently strong to withstand a motion to dismiss. *Id.* at PageID.1480.

### 2. A4's Proposed Amendments Attempt to Plead Seller-Based Standing

"The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to effect." *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991). As part of establishing antitrust standing, a plaintiff must demonstrate that it has suffered an "antitrust injury," which is an "(1) 'injury of the type that the antitrust laws were intended to prevent' and (2) injury 'that flows from that which makes defendants' acts unlawful.'" *Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 790 (6th Cir. 2005) (quoting *In re Cardizem*, 332 F.3d 896, 909 (6th Cir. 2003)). Pleading a cognizable "antitrust injury" as part of antitrust standing is essential to surviving a motion to dismiss—the standard that A4 must meet here to be granted leave to amend its Complaint.

*Hodges v. WSM, Inc.*, 26 F.3d 36, 38 (6th Cir. 1994); *Valley Prod. Co. v. Landmark, a Div. of Hosp. Franchise Sys., Inc.*, 128 F.3d 398, 406 (6th Cir. 1997).

A4's proposed Amended Complaint clarifies that A4 is not solely challenging BCBS-MI's rates, but instead emphasizes that BCBS-MI conspired to create and maintain monopsony power in the market of *buying* anesthesiology services. A4 contends that "insurers compete to purchase anesthesiology services," while hospitals in turn "compete . . . to recruit anesthesiologists," with A4 being a *seller* of the services that BCBS-MI and the hospitals want to buy. ECF No. 43, PageID.1514, PageID.1518; *see also Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) ("The Sherman Act . . . also applies to abuse of market power on the buyer side—often taking the form of monopsony or oligopsony."); *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 474 (6th Cir. 2005) (distinguishing competition between NHL players and "between NHL clubs for these players' services"). BCBS-MI thus injured A4 as a seller of anesthesiology services.

As such, "[a] plaintiff may state a Sherman Act Section 1 claim for lower prices, for example, as a result of a buyers' cartel where a group of buyers sets a price below competitive levels." *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1195 n.6 (S.D. Tex. 2009). A4 argues that its amendments align its seller-based claims with those at issue in *In re Southeastern Milk Antitrust Litigation*,

where the court held that milk sellers had plausibly pled antitrust injury caused by milk buyers' conspiracy to monopsonize. 555 F. Supp. 2d 934, 945 (E.D. Tenn. 2008). A4 claims that like the milk sellers in *In re Southeastern Milk*, it also "[has] no other option but to sell at the price set by [BCBS-MI]. . . . In other words, the jury may find that [A4] ha[s] suffered an antitrust injury because of [BCBS-MI's] monopsonistic behavior." 801 F. Supp. 2d. 705, 731 (E.D. Tenn. 2011).

In positioning itself as an injured seller, A4 seeks to correct two main problems from its initial pleading. First, A4 attempts to invoke the "conspiracy" exception from *Kartell v. Blue Cross Blue Shield of Massachusetts, Inc.*, 749 F.2d 922 (1st Cir. 1984). *Kartell* establishes that physicians selling medical services to insurers cannot claim antitrust injury when the insurer lowers the amount it is willing to pay for their services because buyers are free to decide "what to seek to buy and what to offer to pay." *Id.* at 929. But the *Kartell* court suggested that this general rule is inapplicable where the seller shows that the buyer's pricing power was gained through "conspiracy" or "agreements to fix prices." *Id.* at 930, 932. Second, assuming A4 can plausibly plead that BCBS-MI engaged in a conspiracy, it can assert antitrust injury even without evidence of predatory pricing. *See* ECF No. 41, PageID.1469–74; *see also Kartell*, 749 F.2d at 932; *In re Se. Milk*, 555 F. Supp. 2d at 945–46.

9

Importantly, pleading seller-based standing inherently requires A4 to plausibly plead the existence of a conspiracy. Without sufficient evidence of illegal concerted action, what A4 complains of—being underpaid for medical services purchased by BCBS-MI as an insurer-buyer—does not raise a cognizable antitrust injury. *See, e.g.*, *Kartell*, 749 F.2d at 925 ("Antitrust law rarely stops the buyer of a service from trying to determine the price or characteristics of the product that will be sold."); *Westchester Radiological Assocs. P.C. v. Empire Blue Cross & Blue Shield, Inc.*, 707 F. Supp. 708, 713 (S.D.N.Y.), *aff'd*, 884 F.2d 707 (2d Cir. 1989) ("[I]f [the radiologists] wish to sell to Blue Cross, they must sell Blue Cross the package it wants to buy, and they must agree that the price charged to Blue Cross will be the only charge for the services."); *Mich. State Podiatry Ass'n v. Blue Cross & Blue Shield of Mich.*, 671 F. Supp. 1139, 1152 (E.D. Mich. 1987) ("[The plaintiffs'] argument merely is that podiatrists make less money from BCBSM than previously. Such a claim is insufficient to state an antitrust violation."); *see also Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 347 (6th Cir. 2006) ("[I]t is the appropriate nature of a functioning competitive marketplace that buyers are free to choose from whom they will buy, sellers are free to choose to whom they will sell, and salesmen battle and strive to curry favor and close the deal.").

For the reasons discussed below, A4's proposed amendments fail to plausibly support the alleged Hospital Conspiracy. As such, A4's

amendments regarding the Hospital Conspiracy are futile because they cannot correct A4's lack of antitrust standing and antitrust injury. However, A4's amended allegations do plausibly establish the existence of a nationwide Blues Conspiracy. Therefore, A4's proposed amendments clarifying its position as a seller injured by the Blues Conspiracy can rectify the original Complaint's antitrust standing and antitrust injury defects.

## B. A4's Amended Pleadings Raise Two Horizontal Conspiracies

There are two main types of antitrust conspiracies: horizontal and vertical. As the Sixth Circuit explained in *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*:

> Horizontal conspiracies involve agreements among competitors at the same level of competition to restrain trade, such as agreements among manufacturers to fix prices for a given product and geographic market, or among distributors to fix prices for a given market. Vertical conspiracies, on the other hand, involve agreements between competitors at different levels of competition to restrain trade, such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market.

854 F.2d 802, 805 (6th Cir. 1988).

Here, A4 alleges two horizontal conspiracies: (1) the Hospital Conspiracy; and (2) the Blues Conspiracy. Pursuant to its Hospital Conspiracy theory, A4 alleges that hospitals agree with BCBS-MI and each other to compensate Michigan anesthesiologists "at a single, uniform rate by [BCBS-MI], regardless of quality, and that if an

anesthesiologist rejects that rate, that doctor will not be permitted to serve patients at those facilities." ECF No. 43, PageID.1516 (citing ECF No. 43-2, PageID.1539–40). But A4 also clarifies that the Hospital Conspiracy theory has a "vertical component, between BCBS and each hospital." ECF No. 43-2, PageID.1540. Specifically, A4 posits that BCBS-MI convinces hospitals to sign a uniform agreement with BCBS-MI and enforces this agreement through "illegal boycott and price fixing agreements by steering [patients] away from any hospital" if anesthesiologists seek a different rate from BCBS-MI. *Id.*

A4's alleged Blues Conspiracy "also involves a boycott and price-fixing conspiracy, coupled with a geographic market allocation conspiracy." ECF No. 43, PageID.1516–17. According to A4, BCBS-MI participates in a horizontal conspiracy scheme with other Blue Cross Blue Shield insurers (the "Blues") to "divide the markets for health insurance in the United States and [] fix the prices paid to providers of medical services, including anesthesiology services." ECF No. 43-2, PageID.1540. As a result, A4 alleges that BCBS-MI "is insulated in Michigan from competition from other Blue Cross Blue Shield health insurers that would otherwise enter the Michigan markets." *Id.*

Although the "traditional horizontal conspiracy case involves an agreement among sellers with the purpose of raising prices to supracompetitive levels," the Sherman Act "also applies to abuse of market power on the buyer side—often taking the form of monopsony or

oligopsony." *Todd*, 275 F.3d at 201 (citing Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 297–301, 308 (1991)). A4 correctly notes that "a horizontal conspiracy among buyers to stifle competition is as unlawful as one among sellers." *Id*. But the question here is whether A4 can plead facts to plausibly show that a horizontal conspiracy exists amongst BCBS-MI, the hospitals, and/or the Blues.

In general, to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a "specific time, place, or person involved in the alleged conspiracies" to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007). "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id*. at 556. The plaintiff must provide more specific evidence, such as "a written agreement or even a basis for inferring a tacit agreement." *Id*. at 557. Ultimately, the court must assess "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement.'" *Id*. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). Based on these plausibility standards, the Court examines whether the factual allegations in A4's proposed Amended Complaint are sufficient to answer the questions of "Who, what, when, and where?" with respect to the alleged conspiracies.

### 1. The Hospital Conspiracy

A4's Hospital Conspiracy theory assumes that no hospital would independently coerce its anesthesiologists into accepting BCBS-MI's low uniform reimbursement rates. Instead, in an ordinary market, A4 claims that hospitals would permit anesthesiologists to demand higher prices for providing higher quality care. A4 contends that without a conspiracy binding all hospitals in partnership with BCBS-MI, a hospital would inevitably lose anesthesiologists to other hospitals that do not cap reimbursement at such low rates. *See* ECF No. 43, PageID.1514–15.

A4 also explains that the alleged hospital conspiracy involves both a vertical component and a horizontal component. *Id.* At the vertical level, BCBS-MI signs "template agreements" with hospitals that in turn require their anesthesiologists to accept BCBS-MI's low uniform rate terms. *Id.* at PageID.1515. At the horizontal level, the hospitals agree with each other to inhibit anesthesiologists' ability to demand higher rates. *Id.* Together, these horizontal and vertical agreements eliminate "collective-action risk," by having "nearly every[] Michigan hospital agree with [BCBS-MI] and each other to restrict anesthesiologists' ability to negotiate with [BCBS-MI], regardless of the hospital." *Id.* at PageID.1515.

A4 alleges that surgeons may choose to service a particular hospital based on the quality of available anesthesiologists, which

14

ultimately determines the patient's decision as to where to seek health care services. *Id.* at PageID.1514–15. Because surgeries potentially account for up to 80% of hospital revenue, A4 points out that "it makes no economic sense for a hospital to agree to prohibit high-quality anesthesiologists from negotiating rates with [BCBS-MI]," as better anesthesiologists bring in higher surgery revenue. *Id.* at PageID.1515.

A4 posits that BCBS-MI "facilitated" the horizontal aspect of the conspiracy by:

> (1) publicly acknowledging that it uses a template agreement with hospitals (which [] contains a term restricting anesthesiology reimbursement just as in [BCBS-MI's] executed hospital agreements); (2) consistently agreeing, over decades and with different hospitals, to essentially-identical restrictions on anesthesiologist reimbursement, even as other aspects of its hospital agreements changed; and (3) enforcing the conspiracy in 2019 after A4's decision to leave BCBS's network caused co-conspirators Trinity and Beaumont, where A4 served patients, to be non-compliant.

*Id.* at PageID.1516–17.

BCBS-MI contends, and the Court agrees, that A4 lacks direct, "smoking gun" evidence of conspiracy between the hospitals. *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014) (explaining that direct evidence of a conspiracy in a Section 1 case "must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted"). Without smoking gun evidence, a horizontal price-fixing conspiracy may be "inferred" by

15

"conscious parallelism," where "interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices." *Todd*, 275 F.3d at 198. But "circumstantial evidence alone cannot support a finding of conspiracy when the evidence is equally consistent with independent conduct." *Sancap Abrasives Corp. v. Swiss Indus. Abrasives*, 19 F. App'x 181, 187 (6th Cir. 2001). The Sixth Circuit has identified certain "plus factors" that must accompany circumstantial evidence to indicate concerted action:

> 1) whether defendants' actions, if taken independently, would be contrary to their economic interests; 2) product uniformity; 3) whether the defendants have been uniform in their actions; 4) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and 5) whether the defendants have a common motive to conspire or have engaged in a large number of communications.

*Hyland*, 771 F.3d at 320.

The Ninth Circuit's decision in *Barry v. Blue Cross of California*, closely tracks the facts at issue here. In *Barry*, the plaintiffs alleged that Blue Cross of California orchestrated "a horizontal agreement among competing physicians" to engage in price-fixing and a group boycott. 805 F.2d 866, 868 (9th Cir. 1986). The plaintiffs claimed that the conspiring physicians acted with "conscious parallelism [in] a tacit conspiracy," by pointing to evidence "that several thousand physicians signed identical contracts with Blue Cross and that physicians participated in creating the plan." *Id.* The court plainly rejected the

16

plaintiffs' argument "that because several thousand physicians all signed identical contracts, we should infer a tacit conspiracy." *Id.* at 869. In emphasizing that a horizontal conspiracy must involve participants being "economically interdependent," the court articulated three key factors for inferring a conspiracy: (1) "whether each physician had an independent business reason for his conduct"; (2) "whether joining the Plan required a commitment contrary to the physicians' economic self-interest"; and (3) "whether an alleged conspirator would have benefited from having other physicians join the alleged conspiracy." *Id.* at 870.

First, the *Barry* court determined that each physician had a "good independent reason for joining the Plan: each obtained access to Blue Cross customers." *Id.* Second, the court found that joining the Plan was not against the physician's self-interest. Although the contract required physicians to accept lower fees when treating Plan patients, "each physician was free to resign from the Plan at any time" if they were unsatisfied with their earnings. *Id.* And finally, the court determined that the participating physicians as alleged co-conspirators "did not benefit from having other physicians join" the scheme. *Id.* Assuming "that a certain number of member physicians is necessary to make the Plan workable" at its inception, the participating physicians likely would have benefited from recruiting new members. *Id.* But "once the Plan was functioning, participating physicians did not benefit from

17

having other physicians join," as each new physician would then be competing with the existing physicians "for the patronage of Plan subscribers." *Id*. Therefore, the *Barry* court affirmed the district court's grant of summary judgment in favor of Blue Cross of California.

### i. A4 Fails to Plausibly Allege the Existence of the Hospital Conspiracy

A4 has not plausibly alleged a horizontal conspiracy between hospitals based on circumstantial evidence and "plus factors." Specifically, A4 fails to demonstrate that the hospitals conspired with one another in an illegal scheme orchestrated by BCBS-MI.

In its initial Order, the Court determined A4's allegation that BCBS-MI's anti-competitive conduct began in April 2019 and culminated in October 2020, failed to adequately plead a causal link between BCBS-MI's conduct and the alleged injury. Because the artificially low-reimbursement rates A4 cited were from 2018, the alleged injury "*preced[ed]* the time period when the conspiracy was formed." ECF No. 41, PageID.1485.

In the proposed Amended Complaint, A4 has attempted to correct this flaw:

> Whereas the Complaint focused on allegations that BCBS, Trinity, and Beaumont conspired in 2019 after A4 signaled its intent to leave BCBS's network, the Amended Complaint clarifies that those actions were instead efforts to enforce a conspiracy that had been ongoing ***for decades prior***. Pursuant to that underlying conspiracy, which is memorialized in written agreements produced in discovery

18

by BCBS, hospitals in Michigan have agreed with BCBS, and each other, that anesthesiologists will not be permitted to access the hospitals to treat patients unless they accept BCBS's statewide, uniform rate for anesthesiology services. See Ex. 1 at ¶¶ 1, 26-35, 104-117 (proposed Amended Complaint). Because anesthesiologists require access to hospitals to serve patients, the conspiracy requires anesthesiologists to accept BCBS's uniform rate if they wish to practice in Michigan.

ECF No. 43, PageID.1514 (emphasis added).

In response, BCBS-MI suggests that the more rational explanation is that "hospitals independently find it more valuable to contract with [BCBS-MI] than to contract with any particular anesthesiology group." ECF No. 46, PageID.1738. The hospitals therefore agreed with BCBS-MI to an in-network provision, "irrespective of whether the hospital's currently-admitted anesthesiologists go elsewhere." *Id.* at PageID.1738–39. Furthermore, BCBS-MI contends that if hospitals cannot afford to leave BCBS-MI, that is an independent and valid reason for accepting BCBS-MI's terms. *Id.* at PageID.1720–21. Finally, BCBS-MI posits that in this case, it is "only natural" that each hospital would choose to stay in-network with BCBS-MI and replace its anesthesiologists, if faced with that choice. *Id.* at PageID.1739–40.

The Court agrees that A4 has not adequately supported its Hospital Conspiracy theory. First, the fact that the hospitals signed an identical template agreement is insufficient to demonstrate a tacit

conspiracy. *See Barry*, 805 F.2d at 869. And the proposed Amended Complaint provides only sparse support for other indicators of concerted action between the hospitals. For example, A4 states that an unnamed hospital, as an alleged co-conspirator, contacted Trinity to threaten Trinity with steering away potential patients. ECF No. 43-2, PageID.1606–07. But the proposed Amended Complaint does not allege any other facts that the hospitals conspired together rather than acting independently. Moreover, the fact that some agreements were signed nearly two decades apart further cuts against finding tacit conspiracy. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009) (discounting statement evidencing parallel conduct because the statement was made "too remote[ly] in time to support a plausible inference of agreement"); *cf. Home Quarters Real Est. Grp., LLC v. Mich. Data Exch., Inc.*, No. 07-12090, 2009 WL 276796, at *4 (E.D. Mich. Feb. 5, 2009) (adopting magistrate judge's findings that the "temporal proximity of Defendants' actions," which occurred within the same 24-hour period, demonstrates tacit conspiracy).

Second, as in *Barry*, there is a good independent reason for each hospital to want to contract with BCBS-MI: guaranteed access to BCBS-MI customers. Relatedly, it is not contrary to a hospital's economic self-interest to partner with BCBS-MI. By pursuing an agreement with BCBS-MI, hospitals are opening themselves up to "compete for the same consumer's business . . . and give customers *more* options." *Stop &*

20

*Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 62 (1st Cir. 2004).

Third, increasing the number of participating hospitals could be considered beneficial if a threshold number of partnering hospitals is necessary to make the uniform rate agreement economical. But after a certain point, each new partnering hospital will become unwanted competition for recruiting anesthesiologists and BCBS-MI subscribers. As such, the hospitals do not have a significant economic incentive to recruit additional "co-conspirators."

Lastly, the Court finds that A4's proposed amendments fail to address crucial causation issues. Even assuming BCBS-MI possesses significant market power and it "uses that power to obtain 'lower than competitive' prices," *Kartell*, 749 F.2d at 927, this does not solve the problem of whether the uniform rates are caused by the alleged Hospital Conspiracy. Indeed, "even a monopolist is free to exploit whatever market power it may possess when that exploitation takes the form of charging uncompetitive prices." *Id.* A4's proposed Amended Complaint also notes that Beaumont contracts with a competitor insurer that does not require the low uniform rates imposed by BCBS-MI. ECF No. 43-2, PageID.1591, ¶ 108. But A4 does not allege whether a more generous rate schedule has alleviated the problems it complains of with respect to BCBS-MI's low fees. Because a hospital can independently contract with a BCBS-MI competitor insurer under

21

different terms, and BCBS-MI does not prevent providers from treating any patients nor patients from receiving treatment from any anesthesiologist, A4 has failed to demonstrate "impermissible market distortions" caused by the Hospital Conspiracy. *See Barry*, 805 F.2d at 872.

The Court finds that A4 has failed to plead factual allegations giving rise to a Hospital Conspiracy. As such, A4 lacks seller-based standing to raise a cognizable antitrust injury premised on the Hospital Conspiracy, and its motion for leave to amend these allegations is **DENIED in part** as futile.

### ii.   A4 Fails to Plead Subject Matter Jurisdiction over Its Hospital Conspiracy Claims

Independent of its findings that A4's proposed amendments on the Hospital Conspiracy theory would be futile to establishing antitrust standing and antitrust injury, the Court also finds that A4 has failed to sufficiently plead subject matter jurisdiction over claims premised on the Hospital Conspiracy.

The Court is permitted to raise concerns about subject matter jurisdiction at any time and of its own volition. *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999). In *McLain v. Real Estate Board of New Orleans, Inc.*, the Supreme Court emphasized that to satisfy the Sherman Act's "jurisdictional requirement," the plaintiff must show "either that defendants' activity is itself in interstate commerce or, if it

22

is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce." 444 U.S. 232, 242 (1980). The Sixth Circuit has interpreted *McLain* to require the plaintiff to "allege[] sufficient facts to support an 'interstate commerce' nexus to bring the case within the parameters of the Sherman Act." *Stone v. William Beaumont Hosp.*, 782 F.2d 609, 614 (6th Cir. 1986); *see also Mich. State Podiatry Ass'n v. Blue Cross & Blue Shield of Mich.*, 671 F. Supp. 1139, 1155 (E.D. Mich. 1987) ("[T]he Sixth Circuit requires a showing that the challenged activity itself has some impact on interstate commerce.").

In *Michigan State Podiatry Association v. Blue Cross and Blue Shield of Michigan*, the court found that the plaintiffs failed to establish "the requisite effect on interstate commerce," thus stripping the court of subject matter jurisdiction over their Sherman Act claims. 671 F. Supp. at 1155. The plaintiffs, an organization representing most podiatrists in Michigan, alleged that BCBS-MI illegally conspired with other doctors to decrease reimbursement rates for podiatric procedures. *Id.* at 1142. To satisfy the jurisdictional interstate commerce requirement, the plaintiffs alleged that:

> (1) BCBSM pays out-of-state physicians for health care services rendered to BCBSM subscribers;
> (2) BCBSM provides prepaid health care plans to cover the work force of virtually all Michigan manufacturers, such as Chrysler, whose products are sold in interstate and foreign commerce and

which depend upon BCBSM's proper and legal administration of health care benefits for their workers;

(3) BCBSM administers, in large part, the federal Medicaid and Medicare programs which entail transfers of large amounts of out-of-state monies into the State of Michigan; and

(4) BCBSM draws resources from a national pool of health care funds available to prepaid health care plans and commercial insurance policies from within and without the State of Michigan.

*Id.* at 1154.

Even so, the court found that "[a]s a matter of practical economics," lowering reimbursement rates for "procedures performed on in state patients" by Michigan-based podiatrists could not demonstrate an "appropriate nexus with interstate commerce." *Id.* at 1155. Therefore, the court concluded that the plaintiffs had failed to satisfy the Sherman Act's jurisdictional prerequisite. *Id.*

Similarly here, A4 generally alleges that "BCBSM is engaged in interstate commerce," and A4's claims involve conduct that "substantially affects interstate commerce." ECF No. 43-2, PageID.1572, ¶ 67. More specifically, A4 claims that because of BCBS-MI's depressed reimbursement rates, "multiple anesthesiologists" have left Michigan for Ohio, and Michigan providers are struggling to recruit anesthesiologists nationwide. *Id.* Furthermore, "BCBSM provides commercial health insurance that covers Michigan residents when they travel across state lines, purchases health care in interstate commerce when Michigan residents require health care out of state, and receives payments from customers located outside Michigan." *Id.*

But with respect to the Hospital Conspiracy, A4's allegations demonstrate that BCBS-MI's conduct is fundamentally local in nature, and it cannot demonstrate that lowering anesthesiology reimbursement rates for Michigan anesthesiologists serving primarily Michigan patients has a substantial impact on interstate commerce. Moreover, as in *Michigan State Podiatry*, A4 "cannot rely on BCBS-MI's overall business activities," nor that BCBS-MI pays for out-of-state services to demonstrate an interstate commerce nexus. 671 F. Supp. at 1155.

The Hospital Conspiracy centers around BCBS-MI's uniform rates for anesthesiologists in Michigan, based on agreements with Michigan hospitals, impacting the quantity and quality of anesthesiologists in Michigan. A4's allegation that an unspecified number of anesthesiologists have left Michigan to work in Ohio is insufficient to establish a substantial effect on interstate commerce. In fact, A4 acknowledges that "commuting [to Ohio] is not an option generally available to Michigan anesthesiologists," and "anesthesiology services, are also, by their nature, primarily local, as people tend to visit hospitals close to where they live and work." ECF No. 43-2, PageID.1634, ¶ 204. With respect to its allegations of difficulty recruiting out-of-state anesthesiologists, A4 introduces inconsistency to its position that it is an injured seller. As a "recruiter," A4 functions as a buyer of anesthesiology services, which A4 repeatedly notes is unrelated to the conspiracies it challenges as an injured seller.

25

Therefore, A4's proposed amendments to its Hospital Conspiracy allegations fail to satisfy the Sherman Act's jurisdictional requirement, and the Court must deny leave to amend those allegations.

### 2. The Blues Conspiracy

A4 also alleges a second conspiracy. A4 contends that BCBS-MI conspired with other "Blues" (commercial health insurance companies licensing the Blue Cross Blue Shield brand), to suppress competition and monopsonize the markets for buying anesthesiology services. ECF No. 43-2, PageID.1596. A4 alleges that the Blues Conspiracy is a horizontal conspiracy implemented through an "amended license agreement" with the Blue Cross Blue Shield Association ("BCBSA"). *Id.* at PageID.1596–97. A4 explains that "BCBSA owns the Blue Cross Blue Shield branding and is in turn owned and controlled by the Blues." *Id.* at PageID.1597. Pursuant to these agreements, A4 alleges that the Blues refrain, with "limited exceptions, from competing in each other's service areas and will curtail competition involving their non-Blue affiliates." *Id.* By restraining competition with the other Blues and their affiliates, BCBS-MI can lower costs and increase control over the Michigan commercial health insurance market. *Id.* at PageID.1598.

In addition, A4 argues that "the 'amended license agreement' requires Blues to fix prices and boycott healthcare providers outside their service area." *Id.* at PageID.1599. Specifically, A4 alleges the following:

26

The Price Fixing and Boycott aspect of the license agreement involves the BlueCard program, which the "amended license agreement" requires the Blues to use. The BlueCard program is a method through which [BCBS-MI] can process claims by a provider in its service area on behalf of a patient covered by another Blue plan, and vice versa. Under the BlueCard program, the patient's Blue insurer is referred to as the "Home Plan," while the Blue located where the medical service is provided is the "Host Plan." If a healthcare provider treats someone covered by a Blue plan in another state, the healthcare provider must submit their claim to the Host Plan, after which the claim is transmitted to the Home Plan for processing. The provider is paid based on the reimbursement rates in his or her contract with the Host Plan—thereby fixing prices between the Host Plan and the Home Plan.

…

As part of the Price Fixing and Boycott conspiracy, [BCBS-MI] and the other Blues have also agreed not to contract with providers outside of their respective service areas. This boycott means that A4's only option for providing services in Michigan to patients insured under other Blues is to do so through [BCBS-MI], using the BlueCard program. A4 is therefore forced to accept [BCBS-MI's] anesthesiology rate when it covers patients insured by any of the Blues, regardless of what those insurers' rates are. This price fixing in turn keeps the anesthesiology rates in Michigan artificially suppressed.

*Id.*

In response, BCBS-MI argues that the Blues Conspiracy allegations must fail because A4 does not identify "any ready, willing, and able entrants" to compete with BCBS-MI in the Michigan insurance market. ECF No. 46, PageID.1742. A4 contends that the "ready, willing, and able" test does not apply to 'market-division agreements' barring

'potential' competition." ECF No. 47, PageID.1798 (citing Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 2030b (4th ed.)).

BCBS-MI has not adequately supported the applicability of the "ready, willing, and able" test to the present circumstances. Moreover, the Court finds that the "ready, willing, and able" standard need not dictate whether A4 has adequately pled the existence of a horizontal price-fixing and market-division conspiracy. Here, A4 alleges that absent a market-division conspiracy, other Blues would compete with BCBS-MI in Michigan. In other words, the Blues Conspiracy constitutes an illegal horizontal agreement between BCBS-MI and other out-of-state BCBSA insurers. Importantly, antitrust doctrine generally considers this type of arrangement illegal per se, without demanding an independent showing of anticompetitive effects. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) ("One of the classic examples of a per se violation of [Section 1 of the Sherman Act] is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition."); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 (6th Cir. 2003) ("[T]he law is clear that once . . . a restraint is subject to per se analysis, the claimed lack of any actual anticompetitive effects or presence of procompetitive effects is irrelevant.").

The ultimate question is whether A4 has plausibly alleged the existence of the Blues Conspiracy to obtain seller-based antitrust standing. In pending multidistrict litigation in the Northern District of Alabama, healthcare providers alleged that "the Defendant Blue Cross/Blue Shield Plans, which are independent companies, along with the Blue Cross Blue Shield Association, have engaged in a conspiracy to horizontally allocate geographic markets." *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1180 (N.D. Ala. 2014). The *In re Blue Cross* court's summary of the provider-plaintiffs' allegations closely track A4's allegations against BCBS-MI:

> [T]he Providers allege that Defendants previously reached an explicit agreement to divide the United States into what they term "Service Areas" and then to allocate those geographic markets among the Blues, free of competition from one another. The Providers specifically allege that Defendants have created geographic markets and allocated those among themselves by agreeing not to compete with each other within those markets. The Providers further allege that, as a result of decreased competition due to the market allocation, they are paid much less by the Blues than they would be absent Defendants' conspiratorial conduct.

*Id.* at 1180. The *In re Blue Cross* court concluded that "Plaintiffs have alleged a viable market allocation scheme" to survive the defendants' motions to dismiss, but it declined to decide whether the alleged horizontal conspiracy should be treated as a per se violation at the motion to dismiss phase. *Id.* at 1184.

BCBS-MI has not attempted to distinguish A4's Blues Conspiracy allegations from those that survived a motion to dismiss in *In re Blue Cross*. Indeed, BCBS-MI notes that these exact claims "are the subject of pending multidistrict litigation." ECF No. 46, PageID.1742. The uncanny similarity between A4's Blues Conspiracy allegations and the *In re Blue Cross* healthcare providers' claims persuade the Court that such nearly identical circumstances compel a consistent result. A4 plausibly alleges the existence of a conspiracy through "amended license agreements" between BCBS-MI and other Blues that geographically divides markets and prevents competition between the Blues. ECF No. 43-2, PageID.1596–96, ¶¶ 119–20. For example, these agreements prohibit BCBS-MI from competing with out-of-state Blues, while also insulating itself from other Blue competitors. *Id.* at PageID.1597–98, ¶ 122. In addition, the agreements bar BCBS-MI and other Blues from earning "more than 20% of its revenue from non-Blue business in its designated service area," thus prohibiting the Blues from "competing with each other using non-Blue subsidiaries." *Id.* at PageID.1597, ¶ 121. A4 also alleges that these horizontal agreements reduce reimbursement prices paid across the Blues' network and require Michigan anesthesiologists to accept BCBS-MI's lower uniform rate even if their patient is insured by an out-of-state Blue with a higher rate. *Id.* at PageID.1599–1600, ¶¶124–28.

30

But crucially, at this stage, the Court's holding "does not resolve the issues of causation and damages," which A4 will still need to prove to recover. *In re Cardizem*, 332 F.3d at 909. Nor is the Court required to decide whether the alleged Blues Conspiracy is considered a per se violation or should be subject to the rule of reason analysis. *See In re Blue Cross*, 26 F. Supp. 3d at 1187 (denying the defendants' motions to dismiss the plaintiffs' horizontal market allocation conspiracy claims but declining to establish the standard of review without a developed factual record).

By plausibly alleging the existence of the Blues Conspiracy and asserting seller-based standing, the Court merely finds that A4 has partially corrected its original Complaint's antitrust standing and antitrust injury deficiencies. Therefore, with respect to its amended allegations regarding the Blues Conspiracy and seller-based standing, A4's motion for leave to amend is **GRANTED in part**.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Leave to Amend is **DENIED in part and GRANTED in part**. Plaintiff is permitted to proceed on its federal antitrust claims based solely on its allegations related to the Blues Conspiracy. The Court retains supplemental jurisdiction over Plaintiff's state law claims raised in the Amended Complaint pursuant to 28 U.S.C. § 1367.

31

**IT IS SO ORDERED.**

Dated: September 28, 2022

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

## Certificate of Service

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on September 28, 2022.

s/Karri Sandusky for A. Chubb
Case Manager