# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

ANESTHESIA ASSOCIATES OF ANN ARBOR, PLLC,

                Plaintiff,

    -against-

BLUE CROSS BLUE SHIELD OF MICHIGAN,

                Defendant.

Civil Action No. 2:20-cv-12916

Hon. Terrence G. Berg

Mag. Anthony P. Patti

# AMENDED COMPLAINT

# TABLE OF CONTENTS

NATURE OF THE ACTION ....................................................................1

    **A.**    Illegally Acquired Monopsony Power Distorts Markets and Harms Consumers. ..........................................................................6

    **B.**    BCBSM Enters into a Conspiracy to Monopsonize with Other Blue Cross Blue Shield Insurers. ..............................................12

    **C.**    After A4 Attempts to Leave BCBSM's Network, BCBSM Undertakes a Campaign of Tortious Interference and Duress Against A4. ...........14

    **D.**    BCBSM Uses Its Monopsony Power to Reduce the Quality and Quantity of Anesthesiology Care in Michigan, While Increasing Prices to Consumers. ..........................................................20

    **E.**    BCBSM's Actions Violate Section 1 and Section 2 of the Sherman Antitrust Act. ..............................................................22

FACTUAL ALLEGATIONS ....................................................................23

    I.    The Parties, Jurisdiction, and Venue. ..................................................23

    II.    The Anesthesiology Market ....................................................26

    **A.**    Anesthesiologists Require Access to Medical Facilities to Practice Medicine. ..........................................................................28

    **B.**    Patients and Surgeons Differentiate Between Anesthesiologists Based on Quality. ........................................................................29

    **C.**    Absent Conspiracy or Monopsony, Insurers Have Incentives to Attract High-Quality Anesthesiologists. ......................................33

    **D.**    Compensation for Anesthesiology Services Is Driven by Conversion Factors. ........................................................................34

    **E.**    Anesthesiologists Generally Operate Out of Independent Practices. .39

    **F.**    Out-of-Network Billing and A4's Promise Not to Balance Bill. ........41

III.   BCBSM Enters into a Conspiracy Aimed at Creating and Exploiting Monopsony Power....................................................................................42

IV.   BCBSM Retaliates Against Anesthesiologists Who Reject BCBSM's Uniform Rate............................................................................................47

   A.   After A4 States Its Intent to Leave BCBSM's Network, BCBSM Punishes the Hospitals Where A4 Works. ...........................................47

   B.   BCBSM Tortiously Interferes with A4's Contracts with Trinity Hospitals and A4's Employees. ..........................................................52

   C.   BCBSM Imposes Economic Duress on A4 by Willfully Breaching Its Contracts with A4's Independent Contractors....................................56

   D.   In October 2020, BCBSM, in Concert with Trinity, Induces Trinity to Terminate Its Relationship with A4. ...................................................58

V.   BCBSM Has Used its Illegally Acquired Monopsony Power to Reduce the Quantity and Quality of Anesthesiologists in Michigan, While Maintaining or Increasing Prices to Consumers. .....................................59

   A.   BCBSM Has Set Its Uniform Price for Anesthesiology Services at a Below-Competitive Level. ..................................................................60

   B.   BCBSM Is Reducing the Quantity and Quality of Anesthesiology Care in Michigan...................................................................................63

   C.   BCBSM Has Increased the Quality-Adjusted Prices Paid by Consumers for Health Insurance and for Anesthesiology Care..........68

   D.   BCBSM Has a History of Entering into Agreements that Unreasonably Restrain Trade and Increase Its Market Power............72

VI.   BCBSM Has Acquired Market Power in Each of the Relevant Markets. ................................................................................................73

VII.   There is No Pro-Competitive Benefit Outweighing the Harms of BCBSM's Conduct...................................................................................76

VIII.  A4 Has Suffered Damages from BCBSM's Torts and Antitrust

Violations. .................................................................................................77

CLAIMS FOR RELIEF ...............................................................................79

    First Cause of Action ...........................................................................79

    Second Cause of Action .......................................................................79

    Third Cause of Action ..........................................................................80

    Fourth Cause of Action ........................................................................82

    Fifth Cause of Action ...........................................................................83

    Sixth Cause of Action ..........................................................................85

    Seventh Cause of Action ......................................................................86

    Eighth Cause of Action ........................................................................88

    Ninth Cause of Action .........................................................................88

REQUEST FOR RELIEF ............................................................................89

JURY DEMAND ........................................................................................90

Pursuant to the Court's Order, ECF 52 (Sept. 28, 2022), granting in part Plaintiff's motion to file the Proposed Amended Complaint of October 15, 2021, ECF 43-2, and without waiver of the claims dismissed by the Court, Plaintiff Anesthesia Associates of Ann Arbor, PLLC, by and through its undersigned attorneys, alleges as follows, upon personal knowledge as to its own acts and status and upon information and belief as to all other matters, for its Amended Complaint against Defendant Blue Cross Blue Shield of Michigan:

## NATURE OF THE ACTION

1.      This action arises from a scheme by Defendant Blue Cross Blue Shield of Michigan ("BCBSM") to monopsonize the market for buying anesthesiology services in Michigan and to commit tortious acts.  Defendant's illegal actions include:

(a) a horizontal market-allocation, price-fixing, and boycott conspiracy with other Blue Cross Blue Shield insurers to divide the markets for health insurance in the United States and to fix the prices paid to providers of medical services, including anesthesiology services.  As a result, BCBSM is insulated in Michigan from competition from other Blue Cross Blue Shield health insurers that would otherwise enter the Michigan markets; and

(b) tortious acts, including interference with contract, to retaliate against any anesthesiologists that attempt to leave BCBSM's network to work with BCBSM's competitors' networks instead of BCBSM.

2.    Through these actions, BCBSM has succeeded in requiring anesthesiologists in Michigan to accept its below-competitive rate, what BCBSM calls its "uniform Blue Cross contracted payment" for anesthesiology services.  By imposing a uniform and below-competitive rate across all anesthesiologists in Michigan, BCBSM has driven doctors from the state (and kept doctors from entering), resulting in a current shortage of almost one-hundred anesthesiologists in Michigan.  This shortage is causing hospitals to close operating rooms for lack of anesthesiologists, which in turn forces patients to delay receiving treatment while they find alternate (and less convenient) sites of care, during which time their conditions may worsen.

3.    BCBSM's action have also driven down the quality of anesthesiology services in the state (as high-quality anesthesiologists leave), meaning that even where a patient's surgeon believes that high-quality anesthesiology care is necessary or important, that option may not be available.

4.    Moreover, BCBSM's uniform, below-competitive rate, together with the anesthesiologist shortage it caused, have led to a situation where doctors are

2

having to oversee more anesthetizing locations concurrently than in years past.[1]
Today, anesthesiologists in many hospitals in Michigan are regularly working at a
4-to-1 staffing ratio, meaning that they are responsible for providing medical
directions for clinical registered nurse anesthetists ("CRNAs") in four different
operating rooms (or other anesthetizing locations) concurrently.  Due to BCBSM's
actions, that staffing ratio has increased over the last decade, where previously
anesthesiologists at many hospitals in Michigan regularly worked at a 3-to-1 ratio
or lower.

5.     BCBSM is aware of the harms it is causing.  In Fall 2020, BCBSM
had a call with the Michigan Society of Anesthesiologists, with representatives
from multiple anesthesiology groups in Michigan joining.  On the call, those
anesthesiology groups confirmed that BCBSM's rate was: causing
anesthesiologists to leave the state; hampering efforts to recruit anesthesiologists
into Michigan; and forcing the remaining doctors to work longer hours and at
higher staffing-ratios.  At the meeting BCBSM admitted that its anesthesiology
rate was low and needed to come up, but as of 2021, the rate remains one of the
lowest in the nation.

---

[1] Anesthetizing locations include operating rooms, procedure rooms, and delivery
rooms.

6.     While BCBSM benefits from reducing its purchases of anesthesiology services, and the amount it pays for those services, the costs of BCBSM's actions are imposed not only on anesthesiologists but also on Michigan consumers through fewer and lower-quality anesthesiologists in the state.  Because high-quality anesthesiology can be central to a patient obtaining a good surgical outcome, patients or their surgeons often seek out high-quality anesthesiologists.  For patients in Michigan, that option is limited and at risk of disappearing.

7.     Because Michigan anesthesiologists' only choices, as a practical matter, are to accept BCBSM's reimbursement rate or to leave the state and practice elsewhere, many have chosen to depart (or not enter) the state, leaving Michigan, as of April 2021, with nearly one-hundred unfilled anesthesiology positions.  This lack of anesthesiologists has reduced the overall supply of anesthesiology services in Michigan available to patients, as demonstrated by the fact that hospitals have been forced to close surgery departments for lack of qualified anesthesiologists to staff them.  Despite there being so many open positions available for anesthesiologists in Michigan, the majority of the University of Michigan's anesthesiology graduates leave the state to work elsewhere, rather than work in Michigan at BCBSM's suppressed, below-competitive rate.

8.     When these doctors leave the state, they are also unavailable to serve patients insured by BCBSM's competitors.  Thus, Michigan consumers are harmed

by a reduction in anesthesiology care regardless of their health insurance carrier.

BCBSM is therefore able to impose supracompetitive rates on consumers for

health insurance, despite decreasing the quality of its offering to consumers,

leading to higher quality-adjusted prices for insurance coverage and, by extension,

higher quality-adjusted prices for anesthesiology care.  The price of anesthesiology

care for consumers takes into account both health insurance premiums (which the

consumers pays for coverage of medical treatments, including anesthesiology care)

and out-of-pocket costs, including co-payment (a fixed payment, set by the insurer,

which the patient pays per treatment), co-insurance (a percentage, set by the

insurer, of the fee for a treatment that the patient pays), and deductible, or some

mix of those three (for example, a subscriber may be on a plan where there is a co-

payment for anesthesiology services, but no co-insurance charge).

9. These reductions in quantity and quality as well as the increase in

quality-adjusted prices constitute the classic harms to competition of monopsony:

with reduced prices for inputs comes reduced purchases of inputs and, as a result,

reduced output, leading to deadweight harm to both producers and consumers.

10. As a seller of anesthesiology services that has invested heavily in

delivering high-quality care to patients, Plaintiff Anesthesia Associates of Ann

Arbor, PLLC ("A4") is a direct victim, in fact the most direct victim, of BCBSM's

anticompetitive conduct.  For years, A4 has been forced to accept BCBSM's below

competitive rate, and in 2019, when A4 attempted to reject that rate, BCBSM

threatened to, and did, steer work away from the hospitals where A4 practiced until

those hospitals forced A4 to accept BCBSM's uniform reimbursement rate.

### A.   Illegally Acquired Monopsony Power Distorts Markets and Harms Consumers.

11.   Monopsony refers to market power on the buy-side of a market.  In

1948, the Supreme Court confirmed that conspiracies to create monopsony power

are "the sort of combination condemned by the [Sherman] Act . . . and the persons

specially injured under the treble damages claim are sellers, not customers or

consumers."  *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219,

235 (1948).   Although conspiracies to monoposonize and to monopolize are both

illegal, when assessing a monopsony claim under the antitrust laws, the "factors

are reversed" from what they would be in a traditional monopoly claim.  Roger D.

Blair & Jeffrey L. Harrison, *Antitrust Law & Monopsony*, 76 Cornell L. Rev. 297,

324 (1991).

12.   First, when assessing monopsony claims "the market is not the market

of competing sellers"—as it would be in a monopoly claim—"but of competing

buyers.  This market is comprised of buyers who are seen by sellers as being

reasonably good substitutes."  *Id.*

13.   Second, while a monopolist *decreases the supply of outputs* (by

selling less) *and increases the prices* at which it *sells those outputs* to consumers, a

monopsonist instead *decreases the demand for inputs* (by buying less) *and decreases the prices* at which it *buys inputs. Id.* Just as an illegal monopoly is distinguished from a competitive market by the fact that it reduces output supply, an illegal monopsony is distinguished by the fact that it reduces input purchases. Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* § 575 (4th ed.). While a legitimate buyer will seek to reduce its purchase prices so that it can *buy more* (and in turn sell more to its customers), a monopsonist will reduce its purchase prices and *buy less. Id.* Just as monopoly distorts the supply of outputs, monopsony distorts the supply of inputs, leading to a mismatch between consumer demand and the inputs necessary to meet that demand, thereby reducing consumer welfare. *Blair & Harrison*, 76 Cornell L. Rev. at 316.

14.    Third, and following from the above, the direct victims of monopsony and monopoly are different. When a wholesale seller conspires with downstream firms to fix retail prices, the direct victims are consumers at the retail level, and competing sellers must make an additional showing to establish standing. By contrast, if that wholesale seller conspires to fix the prices at which it purchases raw materials or inputs, the "most direct victims" of that monopsony are "the sellers" who "suffer a loss in revenue due to the decreased price." *Blair & Harrison*, 76 Cornell L. Rev. at 316. While consumers—ultimately—also suffer a

"distinct" harm from the "restrictions in output" caused by monopsony, they are not the most direct victim; rather, the sellers (here: anesthesiologists) are the most direct victim.  *Id.*

15.    However, when an entity possesses both monopsony and monopoly power, both sellers and consumers can suffer *direct and distinct* injuries.  On the monopsony side, the entity pays below competitive prices for inputs and decreases the amount that it purchases.  Because it is purchasing fewer inputs, it also creates fewer outputs.  Then, as a monopolist, it uses that restriction in the supply of outputs to sell to consumers at higher prices, thereby harming consumers directly as well as sellers.  These actions lead to deadweight economic harm on both the input and output sides, as prices and the quantity/quality of services are distorted from competitive levels.

16.    For example, a television network could possess both (a) monopsony power in market for buying television programming and (b) monopoly power in the market for broadcasting television programs to consumer subscribers.  As a monopsonist, that network can pay less for television programming and in turn buy fewer television programs than it would in a competitive market (for example, it will purchase ten shows instead of twenty); in turn, on the monopoly side, the network will offer fewer television programs to its subscribers (ten shows instead of twenty), thus reducing the amount of programming that it sells while also

8

maintaining supracompetitive prices.  Even if the network does not increase prices to consumers but instead keeps them the same as when more programs were offered, the price per program will still go up (as there are now fewer programs), leading to higher quality-adjusted prices for consumers.

17.     As another example, a cellular service provider that possesses both monopsony and monopoly power can, as a monopsonist, pay less for, and buy less, thus resulting in lower quality cellular service (*e.g.*, lower speeds and worse geographic coverage).  On the monopoly side, the cellular provider will offer consumers a less robust cellular network while charging them the same or more, thus increasing quality-adjusted prices.

18.     As explained further below, BCBSM has created the same types of distortions (a) as a monopsonist in the market for purchasing anesthesiology services and (b) as a monopolist in the market for selling health insurance to consumers.

19.     The market for purchasing anesthesiology services in Michigan is made up of commercial health insurers (*i.e.*, insurers other than Medicare, Medicaid, or other government health-coverage programs) who compete to have anesthesiology providers serve their subscribers.[2]  An anesthesiologist keeps

---

[2] While Medicare and Medicaid do not compete in this market, they are not immune from the cross effects of BCBSM's anticompetitive actions.  For example,

patients alive and in comfort while they undergo medical procedures—from childbirth to orthopedic surgery to heart transplants to the intubations that have become increasingly necessary during the COVID-19 pandemic.

20.     Given the high-stakes involved in anesthesiology and the hands-on doctor-patient relationship that it entails, it has long been recognized that patients or their surgeons differentiate between anesthesiologists based on quality.  *See, e.g.*, *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 22-23 & nn.34, 39 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).  From patients' perspective, anesthesiology services are not fungible or commodified.  Instead patients or their surgeons seek to work with anesthesiologists that can provide the care necessary to increase the chances of a good outcome.  *Id.*  As a result, patients will seek (or defer to their surgeons' decisions to seek) higher-quality anesthesiologists, even if doing so entails increased costs.

21.     As surgeons often have privileges at multiple hospitals, they can and do choose where to perform surgery on a patient based on where they obtain high-quality anesthesiology services.  For example, Beaumont, a Michigan hospital chain, recently ceased working with A4 as well as another anesthesiology provider,

senior citizens on Medicare in Michigan are harmed by the lower number and quality of anesthesiologists in Michigan.

North American Partners in Anesthesia ("NAPA"), as a result of BCBSM's illegal actions. After these staffing changes, Beaumont surgeons are increasingly shifting operations to Trinity Health Michigan ("Trinity"), a hospital system where A4 still works—albeit at a reduced capacity due to BCBSM's illegal actions.[3] Despite the potential costs and inconveniences of going to Trinity rather than Beaumont (*e.g.*, if a patient lives closer to Beaumont than Trinity), patients are accepting their surgeons' decisions so that the surgeons could work with their preferred anesthesiologists. As the types of procedures that are most lucrative for hospitals—such as complex cardiac surgery—generally require highly-trained and skilled anesthesia providers, hospitals have a strong incentive to keep the quality of their medical staff (including anesthesia providers) high, lest they lose patients to hospitals where surgeons can choose from a more robust selection of anesthesiologists. For example, it has been reported that up to 80% of hospital revenue is derived from orthopedic and cardiac procedures.

22.     Patients' and their surgeons' desire for access to high-quality anesthesiology care also in turn drives (absent conspiracy or monopsony) competition among health insurance providers. Absent conspiracy or monopsony,

---

[3] Eric Starkman, *Bailing Out at Beaumont – 2 More Top Execs Bid Bye-Bye to CEO John Fox*, Deadline Detroit (May 26, 2021), https://www.deadlinedetroit.com/articles/28082/starkman_bailing_out_at_beaumont_--_2_more_top_execs_bid_bye-bye_to_ceo_john_fox.

if an insurer cannot attract a sufficient number and quality of doctors to its network, its insurance offerings will be less competitive and it will have to charge less than its peers.  Thus, the demand for high-quality health care (including anesthesiology services) drives competition among insurers.  Health insurers engage in this competition by working to entice anesthesiologists to join their networks, a process referred to as "participating" or going "in-network."  When a provider goes in-network, that provider is agreeing to serve the insurer's subscribers on pre-determined terms.

23.     One of the key terms that is agreed between an anesthesiologist and an insurer as part of an anesthesiologist going in-network is the anesthesiologist's "conversion factor," which is a variable that feeds into how anesthesiology fees are calculated.  Conversion factors vary based on the cost and quality of care, with higher-quality anesthesiologists commanding higher conversion factors to go in-network.  Thus, insurers that wish to offer in-network access to higher-quality anesthesiologists desired by many patients (or their surgeons) must be willing to pay a higher conversion factor to those anesthesiologists to bring them in-network.

**B.     BCBSM Enters into a Conspiracy to Monopsonize with Other Blue Cross Blue Shield Insurers.**

24.     BCBSM, however, is party to a horizontal conspiracy with other Blue Cross Blue Shield insurers to divide the United States into separate fiefdoms in which the conspirators will not compete with each other.  This conspiracy

12

developed through communications involving BCBSM and other Blue Cross Blue Shield insurers (collectively, "Blues"), dating back at least to the 1980s, when the Blues created mandates that became known as the "Long-Term Business Strategy." This strategy was referred to at a Blue Cross Blue Shield Annual Meeting as a change that would lead to "concentration of power."  Consistent with this strategy, in 1990, the Blues (including BCBSM) began a policy of limiting competition by requiring the Blues (including BCBSM) to adhere to exclusive service areas as part of licensing the Blue Cross Blue Shield branding.  The conspiracy further developed through discussions involving BCBSM and the Blues in June 2013.  The conspiracy is currently memorialized in a so-called "amended license agreement" pursuant to which all of the Blues agree to multiple anticompetitive restraints.

25.     The "amended license agreement" divides the country into geographic markets, referred to as service areas, in which BCBSM and the other Blues will not compete with each other.  These competition restrictions go far beyond a simple licensing arrangement: the restrictions also limit the ability of the conspirators to compete with each other using non-Blue Cross Blue Shield branded insurance products.  Pursuant to this conspiracy, BCBSM can operate in Michigan essentially free from competition from the other Blues, and they in turn can operate in their territories relatively free from competition by BCBSM.  This horizontal conspiracy also requires BCBSM and the other Blues to restrict the amount of revenue

13

generated by their non-Blue subsidiaries.  This output restriction thereby ensures that the Blues do not circumvent the geographic restrictions by competing under other brand names.

26.     In addition, the "amended license agreement" requires the Blues, and BCBSM, to participate in the BlueCard program, a method by which the Blues fix prices and boycott healthcare providers outside of their respective service areas. Under the BlueCard program, if A4 provides medically necessary care to someone insured by the Blues in Wisconsin, Ohio, or Florida, for example, A4 cannot enter into a direct agreement with those insurers.  Instead, A4 must submit the charges to BCBSM and accept BCBSM's rates.  This price fixing and boycott conspiracy further allows BCBSM to keep its provider reimbursements low, without having to worry about competition.

27.     Since 2013, BCBSM and its co-conspirators have continued to take overt acts to further their horizontal conspiracy, including paying A4 at below-competitive prices.

### C.     After A4 Attempts to Leave BCBSM's Network, BCBSM Undertakes a Campaign of Tortious Interference and Duress Against A4.

28.     In April 2019, A4 told BCBSM that it could not continue to accept BCBSM's artificially low rate.  A4 explained to BCBSM, and the hospitals where it provided services, that A4 would continue to treat BCBSM's subscribers, and

would not bill those patients any differently than it had before, but that A4 would not stay in BCBSM's network unless BCBSM paid a competitive rate. From the perspective of consumers, this meant no change.

29.   BCBSM retaliated by threatening to boycott the hospitals and medical facilities where A4 provided anesthesia services, unless those facilities in turn boycotted A4 and/or forced A4 to comply with BCBSM's demands.

30.   On April 22, 2019, A4 learned of BCBSM's actions from one of A4's longtime partners, Trinity. The news came from Trinity's chief executive officer for its Michigan hospitals, Rob Casalou, who also sits on BCBSM's board of directors. Casalou wrote that he "spoke to BCBSM last Wednesday about" A4 possibly leaving BCBSM's network. BCBSM, he warned, was threatening "***to steer work away from facilities with A4***," *i.e.*, the medical facilities, including Trinity's hospitals, where A4 performs procedures. (Emphasis added.)

31.   Casalou explained that Trinity took BCBSM's boycott threat seriously. "BCBSM has a reputation for being ***the most aggressive*** of the payers in these situations," he cautioned, that even though A4 was not balance-billing patients, BCBSM's aggressive tactics would mean that "***the impact on our facilities and patients will eventually be felt***." (Emphasis added.)

32.   When Casalou sent that email, Trinity's Michigan hospitals and A4 had been working together for half a century. Just four years' prior, A4 had been

15

one of only four anesthesiology practices *in the nation* to be awarded the coveted "Preferred Provider" designation by Trinity's parent organization.  Trinity had every reason to continue working with A4.

33.     However, BCBSM soon made good on its threats.  Casalou informed A4 that BCBSM was warning its subscribers that if they sought care at Trinity, BCBSM would take steps to leave those subscribers personally responsible for any charges by A4.  As Casalou explained, BCBSM was telling its subscribers that it "will put the patient in the middle of [A4's] dispute" with BCBSM.

34.     Casalou also informed A4 that BCBSM had caused the president of another Michigan hospital to contact Trinity and warn that the hospital's parent organization was "seriously considering telling its patients that they should not use Trinity facilities for any care that would require anesthesia," despite there being a reciprocity agreement between Trinity and that organization.  While A4 had taken every effort to avoid any change in patient care or billing, BCBSM was pursuing the opposite strategy.

35.     BCBSM's actions, Casalou explained to A4, would cause patients to stop using Trinity and would have a serious financial effect on Trinity.  Despite Trinity's long relationship with A4, and despite Trinity lauding A4 as one of the best practice groups in the country, in July 2019, Trinity, opted to terminate what it

had called weeks earlier its "***long-standing and successful relationship with A4***." (Emphasis added.)

36.     At the same time, A4 was receiving similar warnings from its other hospital partner in Michigan, Beaumont Health ("Beaumont"), about what BCBSM would do to Beaumont in retaliation for A4 going out of network.  As with Trinity, A4's anesthesiologists had worked successfully in Beaumont's hospitals for years.  For example, A4's cardiac anesthesiologists helped bring improvements to Beaumont's Dearborn hospital.  While cardiac surgery is an important revenue generator for hospitals, Beaumont could not withstand BCBSM's enforcement pressure any more than Trinity could.  On July 5, 2019, BCBSM succeeded in causing Beaumont to send a termination notice to A4.

37.     Along with BCBSM's threats against A4, BCBSM in 2019 also knowingly (i) coerced and induced Trinity's hospitals to breach non-solicit obligations they owed to A4 and (ii) conspired with Trinity to induce A4's employees to breach their non-compete obligations.

38.     A4 competes nationally for physicians and has made substantial investments in recruiting, training, and maintaining its team of anesthesiologists and CRNAs.  To protect the investments in its practice, A4 has limited non-compete agreements with certain of its anesthesiologists and non-solicit agreements with the hospitals where its anesthesiologists practice.  BCBSM knew

17

of these non-compete and non-solicit obligations, including through Casalou.

Despite knowing of these agreements, beginning in or around June 2019, BCBSM

acted through and in concert with Trinity's hospitals, to solicit and hire A4's

anesthesiologists to work directly for Trinity, violating A4's contractual rights and

causing damage to A4.

39.     Under pressure from BCBSM, and in conspiracy with BCBSM,

Trinity in or around June 2019 solicited A4's doctors, promising that even if the

doctors breached their agreements with A4, Trinity "***will indemnify the clinicians***

***against any risk from the non-competes, if they agree to accept employment***" at

Trinity's hospitals.  (Emphasis added.)  In making this offer, Trinity explicitly

referenced the threat from BCBSM as motivating Trinity's attempt to hire A4's

doctors.  Trinity's solicitation stated that Trinity was concerned with A4's "plan to

depar[ticipate] with Blue Cross," because "***Blue Cross Blue Shield of Michigan***

***has been very aggressive in the past in these types of situations***" and would

potentially direct its insureds to "***alternative sites of care***."  (Emphasis added.)

Hence, "***if efforts to resolve this are unsuccessful . . . we will be prepared to***

***approach A4 physicians and CRNAs about direct employment***."  (Emphasis

added.)  Within months, A4 had lost several physicians due to BCBSM's tortious

interference.

18

40.     Another prong of BCBSM's unlawful retaliation was economic duress aimed directly at A4 through its independent contractors.  A4 works with certain anesthesiologists and CRNAs who are independent contractors and who also provide services for other healthcare groups.  These healthcare professionals have individual in-network contracts with BCBSM, covering the work they do with A4 and other providers.  A4 did not require these individuals to go out of network with BCBSM, nor did they seek to do so.  Nonetheless, BCBSM terminated the provider status of these independent contractors in July 2019, as punishment for working with A4.  These terminations were without cause, without notice, and constituted breaches of BCBSM's contracts with the contractors.

41.     For A4's independent contractors, these terminations meant that even when they were working with other providers, they would not have in-network status, thereby jeopardizing their ability to work with other healthcare providers.

42.     After learning of the terminations, A4 wrote to BCBSM, stating that the terminations must have been an error, and asking that the affected independent contractors have their provider status reinstated.  But it was not an error.  BCBSM's subsequent communications made clear that BCBSM would continue to breach its agreements, and unlawfully treat these healthcare practitioners as terminated, unless (i) they stopped working with A4 or (ii) A4 went back in-network with BCBSM.

43.     Faced with the simultaneous threats of losing its hospital partners and its personnel and being put out of business, A4 agreed to go back in-network with BCBSM and to accept BCBSM's artificially low conversion factor for anesthesiology.

44.     A year later, A4 again attempted to seek a competitive rate from BCBSM with the same result.  On Thursday, October 22, 2020, A4 attempted to resolve its disagreement with BCBSM by inviting BCBSM to negotiate a competitive rate with A4, before A4 filed this lawsuit.  The following Monday, October 26, 2020, BCBSM informed A4 that it was refusing to negotiate with A4 on these issues.  Instead, BCBSM induced Trinity to send a notice terminating its long-standing relationship with A4.  The very next morning, Tuesday, October 27, 2020, Trinity informed A4 that it was terminating all of A4's relationships with Trinity's hospitals in Michigan, effective in 180 days.

**D.     BCBSM Uses Its Monopsony Power to Reduce the Quality and Quantity of Anesthesiology Care in Michigan, While Increasing Prices to Consumers.**

45.     BCBSM has used its illegally acquired market power to set its conversion factor at one of the lowest rates in the entire nation.  Compared to the rates used in other states, BCBSM's conversion factor was, as of April 2021, one

of the three lowest in the country,[4] and it has remained in the bottom nationally and regionally for years.  BCBSM's rate has resulted in a chronic shortage of anesthesiologists in Michigan, one that is becoming even more acute as BCBSM's practice of imposing a below-competitive rate continues.  A4 lost doctors to neighboring Ohio, other Michigan anesthesiology providers have reported similar staffing problems, and there are nearly one-hundred open anesthesiology positions in the state.  After Beaumont ceased working with A4 and NAPA, it has been reported to have lost about 50% of its anesthesiologists at one hospital.  The gulf between BCBSM's rate and those available outside Michigan shows why so many anesthesiologists are leaving the state.  Based on American Society of Anesthesiologists data, Ohio's average conversion factor for anesthesiology in 2018 was about $10 higher than BCBSM's.  Because of how anesthesiology billing is calculated, a $10 difference in the conversion factor can result in a *$40 per hour* difference or more in compensation.

46.     Because these shortages affect insurance providers across Michigan (not just BCBSM), BCBSM has not had to lower the rates it charges to consumers, despite its service-offering declining in quality as anesthesiologists leave the state.

---

[4] Rick Ganzi, *Michigan is Facing an Anesthesiologists Shortage, Due to Minimal Reimbursement*, Lansing State Journal (Apr. 27, 2021), https://www.lansingstatejournal.com/story/opinion/contributors/viewpoints/2021/04/27/gap-reimbursement-rates-anesthesiologists-hurts-health-care/7201393002/.

In fact, because BCBSM possesses monopoly power in the commercial health insurance market, with over 68% of the market statewide, BCBSM has been able to raise prices even as it restricts the quality and quantity of anesthesiologists available to consumers.  BCBSM raised its rates by at least 2.5% for 2021 and is planning on raising its premiums by at least 6% for 2022, according to Michigan's Department of Insurance and Financial Services.  Kaiser Family Foundation data shows that Michigan has some of the highest insurance premiums in the country. BCBSM's actions have thus increased both the nominal and the quality-adjusted prices for consumers.  Nor are high premiums the only way in which BCBSM can impose supracompetitve charges on its customers.  It can also impose higher co-payments and higher co-insurance than it would in a competitive market.

### E.    BCBSM's Actions Violate Section 1 and Section 2 of the Sherman Antitrust Act.

47.    BCBSM has no pro-competitive justification for the anticompetitive restraints it has created and exploited.  These restraints constitute unreasonable restraints of trade as well as *per se* violations under Section 1 and Section 2 of the Sherman Antitrust Act.  A4 has suffered, and will continue to suffer, damages from these antitrust violations.  Those damages flow directly from the anticompetitive nature of BCBSM's conduct.

## FACTUAL ALLEGATIONS

### I.    The Parties, Jurisdiction, and Venue.

48.    Plaintiff A4 is a physician-owned, professional limited liability organized under Michigan law and with a principal place of business in Ann Arbor, Michigan.  Its anesthesiologists have undergone rigorous board certification, have introduced new procedures to Michigan hospitals, are professors at Wayne State University, and since the onset of the COVID-19 pandemic, have worked tirelessly, and at great personal risk to themselves, to perform life-saving intubations to place patients suffering from COVID-19 onto ventilators.  Originally founded as a professional corporation in 1968, A4 has grown into one of the most respected anesthesiology practices in the state.  Its doctors work with some of the top physicians in Michigan performing state-of-the-art procedures.  While A4 previously served patients in Grand Rapids, Michigan, as of 2019, BCBSM's anticompetitive acts have limited A4 to operating in Southeastern Michigan.

49.    A4 is a seller of anesthesiology services in Michigan and sells to BCBSM.  A4 has suffered direct antitrust injury, in the form of lower revenues and lost profits, as a result of BCBSM's conspiracy.

50.    Defendant BCBSM is the largest commercial health insurer in Michigan and the ninth largest insurer in the country.  Headquartered at 600 E. Lafayette Blvd., Detroit, Michigan 48226, BCBSM provides private health

23

insurance to over 4.5 million insureds in Michigan, and controls 68% or more of Michigan's commercial health insurance market.  BCBSM is the only Michigan entity licensed to use Blue Cross Blue Shield branding, which is administered nationally by the Blue Cross Blue Shield Administration ("BCBSA").  While BCBSM is nominally a nonprofit mutual health insurance company, its chief executive officer received over *$19 million in compensation* in 2018, the highest among all Blue Cross Blue Shield insurance companies and higher than the CEOs of almost every Michigan *for-profit* company, including Ford and Fiat Chrysler.

51.  BCBSM participates in the health insurance market through various arms including BCN (which itself previously operated as multiple entities, including Blue Care Network of Southeastern Michigan and Blue Care Network of Southwestern Michigan).  BCBSM coordinates and directs the operation of its various health insurance offerings, including BCN, when it comes to provider reimbursements.  BCBSM's practice has been to negotiate—or in the case of anesthesiology providers, unilaterally set—reimbursement rates for its health insurance products, so the conversion factor imposed for BCN products is the same as BCBSM's other health insurance products.  Because the various product arms of BCBSM act as one entity in the market for purchasing anesthesiology services, they are referred to collectively as BCBSM in the Complaint.

52.     Prior to 2013, BCBSM operated as a non-profit corporation, exempt from state and local (but not federal) taxation under Michigan law, but with regulatory requirements, including that it serve as the state's "insurer of last resort."  However, in 2010, the Affordable Care Act was signed into law, which prohibits health insurers from refusing to cover a person or charging that person more because of a pre-existing condition.  Subsequently in 2013, Michigan enacted legislation, pursuant to which BCBSM converted into a mutual nonprofit and, among other things, ceased being "the state's 'insurer of last resort.'"[5]  Subsequent to 2010, BCBSM and its co-conspirators substantially increased their anticompetitive restraints and their market power.  These federal and state legislative enactments, and the responses to them by BCBSM and its co-conspirators, substantially changed the markets for commercial healthcare insurance in Michigan and related markets in Michigan.

53.     BCBSM is engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.  Among other things, BCBSM's artificially low rate for anesthesiology services has caused A4 to lose multiple anesthesiologists who left to work in Ohio.  BCBSM's low rate for anesthesiology

---

[5] Jeff Karoub, *Gov. Snyder Signs Blue Cross Blue Shield Overhaul*, Oakland Press (Mar. 18, 2013), https://www.theoaklandpress.com/news/gov-snyder-signs-blue-cross-blue-shield-overhaul/article_3385072c-8ca8-5c14-80a3-58fc33adf27a.html.

services has also made it more difficult for A4 and other Michigan anesthesiology providers to compete nationally to recruit anesthesiologists.  BCBSM provides commercial health insurance that covers Michigan residents when they travel across state lines, purchases health care in interstate commerce when Michigan residents require health care out of state, and receives payments from customers located outside Michigan.

54.     This Court has personal jurisdiction over BCBSM, because BCBSM is headquartered in and has its principal place of business in Detroit, Michigan. For the same reason, venue is proper in this District under Section 12 of the Clayton Act.  15 U.S.C. § 22.

55.     This Court has subject matter jurisdiction over A4's Clayton Act claims and jurisdiction pursuant to 15 U.S.C. § 15, 28 U.S.C. § 1331, and/or 28 U.S.C. § 1337(a).  BCBSM's antitrust violations have harmed A4 in this district and elsewhere.  This Court has supplemental jurisdiction over A4's claims under Michigan law, pursuant to 28 U.S.C. § 1367 and principles of pendent jurisdiction.

## II.     The Anesthesiology Market

56.     Anesthesiology is one of the most vital specialties in medicine as well as one of the most physically and mentally demanding.  The anesthesiologist is called on to perform a feat that to this day remains a miracle of medicine: keeping

patients alive; safe; and in comfort; while they undergo invasive procedures.[6] Whether the procedure lasts 20 minutes or 20 hours, the anesthesiologist is called on to make split-second decisions and adjustments to ensure that the patient's airways, breathing, and circulation are functioning properly. Because anesthesiologists are tasked with keeping patients safe when they are at their most vulnerable, anesthesiology is known as "one of the most intense physician–patient relationships in medicine."[7]

57.     Anesthesiology covers a wide range of procedures, including cardiac anesthesiology, neuroanesthesiology, obstetric anesthesiology, and pediatric anesthesiology. During the COVID-19 pandemic, the need for anesthesiologists has grown, as have the concomitant sacrifices they are called on to make for their patients. COVID-19's tragic symptoms have led to a sharp increase in the use of ventilators as increasing numbers of patients lose the ability to breathe on their own. Before a patient can be placed on a ventilator, they must be intubated, and it is anesthesiologists who perform this life-saving procedure, one that that also puts the anesthesiologist directly at risk of infection. As the COVID-19 epidemic

---

[6] "It is, quite literally, the physician anesthesiologist's job to keep patients alive during invasive procedures." *Anesthesiology Specialty Description*, Am. Med. Assoc., https://www.ama-assn.org/specialty/anesthesiology-specialty-description (last accessed Oct. 9, 2020).

[7] *Id.*

continues, anesthesiologists, including the doctors at A4, are continuing to put themselves in harms' way to ensure that patients get the care they need.

58.     The unique role of anesthesiologists in medicine has shaped the market for anesthesiology services, leading to a compensation model that is different from all other medical specialties.  A4 below provides a brief background on anesthesiology and the relevant markets.  This background provides context for the harm BCBSM continues to exact upon those markets, to the detriment of competition, anesthesiologists, and patients.

### A.     Anesthesiologists Require Access to Medical Facilities to Practice Medicine.

59.     With the exception of anesthesiologists who solely provide pain management, all practicing anesthesiologists, A4 included, depend entirely on access to medical facilities, such as Trinity, for work.  An anesthesiologist's role is to perform, and to keep patients safe during, medical procedures, be they surgical, respiratory, obstetric, or otherwise.  Without a medical facility for these procedures to take place, an anesthesiologist has no practice.  A patient cannot visit an anesthesiologist's office, receive anesthesia, and then walk down the street to undergo surgery.  Anesthesia must be administered at the site of, and contemporaneous with, the patient's medical procedure.  The simple and unavoidable fact of anesthesiology is that practitioners who administer anesthesia have no choice but to work with medical facilities, such as Trinity's hospitals.

**B.     Patients and Surgeons Differentiate Between Anesthesiologists Based on Quality.**

60.     Anesthesiologists are not fungible in the eyes of the patients or surgeons selecting them.  Instead patients or their surgeons differentiate between anesthesiologists based on the quality of care they deliver, with anesthesiologists offering a higher quality of care being more desirable.  *See, e.g.*, *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 22-23 & nn.34, 39 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). For patients undergoing pain management procedures or other procedures in which the anesthesiologist is the primary treating physician, this can mean seeking out an anesthesiologist directly.  For patients who are planning to undergo surgery, quality of care is just as, if not more, important.  In those situations, the patient's surgeon will typically choose the anesthesiologist for the procedure, as the surgeon will (a) have had a greater opportunity than the patient to make assessments of different anesthesiologists and (b) has a strong incentive to work with anesthesiologists that have the requisite skills and training to facilitate a good surgical outcome.

61.     Following from the fact that patients (or their surgeons) differentiate between anesthesiologists based on quality is the fact that when patients (or their surgeons) decide that a higher-quality anesthesiologist is necessary for a procedure, the patient can be willing to incur greater costs to receive those services.

29

62.     Because surgery patients are interested in receiving a good surgical outcome, they will often defer to their surgeon's choice of a high-quality anesthesiologist, even when that choice entails greater costs than a lower-quality (from the surgeon's perspective) option.  Those costs can include higher co-insurance payments for an anesthesiologist that charges higher rates or a willingness to travel farther or otherwise incur greater inconvenience to receive higher quality anesthesiology services.  The latter can mean switching hospitals to have a procedure performed at a facility staffed with higher quality anesthesiologists.  Surgery patients are able to do this because surgeons often have privileges at multiple competing hospitals.

63.     For example, it has been reported that "Beaumont's best and most conscientious surgeons are increasingly choosing to perform their procedures" at a competing hospital, St. Joseph Mercy Oakland,[8] which is one of the Trinity hospitals where A4 operates.  Beaumont recently ceased working with A4 as well as another respected anesthesiology group, NAPA, and, as a result of BCBSM's anticompetitive actions, has not been able to replace those doctors with a sufficient number and quality of anesthesiologists, from surgeons' perspective, to continue

---

[8] Eric Starkman, *Bailing Out at Beaumont—More Top Execs Bid Bye-Bye to CEO John Fox*, Deadline Detroit (May 26, 2021), https://www.deadlinedetroit.com/articles/28082/starkman_bailing_out_at_beaumont_--_2_more_top_execs_bid_bye-bye_to_ceo_john_fox.

providing the same level of medical care.  After Beaumont ceased working with these providers, cardiologists at Beaumont expressed "serious concerns that Northstar," the new anesthesiology provider at Beaumont, "will not be able to provide the quality of cardiac anesthesia services that we have received for several decades."[9]  Given these concerns, Beaumont surgeons and their patients are going to Trinity (where A4 still works) for surgery instead, so that their surgeries can be performed in conjunction with A4 anesthesiologists.

64.     Even leaving aside the potential inconvenience caused to patients of shifting surgeries from one hospital to another, these decisions by surgeons are not sufficient to address the injuries to patients or to A4 from BCBSM's actions.  The numerous unfilled anesthesiologist positions in the state demonstrate that Michigan does not have enough anesthesiologists to meet patients' needs.  Also, the option of switching hospitals to receive care from a higher-quality anesthesiologist is not available to patients in emergency situations or who otherwise cannot travel the distance necessary.  For A4, the shifted surgeries do not make up for the much larger number of opportunities to treat patients A4 has lost due to having to cease operations at Beaumont and (and at parts of Trinity) due to BCBSM's actions and low-reimbursement rate.

---

[9] Karen S. Sibert, *How Could a Patient Die from Anesthesia for a Colonoscopy?*, MedPage Today (Feb. 4, 2021), https://www.kevinmd.com/blog/2021/02/how-could-a-patient-die-from-anesthesia-for-a-colonoscopy.html.

65.     Additionally, as BCBSM's conduct continues to drive high-quality anesthesiologists out of the state, Trinity and other hospitals are at risk of losing their remaining high-quality anesthesiologists as well, a significant loss to Michigan consumers.

66.     The shift of surgeries from Beaumont to Trinity underlines the importance to hospitals of having high-quality anesthesiologists available on staff. Such surgeries are often critical to a hospital's finances, because surgeries not only generate large amounts of revenue, they have high profit margins as well.  As Reuters reported during the pandemic, when many hospitals were cancelling elective surgeries, "[H]igh-margin services, such as orthopedic and heart procedures, can account for up to 80% of revenue, while infectious disease and intensive respiratory treatments are less profitable."[10]  Aside from orthopedic and cardiac surgery, elective surgeries generally are known to "generate high profit margins for hospitals."[11]  (The term "elective" here does not mean merely cosmetic

---

[10] Robin Respaut & Rebecca Spalding, *U.S. Hospitals Halt Lucrative Procedures Amid Coronavirus Crisis, Job Cuts Follow*, Reuters (Mar. 31, 2020), https://www.reuters.com/article/us-health-coronavirus-usa-hospitals/u-s-hospitals-halt-lucrative-procedures-amid-coronavirus-crisis-job-cuts-follow-idUSKBN21I388.

[11] Sourav Bose & Serena Dasani, *Hospital Revenue Loss from Delayed Elective Surgeries*, U. Penn. Leonard Davis Institute of Health Econ. (Mar. 16, 2021), https://ldi.upenn.edu/our-work/research-updates/hospital-revenue-loss-from-delayed-elective-surgeries/.

or optional, it includes medically-necessary procedures that, while not needing to be performed on an emergency basis, may still be "time-sensitive.")[12]  Because these surgeries often require anesthesiology, hospitals that are perceived by surgeons as having lower-quality anesthesiologists risk losing out on these lucrative procedures to hospitals staffed with higher-quality anesthesiologists.

67.    Notably, "staff" in the hospital context does not necessarily mean that a doctor is employed by the hospital.  Anesthesiologists, or groups of anesthesiologists such as A4, often work instead as independent contractors who contract with the hospital to gain access to its facilities.  While these contracts may involve stipends or subsidies paid by the hospital, the anesthesiologists are expected to bill patients' insurers directly as the primary vehicle for compensation.

### C.    Absent Conspiracy or Monopsony, Insurers Have Incentives to Attract High-Quality Anesthesiologists.

68.    Absent conspiracy or monopsony, the market for insurers purchasing anesthesiology services would be aligned with the demand by patients (or their surgeons) for anesthesiologists.  Insurers will, absent conspiracy or monopsony, want to have a sufficient number and quantity of anesthesiologists in network to serve their subscribers' needs.  The process of a doctor contracting with an insurer to join the insurer's network and serve the insured's members on pre-determined

---

[12] *Id.*

terms is called going "in-network" or "participating."  To be in-network means that the anesthesiologist has contracted with the insurance company to be compensated according to an agreed formula when the anesthesiologist treats that insurer's subscribers.  If an insurer is not willing to pay competitive rates for anesthesiologists, it will have fewer high-quality anesthesiologists in its network.

69.     In sum, absent conspiracy or monopsony, insurers need to provide patients with access to a network of anesthesiologists of sufficient size and quality and this need drives competition among insurers in the market for purchasing anesthesiology services, which in turn leads to competitive rates.

### D.    Compensation for Anesthesiology Services Is Driven by Conversion Factors.

70.     When assessing rates for anesthesiology services, the key metric is the conversion factor, which is typically the variable that drives differences in anesthesiology compensation.  This was not always the case.  In the 1940s, anesthesiologists were often compensated with a fixed percentage, around 20%, of the cost of each surgery where they administered anesthesia.[13]  This method was inefficient as it failed to tie compensation to the specific contributions anesthesiologists provide.  A relatively simple surgery might present complex issues for the anesthesiologist and vice versa.  *United States v. Am. Soc. of*

---

[13] Kenneth Y. Pauker, *A History of RBRVS as a Perspective on P4P – Part 1*, Cal. Soc. Anesthesiologists Bulletin 42, 44 (Spring 2006).

*Anesthesiologists, Inc.*, 473 F. Supp. 147, 152 (S.D.N.Y. 1979) (hereinafter *ASA, Inc.*).

71.     In the 1950s, a new compensation model was pioneered in California, where the anesthesiologist would be paid based on multiple factors including the time spent and the complexity of the work.[14]  This system, referred to as the "Relative Value Guide" method, has continued to evolve and is used to this day in various iterations across different payers, both public and private, including Medicare.  This time-based compensation system is unique to anesthesiologists among medical practitioners.

72.     The basic inputs into compensation under the Relative Value Guide are four-fold: a base factor; modifiers; time; and a conversion factor.

73.     *Base Factors and Modifiers:* The base factor and modifiers are numerical units which vary, respectively, depending on the procedure being performed and the characteristics of the patient.  More complex procedures have higher base factors, and patients with complicating conditions are associated with higher modifiers.  Base factors are generally the same across the United States, with private insurers adopting the base factors used by Medicare.  While the specific types of modifiers and how much they affect base compensation can vary across anesthesiologists and payers, the relatively small size of the modifiers

---

[14] *Pauker, supra* at 44.

means that they tend not to drive large differences among anesthesiology compensation.

74.     *Time:* The next variable, time, reflects how long the anesthesiologist spent on the procedure, typically measured in 15-minute units from when the anesthesiologist begins preparing the patient to when the patient is placed safely under post-operative care.[15]  If an anesthesiologist spends 30 minutes on the procedure, that would equate to two time units.  Aside from variations on how to round to the nearest time unit as well as on what the precise start and stop points are, the time factor is generally treated the same across anesthesiologists in the United States.

75.     *Conversion Factor:* The final variable, the conversion factor, is the variable that varies the most across the United States.  Because the other three variables are generally the same across the country, commercial insurers compete to sign up anesthesiologists to their networks by offering higher conversion factors than their competitors.  The conversion factor is intended to take into account geographic differences, differences in cost of care, and the quality of the anesthesiologist.  All else being equal, a practitioner in a higher cost of living area

---

[15] Peter DeSocio & Vijay Saluja, *Definition of Anesthesia Time*, Am. Soc. Anesthesiologists, https://www.asahq.org/quality-and-practice-management/managing-your-practice/timely-topics-in-payment-and-practice-management/2019-relative-value-guide-updates-include-anesthesia-time-and-field-avoidance (last accessed Oct. 10, 2020).

will have a higher conversion factor than one in a lower cost of living area, and an anesthesiologist that delivers higher quality of care will charge a higher conversion factor than an anesthesiologist in the same area that delivers a lower quality of care.

76.     The conversion factor is multiplied by the base compensation, modifiers, and time to yield the total allowance for the anesthesiologist's work on a given procedure.

77.     In an efficient market, the conversion factor would vary considerably across different anesthesiologists and different locations, reflecting the different value propositions that anesthesiologists present and the different costs of care.  As the *ASA, Inc.* court observed, "conversion factors often vary from physician to physician."  473 F. Supp. at 155.

78.     Even Medicare, which has the luxury of not having to follow market forces, varies its conversion factors widely both among and within states, to reflect changes in the cost of care.  For example, Medicare has two different conversion factors for Michigan.  In 2020, anesthesiologists in the Detroit area (including Macomb, Oakland, Washtenaw, and Wayne counties) were paid pursuant to a Medicare conversion factor of $23.07, one of the highest Medicare conversion factors in the country, ranking approximately 28th out of over 100 localities.

79.     If conversion factors did not vary by location, anesthesiologists would, as a practical matter, largely be pushed to practice in the lowest-cost locations.  Geographic variance in conversion factors therefore ensures that patients in high-cost areas can receive needed medical care.

80.     The conversion factors paid by commercial health insurers tend to be much higher than Medicare conversion factors.  Nationwide, the average Medicare conversion factor is about 29.1% of the average commercial conversion factor for anesthesiology.[16]  The large gap stems from a Medicare decision in the early 1990s to increase compensation for general practitioners while reducing it for anesthesiologists.  Medicare rates for anesthesiology were cut by about 40%, resulting in Medicare payments being much lower for anesthesiologists compared to many other medical practitioners.[17]  Since then, Medicare reimbursements for anesthesiologists have remained depressed, to the point where Medicare payments are not sufficient to cover the cost of practicing anesthesia.  As a result,

---

[16] Stanley W. Stead & Sharon K. Merrick, *ASA Survey Results for Commercial Fees Paid for Anesthesia Services – 2018*, 82 ASA Monitor 72, 72 (Oct. 2018) ("ASA Survey"), available at https://pubs.asahq.org/monitor/article/82/10/72/6203/ASA-Survey-Results-for-Commercial-Fees-Paid-for.

[17] *The Other Big Medicare Payment Problem – The Low, Low Anesthesia Conversion Factor*, Anesthesia Bus. Consultants (May 3, 2010), https://www.anesthesiallc.com/publications/anesthesia-provider-news-ealerts/428-the-other-big-medicare-payment-problem-the-low-low-anesthesia-conversion-factor.

anesthesiologists depend on payments from commercial payers to continue operating.

81.    Even with the same physician, the conversion factor may change depending on how the anesthesiology was administered.  For example, when an anesthesiologist works with a hospital-employed CRNA on a procedure, BCBSM will reduce the anesthesiologist's conversion factor by 45%, with the remainder being allocated to the CRNA.  Not all health insurers in Michigan follow this practice.  Instead, other insurers, recognizing that the contributions of anesthesiologists and CRNAs to patient care are complimentary rather than zero-sum, do not reduce conversion factors when anesthesiologists and CRNAs work together.

### E.    Anesthesiologists Generally Operate Out of Independent Practices.

82.    Just as anesthesiologist compensation changed over time, so too has the treatment of anesthesiology services.  Anesthesia practitioners originally were considered hospital staff and lacked the independence, respect, and pay associated with other medical professionals.  *ASA, Inc.*, 473 F. Supp. at 150.  Under this model, the anesthesiologist's client was the hospital, not the patient.  *Id.*  After World War II, anesthesiologists moved away from the employee model and instead formed collaborative practice groups.  *See id.*  By 1979, around 90% of all active

39

anesthesiologists were working independently or in practice groups rather than receiving hospital salaries.  *Id.*

83.     The practice group model has multiple benefits for quality of care.  It provides the anesthesiologist with a collaborative work environment aimed at honing and improving his or her craft.  It also provides flexibility so that surgeons can seek out anesthesiologists with whom they have a rapport and develop long-lasting working relationships, even if they have separate employers.  Being independent also permits anesthesiologists to work at multiple hospitals, performing different types of procedures and dealing with different types of patients, all the while increasing the depth and breadth of their skills.

84.     From the hospital's perspective, the practice group model allows the hospital to avoid the costs of recruiting, training, and managing anesthesiologists that would otherwise come with employing anesthesiologists directly.  "[H]ospital employment" of anesthesiologists, by contrast, is considered "an option of last resort" for the hospital.[18]

---

[18] Tony Mira, *Is Hospital Employment Inevitable for Anesthesia Providers*, Anesthesia Business Consultants (Sept. 9, 2019), https://www.anesthesiallc.com/publications/anesthesia-provider-news-ealerts/1244-is-hospital-employment-inevitable-for-anesthesia-providers.

**F.      Out-of-Network Billing and A4's Promise Not to Balance Bill.**

85.      When an anesthesiologist is in-network, the question of what conversion factor will be charged is typically subject to the anesthesiologist's contract with the patient's insurer.  When an anesthesiologist is out-of-network with an insurance company, he or she does not have a pre-existing agreement on rates with the insurance company, and instead each bill is determined either by negotiation (which may lead to litigation) or by applicable laws governing anesthesiologist compensation on a case-by-case basis.  Prior to 2020, if the out-of-network insurer refused to pay the amount requested by the anesthesiologist, the physician had two options: (1) suing the insurance company; or (2) billing the patient for the remainder.

86.      When A4 informed BCBSM in 2019 that it was considering going out of network with the insurer, A4 repeatedly confirmed to BCBSM and to the hospitals where A4 worked that A4 would not balance bill any of BCBSM's insureds.  Put differently, A4 confirmed that it would not charge BCBSM's insureds any more after A4 went out-of-network than A4 would have when it was in-network.

87.      In 2020, Michigan adopted legislation that mandated in some circumstances what had already been A4's policy concerning A4's attempt to leave BCBSM's network: not balance billing patients.  In 2021, federal regulators

41

promulgated balance-billing regulations at the federal level.  These laws and rules also regulate how much anesthesiologists can bill out-of-network insurers in certain instances, with calculations based on the insurer's in-network rates. Because in-network rates are an input into the calculations under these new laws and rules, BCBSM's historic and on-going suppression of in-network rates, through its conspiracy with other insurers, mean that even with these regulations, anesthesiologists are still being paid below-competitive rates.

### III.   BCBSM Enters into a Conspiracy Aimed at Creating and Exploiting Monopsony Power.

88.    BCBSM entered into a horizontal conspiracy with other insurers nationwide to suppress competition and monopsonize the markets for buying healthcare provider services, including hospital services and anesthesiology services.  BCBSM entered into this horizontal conspiracy with other Blues— commercial health insurance companies licensing the Blue Cross Blue Shield brand.

89.    Together, the Blues insure around 105 million Americans and have provider networks including around 96% of hospitals and around 93% of professional providers.  The conspiracy is implemented in a so-called "amended license agreement" with the Blue Cross Blue Shield Association ("BCBSA").  The BCBSA owns the Blue Cross Blue Shield branding and is in turn owned and

controlled by the Blues.  Pursuant to their "amended license agreement" with

BCBSA, the Blues agree to multiple anticompetitive restraints.

90.    For example, the "amended license agreement" includes an agreement

to allocate geographic markets, referred to as "services areas," among the Blues,

pursuant to which Blues will refrain, with limited exceptions, from competing in

each other's service areas and will curtail competition involving their non-Blue

affiliates.

91.    This horizontal conspiracy includes restrictions on (i) how much

revenue a Blue can generate from non-Blue business in its designated service area

and (ii) how much revenue a Blue can generate company-wide through businesses

other than its Blue-branded business.  Under these so-called "Best Efforts" rules, a

Blue license holder cannot receive more than 20% of its revenue from non-Blue

business in its designated service area and cannot receive more than 33% of its

company-wide revenue from non-Blue business.  These limits, which are output

restrictions on non-Blue revenues, ensure that Blues will not circumvent the

service area allocations by competing with each other using non-Blue subsidiaries.

92.    This horizontal conspiracy results in BCBSM enjoying less

competition in Michigan both for selling commercial health insurance and for

signing providers up to its network.  In exchange, BCBSM restricts its competition

with the other Blues in their service areas.  By restraining competition with the

other Blues and their affiliates, BCBSM is able to pay providers less than it otherwise would have: lowering its costs and increasing its control of the Michigan commercial health insurance market.  These restrictions have no pro-competitive justification, and instead serve to protect BCBSM and the other Blues from the normal market forces that drive competition and innovation, while harming competing health insurers, healthcare providers, and consumers.

93.    Other Blues would compete with BCBSM, and vice-versa, under normal market conditions.  For example, Blue Cross Blue Shield of Wisconsin ("BCBS-WISC") provides health insurance plans in Wisconsin to approximately 900,000 enrollees in Wisconsin, either directly or through subsidiaries.  As another example, Anthem Blue Cross Blue Shield of Ohio ("BCBS-OH") provides health insurance plans in Ohio to more than 3,000,000 enrollees, either directly or through subsidiaries.  But for the horizontal conspiracy among Blues insurers, BCBS-WISC, BCBS-OH, or both would likely offer health care products in neighboring Michigan, thereby exerting competitive pressures against both BCBSM's monopsony and monopoly power.  However, the geographic and output restrictions in the "amended license agreement" allow BCBSM to insulate itself from the normal forces of competition, thereby allowing BCBSM to keep premiums up and provider reimbursements down.

94.     In addition, the "amended license agreement" also requires Blues to fix prices and boycott healthcare providers outside their service area (the "Price Fixing and Boycott" conspiracy).

95.     The Price Fixing and Boycott aspect of the license agreement involves the BlueCard program, which the "amended license agreement" requires the Blues to use.  The BlueCard program is a method through which BCBSM can process claims by a provider in its service area on behalf of a patient covered by another Blue plan, and vice versa.  Under the BlueCard program, the patient's Blue insurer is referred to as the "Home Plan," while the Blue located where the medical service is provided is the "Host Plan."  If a healthcare provider treats someone covered by a Blue plan in another state, the healthcare provider must submit their claim to the Host Plan, after which the claim is transmitted to the Home Plan for processing. The provider is paid based on the reimbursement rates in his or her contract with the Host Plan—thereby fixing prices between the Host Plan and the Home Plan.

96.     Adding to the administrative difficulties, the provider must comply with the medical policy and other requirements of the Home Plan, to which he or she often does not have access.  As a result of the BlueCard system, A4 is expected to comply with myriad different variations of medical policies, creating inefficiencies, adding to administrative costs and resulting in claim denials, in

whole or part based upon the lack of information available about the various other Blue plans.

97.     As part of the Price Fixing and Boycott conspiracy, BCBSM and the other Blues have also agreed not to contract with providers outside of their respective service areas.  This boycott means that A4's only option for providing services in Michigan to patients insured under other Blues is to do so through BCBSM, using the BlueCard program.  A4 is therefore forced to accept BCBSM's anesthesiology rate when it covers patients insured by any of the Blues, regardless of what those insurers' rates are.  This price fixing in turn keeps the anesthesiology rates in Michigan artificially suppressed.

98.     For example, Blue Cross Blue Shield of Florida uses conversion rates of around $70 - $80, significantly higher than BCBSM's $63.76 conversion rate in 2020.  However, when A4 treats patients insured by Blue Cross Blue Shield of Florida, it must accept BCBSM's lower rate.

99.     There is no pro-competitive justification for BCBSM's horizontal conspiracy with the other Blues.  These horizontal conspiracies restrain competition, restrict output, fix prices, and boycott services providers, thereby restraining trade in Michigan, while increasing BCBSM's market power and enabling BCBSM to pay anesthesiologists less than what BCBSM would have paid absent these violations of the antitrust laws.

46

IV.   **BCBSM Retaliates Against Anesthesiologists Who Reject BCBSM's Uniform Rate.**

A.   **After A4 States Its Intent to Leave BCBSM's Network, BCBSM Punishes the Hospitals Where A4 Works.**

100.   In the first quarter of 2019, A4 attempted to negotiate a higher conversion factor with BCBSM.  BCBSM had kept A4's anesthesiology conversion factor essentially the same for over five years, despite the cost of care increasing.  A4 sought an increase that would bring BCBSM's conversion factor more in line with market realities.

101.   When BCBSM refused to negotiate a higher rate, A4 informed BCBSM that it would be terminating its in-network status with BCBSM on 90-days' notice.  A4 assured BCBSM, and the hospital networks where A4 worked, that if A4 went out of network, it would not balance bill BCBSM's patients: A4 would leave any conflict over rates strictly between A4 and BCBSM, rather than involving patients.  Instead of coming to the negotiating table, BCBSM responded by (1) threatening to boycott Trinity and Beaumont unless they terminated their relationships with A4 (or forcing A4 to remain in BCBSM's network); and (2) interfering with A4's contracts, business, and business relationships.

102.   On April 22, 2019, A4 received an email from Rob Casalou, who is both the CEO of Trinity's Michigan operations and a board member on BCBSM's board of directors.  Casalou wrote:

> I spoke to BCBSM last Wednesday about this [A4's potentially going out of network with BCBSM] because the topic came up in a recent board meeting.  I am very concerned about how the A4 de-participation strategy will impact our patients short and long term.  ***BCBSM has a reputation for being the most aggressive of the payers in these situations***.  I did learn that they will consider a new process that would require every BCBSM surgery booked in a facility with A4 to have pre-authorization from the surgeons as at least one change in the process.  ***They will also look to steer work away from facilities with A4***.

103.   (Emphasis added.)  Casalou concluded his email with the ominous note that if A4 even so much as sued BCBSM, "***the impact on our facilities and patients will eventually be felt***.  In such case, we will need to consider our options."  (Emphasis added.)

104.   Casalou's email set out an ultimatum from BCBSM: if A4 went out of network or tried to sue BCBSM, BCBSM would respond by boycotting the facilities that did business with A4, until they ceased doing business with A4 and/or forced A4 to go back in-network with BCBSM.  Around the same time, Beaumont was providing similar warnings to A4.

105.   On May 29, 2019, A4 sent BCBSM a notice reiterating that its in-network status with BCBSM would terminate on July 15, 2019, and reminding BCBSM that it and A4 "still have time to negotiate in good faith in order to reach an alternative rate structure."  A4's letter explained that it was impossible for A4 to continue doing business under BCBSM's artificially low conversion factor, including because "A4 has had virtually the same rate for the last six (6) years,

48

during which time the cost to provide medical care and services has markedly increased. A4 cannot afford to stay at this same rate." Before and after sending the letter, A4 continued to reiterate that even if it went out of network, it would continue to serve BCBSM's insureds and would not balance bill them.

106. A4's promises to continue treating BCBSM insureds and not to balance bill them meant that, even if A4 went out of network, BCBSM subscribers receiving care Trinity or Beaumont would continue to receive medical care from A4 and would not be charged any more by A4 than when A4 was in-network with BCBSM.

107. By 2019, Trinity's Michigan hospitals had been working with A4's anesthesiologists for over 50 years—essentially since A4's founding. During that long relationship, A4 had been responsible for introducing anesthetic techniques to Trinity hospitals, including certain kinds of nerve blocks. In 2015, just four years prior to Casalou's email, A4 had been one of only four anesthesiology practices *in the nation* to be awarded the coveted "Preferred Provider" designation by Trinity's parent organization. After Casalou's email about BCBSM's threat, Trinity reiterated, in a document provided to A4's doctors in or around June 2019, that "***Trinity Health Michigan has enjoyed a long-standing and successful relationship with A4***." (Emphasis added.)

49

108.   A4 had a similarly successful relationship serving as anesthesiology staff at Beaumont.  As with Trinity, A4's anesthesiologists had worked in Beaumont's Michigan hospitals for years, specifically its Beaumont Dearborn, Beaumont Trenton, Beaumont Taylor, and Beaumont Wayne hospitals, all in southeastern Michigan.  Also as with Trinity, A4's work with Beaumont had been successful, including, for example, the improvements A4's cardiac anesthesiologists helped bring to Beaumont Dearborn's cardiac surgery department.

109.   In a normal market, A4's assurances not to balance bill patients, combined with A4's record of success at Trinity and Beaumont, would have caused those hospitals to continue working with A4, even as it attempted to negotiate a competitive rate with BCBSM.  However, this was not a normal market.

110.   By July 2019, Casalou was informing A4 that BCBSM's threats had become a reality.  BCBSM was taking steps to prevent insureds from using Trinity or Beaumont, including by threatening subscribers that if they "receiv[ed] care at a Trinity facility with A4 anesthesiologists," they would be personally responsible for paying A4.  Casalou warned A4, "It appears that BCBSM is making these calls to employers generally" to dissuade patients from using Trinity.  Casalou further warned that BCBSM's actions "will put the patient in the middle of your dispute"

50

with BCBSM.  Despite A4 having taken every effort to avoid any change in patient care or billing, BCBSM was taking the opposite strategy, thereby creating unnecessary inconvenience, and possibly harm, to its own subscribers, to put pressure on Trinity and Beaumont.

111.   Casalou informed A4 that BCBSM's decision to punish patients for using Trinity would lead consumers to avoid "us[ing] Trinity facilities," leading to "a serious financial impact on" Trinity.  BCBSM was seeking to disrupt patient care until the financial consequences caused Trinity and Beaumont to comply with BCBSM's threats.

112.   A4 also learned from Casalou that BCBSM had caused the president of another Michigan hospital to contact Trinity and warn that the hospital's parent organization was "seriously considering telling its patients that they should not use Trinity facilities for any care that would require anesthesia," despite there being a reciprocity agreement between Trinity and that organization.

113.   That same month, BCBSM released a Network Update providing further insight into why it was willing to disrupt its relationships with its own subscribers.  BCBSM's publication explained that A4's decision to reject BCBSM's rate set A4 "apart from other anesthesiology practices in Michigan which <u>all</u> accept the current uniform Blue Cross contracted payment as payment in full."  BCBSM underlined the word "all" in the memorandum, emphasizing the

importance to BCBSM of having every anesthesiologist in Michigan subject to its uniform rate. A4 was attempting to resist the monopsony power that BCBSM had built over decades through its Blues conspiracy. And BCBSM was willing to sacrifice its subscribers' best interests if it meant eliminating that resistance.

114. BCBSM's strategy of targeting patients to harm Trinity and Beaumont succeeded. For example, on July 5, 2019, BCBSM caused Beaumont to issue A4 a notice of termination of their relationship, and less than two-weeks later, BCBSM caused Trinity, on July 15, 2019, to send a termination notice to A4.

**B.    BCBSM Tortiously Interferes with A4's Contracts with Trinity Hospitals and A4's Employees.**

115. Along with pressuring hospitals to cease doing business with A4, BCBSM also tortiously interfered with A4's contracts with Trinity hospitals and A4's contracts with A4's employees. Specifically, BCBSM (i) coerced and induced Trinity's hospitals to breach the non-solicitation obligations they owed to A4; and (ii) acted through, and in concert with, Trinity to tortiously interfere with the non-compete obligations owed to A4 by certain of A4's employees.

116. A4 competes nationally for physicians and has made substantial investments in recruiting, training, and maintaining its team of medical practitioners. To protect the investments in its practice, A4 has narrow non-compete agreements with certain of its anesthesiologists and non-solicit agreements with the hospitals where its anesthesiologists practice.

52

117.    For example, in 2019, A4 and one of Trinity's subsidiaries, Saint Joseph Mercy Health System ("SJMHS"), were working together pursuant to an agreement executed in February 2017 and later amended in August 2018 (the "SJMHS Order").  The SJMHS Order covers A4's services at multiple Trinity hospitals within the SJMHS system, including St. Joseph Mercy Oakland; St. Joseph Mercy Hospital, Ann Arbor; St. Joseph Mercy Livingston Hospital; Saint Joseph Mercy Chelsea Hospital; and St. Mary Mercy Livonia Hospital.  The SJMHS Order provides, "During the term of this Order . . . SJMHS shall not, either directly or indirectly solicit, hire contract with, or otherwise engage, in any capacity, any physician who provides Professional Services or Administrative Services under this Order or the MSA or who is otherwise an employee or independent contract of [A4] during the term of this Order or the MSA without [A4]'s advance written consent."  SJMHS Order § 13.

118.    A4 in 2019 also worked with another Trinity hospital in Michigan, Mercy Health Saint Mary's ("MHSM"), pursuant to an agreement dated September 1, 2016 (the "MHSM Order").  That agreement provides: "During the term of this Agreement and for one (1) year thereafter, MHSM will not, directly or indirectly, whether as an individual, advisor, employee, agent, or otherwise, take any action to induce any Member or employee to cease his or her employment with [A4]." MHSM Order § 11.3(b) (Sept. 1, 2016).

53

119.   A4 also has narrow non-compete obligations with certain of its physicians concerning practicing anesthesiology.  These obligations are narrowly tailored to protect A4's interests, including its investments in the employees, and are subject to geographic, subject matter, and durational limits.  As of 2019, these non-compete obligations included the following requirement: "For one year after the termination of Physician's employment hereunder, Physician shall not practice medicine with respect to anesthesiology or pain management at any healthcare facility within 15 miles of any health care facility where Physician provided services during the term of his or her employment with [A4]."

120.   BCBSM was aware of these hospital and physician contracts, as well as their respective non-solicit and non-compete obligations, including because of BCBSM's relationship with Casalou.  Casalou was then, and remains, CEO of Trinity's Michigan operations.  He executed the SJMHS Order, including its amendment, and was aware of the MHSM Order and its specific terms.  He was also aware of A4's non-compete rights vis-à-vis its employees.  In 2019, Casalou was, and remains, a board member on BCBSM's board of directors.  When A4 dealt with Casalou, it was evident that he did not wall off information he had learned in one role from the other role.

121.   Despite being aware of A4's contractual rights, BCBSM coerced and induced Trinity to breach and interfere with those rights.  In or around June 2019,

while the SJMHS agreement was still in effect, SJMHS circulated a document to

A4's anesthesiologists promising that even if they breached their agreements with

A4, Trinity "***will indemnify the clinicians against any risk from the non-***

***competes, if they agree to accept employment***" at Trinity's hospitals.  (Emphasis

added.)  In making this offer, Trinity explicitly referenced the threat from BCBSM

as motivating Trinity's attempt to hire A4's doctors.  The solicitation states that

Trinity was concerned with A4's "plan to depar[ticipate] with Blue Cross,"

because "***Blue Cross Blue Shield of Michigan has been very aggressive in the***

***past in these types of situations***" and would potentially direct its insureds to

"***alternative sites of care***."  (Emphasis added.)  Hence, "***if efforts to resolve this***

***are unsuccessful . . . we will be prepared to approach A4 physicians and CRNAs***

***about direct employment***."  (Emphasis added.)

122.   This solicitation breached section 13 of the SJMHS Order, because it

"directly or indirectly solicit[ed]" A4's physicians.

123.   A4 responded on July 2, 2019, by demanding that Trinity's hospitals

cease breaching their non-solicitation obligations.  BCBSM, however, continued to

coerce and induce Trinity's hospitals into breaching their non-solicit obligations

owed to A4.

124.   On or around July 23rd, 2019, Trinity offered A4's physicians at

MHSM positions at that hospital, despite the MHSM Order, still being in effect.

55

These solicitations breached the MHSM Order, because they involved MHSM "directly or indirectly . . . or otherwise, tak[ing] action to induce any Member or employee to cease his or her employment with" A4.  MHSM § 11.3(b).

125.   These solicitations not only breached the Trinity hospitals' obligations to A4, they also constituted inducements to A4's employees to breach their narrow non-compete obligations owed to A4.  Working through, and in concert with, Trinity, BCBSM ultimately succeeded in inducing breaches of these non-compete obligations, and caused A4 to lose several of its doctors to Trinity.

126.   On August 16, 2019, A4 sought, and obtained, a temporary restraining order against Trinity, MHSM, and Casalou from the Michigan Circuit Court for the County of Washtenaw.  The temporary restraining order prevented Trinity from continuing its breaches of contract and tortious actions against A4.

**C.   BCBSM Imposes Economic Duress on A4 by Willfully Breaching Its Contracts with A4's Independent Contractors.**

127.   Along with its unlawful threats and tortious interference, BCBSM also applied economic duress to A4 by breaching its contracts with A4's independent contractors.  A4 works with certain anesthesiologists and CRNAs who are independent contractors and who also provide services for other healthcare groups.  These healthcare professionals have individual in-network contracts with BCBSM, covering the work they do with A4 and other providers.  In 2019, A4 did not

require these independent contractors to go out of network with BCBSM as part of A4's decision to leave BCBSM's network, nor did they seek to do so.

128.   These providers have contracts with BCBSM that do not permit BCBSM to terminate their provider status without either cause or notice. Nonetheless, after A4 informed BCBSM that it planned to go out-of-network, BCBSM retaliated shortly thereafter by unlawfully terminating the provider status of A4's independent contractor anesthesiologists and CRNAs. These terminations were without cause, without notice, and constituted breaches of BCBSM's contracts with the affected individuals.

129.   These unlawful terminations meant that these independent contractors would not have in-network status with BCBSM, even when working with entities other than A4.

130.   After learning of the terminations, A4 wrote to BCBSM, stating that the terminations must have been an error, and asking that the affected independent contractors have their provider status reinstated. But the termination, A4 would learn, was not an error. BCBSM's subsequent communications made clear to A4 that BCBSM would continue to breach its agreements, and treat these healthcare practitioners as terminated, unless (i) they stopped working with A4 or (ii) A4 went back in-network with BCBSM.

131.   By breaching its agreements with A4's independent contractors, BCBSM subjected A4 to unlawful economic duress to return to BCBSM's network, which A4 ultimately did, due to the pressures being exerted on it by BCBSM.

132.   BCBSM's tortious actions—its unlawful and malicious threats; its tortious interference; and its breach of its contracts to cause economic duress—caused A4 significant damages.

133.   Faced with an existential threat from BCBSM, A4 acquiesced and went back in network with BCBSM in July 2019.  A4 subsequently entered into a mutual settlement with Trinity, pursuant to which it continues to provide services at SJMHS but is specifically required to remain in-network with BCBSM.  Due to BCBSM's actions, A4 had to cease working at Trinity MHSM and, subsequently, at Beaumont's hospitals.

### D.   In October 2020, BCBSM, in Concert with Trinity, Induces Trinity to Terminate Its Relationship with A4.

134.   On Thursday, October 22, 2020, A4 attempted to resolve its claims against BCBSM by inviting BCBSM to negotiate before A4 filed this lawsuit.  The following Monday, October 26, 2020, BCBSM informed A4 that it was refusing to negotiate with A4.  Instead, BCBSM, in concert with Trinity, induced Trinity to send a notice terminating its long-standing work with A4.  The very next morning, Tuesday, October 27, 2020, Trinity sent a notice to A4 stating that Trinity was

terminating all of A4's relationships with Trinity's hospitals in Michigan, effective in 180 days.  Ultimately, A4 was able to continue working with Trinity; however, due to BCBSM's illegal actions, it must continue to accept BCBSM's uniform rate.

### V.   BCBSM Has Used its Illegally Acquired Monopsony Power to Reduce the Quantity and Quality of Anesthesiologists in Michigan, While Maintaining or Increasing Prices to Consumers.

135.   BCBSM's Blues conspiracy has resulted in BCBSM having monopsony power in the market for purchasing anesthesiology services in Michigan.

136.    In a BCBSM "Network Update," dated July 10 2019, BCBSM emphasized that A4's attempt to leave BCBSM's network set A4 "apart from other anesthesiology practices in Michigan which all accept the current uniform Blue Cross contracted payment as payment in full."  (emphasis in original.)  Pursuant to this uniform rate, the least-qualified and most inexperienced anesthesiologist, working in the lowest cost part of the state, is compensated at the same level as the most sought-after and highly-trained cardiac anesthesiologists.

137.   Unlike BCBSM, its competitors negotiate conversion factors with anesthesiologists to reflect differences in cost and quality of care.  Even Medicare, by contrast, has two different conversion factors for Michigan: one for the Detroit area and one for the rest of Michigan.

138.    Monopsony power is the ability of a buyer to reduce prices while also reducing the overall amount purchased in a market.  BCBSM's actions demonstrate both of these hallmarks of monopsony power.

**A.    BCBSM Has Set Its Uniform Price for Anesthesiology Services at a Below-Competitive Level.**

139.    BCBSM has set its uniform price for anesthesiology services at a level that is below-competitive.  In 2018, BCBSM applied a statewide conversion rate of $58.65.  That is over $17 less than the national average anesthesiology conversion rate in 2018 of $76.32.[19]  In percentage terms, BCBSM's 2018 conversion factor was over 23% lower than the 2018 national average.

140.    BCBSM's 2018 conversion factor is also significantly below the 2018 median national anesthesiology conversion factor of $71.81.[20]  BCBSM's conversion factor was so low that it was in the 25th percentile nationwide according to the American Society of Anesthesiologists 2018 data.[21]  Put differently, 75% of the commercial conversion factors for anesthesiology in 2018 across the country were higher than BCBSM's conversion factor.  In what the American Society of Anesthesiologists classifies as the Eastern Midwest region (Michigan, Illinois, Indiana, Kentucky, and Ohio), BCBSM's 2018 rate was also in the 25th percentile,

---

[19] ASA Survey at 73.

[20] *Id.*

[21] *Id.*

*i.e.* 75% of the commercial conversion factors for anesthesiology in the region were higher than BCBSM's conversion factor.[22]

141.   In a September 2020 internal memorandum, BCBSM acknowledged that Michigan specialists, including anesthesiologists, would suffer "***losses***," absent higher reimbursements from BCBSM.  (Emphasis added.)

142.   BCBSM's low conversion factor cannot be explained by differences in the cost of care.  If BCBSM's low conversion factor merely reflected differences in the cost of care between Michigan and the rest of the country, then one would expect Medicare's conversion factors for Michigan, which also take into account the cost of care, to be significantly lower than Medicare rates for the rest of the country.  That is not the case.

143.   Instead, anesthesiologists in the Detroit area (including Macomb, Oakland, Washtenaw, and Wayne counties) had a 2020 Medicare conversion factor of $23.07, one of the highest Medicare conversion factors in the country, ranking approximately 28th out of over 100 localities, placing it in approximately the upper 75th percentile of Medicare conversion factors.  BCBSM's low rate thus cannot be explained by cost of care.  To the contrary, BCBSM imposes a low conversion rate where A4 operates, despite the high cost of care there.  It is also notable that Medicare has two different conversion factors in Michigan, while BCBSM only

---

[22] *Id.* at 74, 79.

has a single factor for the entire state.  In an efficient market, one would expect there to be more price differentiation by commercial insurers than public insurers, not less.

144.    BCBSM's conversion factor is also much lower than one would expect it to be given the applicable Medicare conversion factors.  According to the American Society of Anesthesiologists in 2018, commercial conversion factors nationwide were on average about three and one-third times the applicable Medicare conversion factors.[23]  Using that multiplier would mean that, based on Michigan's Medicare rates, the commercial conversion factor for the Detroit area should be about $79.56 and the conversion rate for the rest of Michigan should be about $75.29.  However, as of 2020, BCBSM's statewide rate was $63.76, significantly lower than commercial rates one would expect based on Michigan's Medicare rates for anesthesiology.

145.    BCBSM's conversion factor is also much lower than the average and median factors in Ohio.  Ohio and Michigan are similarly-sized Midwestern states located on the Great Lakes and with an industrial focus.  Both have populations with an average age of around forty years old.  One would expect similar

---

[23] ASA Survey at 72.

conversion factors for anesthesiology.  However, the average conversion factor in 2018 in Ohio was $69.16, over ten dollars higher than BCBSM's $58.65.[24]

146.   As of 2021, BCBSM's conversion factor remains one of the lowest in the nation.

147.   Because BCBSM is, in the words of one competing health insurer, "driving the market price for anesthesia in Michigan," BCBSM's low conversion factor results in Michigan overall having some of the lowest pay for anesthesiologists in the nation.  Bureau of Labor Statistics data from 2019 shows that the "[a]nnual mean wage" for anesthesiologists in Michigan is in the *lowest band nationally* (out of four bands) and *is lower than every surrounding or nearby state for which there is data available: Wisconsin, Illinois, Indiana, Pennsylvania, Kentucky, West Virginia, and Missouri* (data for Ohio was not available).[25]

**B.    BCBSM Is Reducing the Quantity and Quality of Anesthesiology Care in Michigan.**

148.   This reduction in demand in turn results in a reduction in the quantity and quality of anesthesiology care in Michigan.  In April 27, 2021, it was reported in the *Lansing State Journal* that "nearly 100 anesthesiologist positions are open

---

[24] *Id.* at 79.

[25] *Occupational Employment and Wages, May 2019 29-1211 Anesthesiologists*, Bureau of Labor Stats. (May 2019), https://www.bls.gov/oes/current/oes291211.htm.

across Michigan right now and experts expect this shortage to continue," with

BCBSM's low reimbursement rate listed as the primary cause.[26]  Despite the glut

of unfilled anesthesiologist positions, "[m]ore than half of all anesthesiologists

trained at the University of Michigan are leaving our state,"[27] an outflow rate that

is higher than other parts of the country.  As a result, "Michigan hospitals are being

forced to shut down operating rooms due to a shortage of anesthesiologists,"[28]

leaving patients to have to find treatment elsewhere, during which time their

conditions may worsen.  Thus, while patients, and in turn hospitals, need more

anesthesiologists to provide critical, high-quality care, BCBSM's conspiracy has

reduced demand among insurers for anesthesiology to the point where there are not

sufficient doctors in the state to serve patients.  Because of BCBSM's long-

standing conspiracy, this shortage has been affecting Michigan for several years.

In 2010, for example, the RAND Corporation was reporting a shortage of both

anesthesiologists and CRNAs in Michigan.[29]

---

[26] Rick Ganzi, *Michigan is Facing an Anesthesiologists Shortage, Due to Minimal Reimbursement*, Lansing State Journal (Apr. 27, 2021), https://www.lansingstatejournal.com/story/opinion/contributors/viewpoints/2021/04/27/gap-reimbursement-rates-anesthesiologists-hurts-health-care/7201393002/.

[27] *Id.*

[28] *Id.*

[29] Lindsay Daugherty et al., *Is There a Shortage of Anesthesia Providers in the United States?*, RAND Corp. (2010), https://www.rand.org/pubs/research_briefs/RB9541.html.

149.   Given the ongoing shortage of anesthesiologists in the state, and BCBSM's below-competitive reimbursement, anesthesiologists are being pushed to work longer hours and to oversee more anesthetizing locations concurrently than in years past.  A decade ago, anesthesiologists in many hospitals in Michigan regularly worked at a 3-to-1 or lower staffing ratio.  That ratio has increased due to BCBSM's continued exploitation of its illegally acquired market power, such that today, anesthesiologists in many hospitals in Michigan are regularly working at a 4-to-1 staffing ratio, meaning that they are responsible for providing medical direction for CRNAs in four different anesthetizing locations concurrently.  With fewer anesthesiologists available, those remaining in Michigan are being tasked with handling more cases concurrently.

150.   A4 is on the frontlines of the anticompetitive effects caused by BCBSM's actions.  A4 is one of the dwindling number of independent anesthesiology groups in Michigan focusing on delivering high-quality care.  But as a result of BCBSM's anticompetitive actions, A4 has lost multiple doctors who have decided to cease practicing in Michigan.  A4 has recently lost multiple doctors who left to practice in Toledo, Ohio about an hour's drive south of Ann Arbor, Michigan.  As discussed above, Ohio's average conversion factor for anesthesiology is about $10 higher than BCBSM's.  Because of how anesthesiology billing is calculated using 15-minute units, a $10 difference in

conversion factor can result in around a *$40 per hour* or more difference in compensation.

151.   Nor is A4 the only anesthesiology group in Michigan suffering from BCBSM's anticompetitive actions.  In Fall 2020, BCBSM had a call with the Michigan Society of Anesthesiologists, with representatives from multiple anesthesiology groups in Michigan joining.  On the call, those anesthesiology groups confirmed that BCBSM's rate was: causing anesthesiologists to leave the state; hampering efforts to recruit anesthesiologists into Michigan; and forcing the remaining doctors to work longer hours and at higher staffing-ratios.  The anesthesiology groups also made clear that the costs to anesthesiologists of delivering anesthesiology care had been increasing faster than BCBSM's rate (which had remained effectively the same for multiple years), thus leading to a practical reduction in BCBSM's rate over time.  At the meeting BCBSM admitted that its anesthesiology rate was low and needed to come up, but as of 2021, the rate remains one of the lowest in the nation.

152.   Just as the overall amount of anesthesiology services in the state has been reduced by BCBSM's actions, A4 has itself had to curtail where it works and the amount of services it provides because of BCBSM's monopsonist practices. After several years of practicing successfully at Beaumont, it had to cease working there due to BCBSM's actions.  Shortly thereafter, Beaumont cut ties with another

respected anesthesiology group, NAPA, as well, in a decision that was likewise animated by BCBSM's monopsonistic practices in the market for purchasing anesthesiology services.

153.   Prior to losing A4 and NAPA, Beaumont's hospitals were highly regarded.  A4 and Beaumont had a successful relationship, which included improvements that A4 brought to the Beaumont Dearborn cardiac surgery department.  This success derived in part from the working relationship developed between Beaumont's cardiac surgeons and A4's cardiac anesthesiologists. Likewise, Beaumont's Royal Oak hospital, where NAPA served patients, had a cardiovascular surgery practice that ranked among the top 50 in the country.

154.   However, after BCBSM's actions led to the loss of A4 and NAPA, Beaumont was not able to hire the number and quality of replacement anesthesiologists to continue operating at the same level of care.  After Beaumont ceased working with A4 and NAPA, cardiologists at Beaumont expressed "serious concerns that Northstar," a new anesthesiology provider at Beaumont, "will not be able to provide the quality of cardiac anesthesia services that we have received for several decades."[30]  Amidst complaints of an anesthesiologist showing up 45-minutes late for surgery and refusing to work on weekends, a majority of

---

[30] Karen S. Sibert, *How Could a Patient Die from Anesthesia for a Colonoscopy?*, MedPage Today (Feb. 4, 2021), https://www.kevinmd.com/blog/2021/02/how-could-a-patient-die-from-anesthesia-for-a-colonoscopy.html.

Beaumont's surgeons declared that they lack confidence in Beaumont's leadership.[31]  Beaumont is also reported to have lost possibly "close[] to 50%" of its anesthesiologists at one hospital.[32]  The reduction in the quality of anesthesiology services available at Beaumont affects *all of Beaumont's* patients, regardless of whether they are insured by BCBSM or some other insurer.

155.   Given these issues, Beaumont surgeons are increasingly having operations performed at Trinity's Oakland hospital instead—where A4 still works—despite the potential additional cost and inconvenience to patients.

### C.   BCBSM Has Increased the Quality-Adjusted Prices Paid by Consumers for Health Insurance and for Anesthesiology Care.

156.   As a monopsonist, BCBSM does not pass on the savings from its below-competitive purchasing price to consumers.  It has no need to do so.  While BCBSM's anticompetitive rate has reduced the quantity and quality of anesthesiology services offered in Michigan, that reduction applies to BCBSM's competitors too.  BCBSM is therefore able to reduce the quality of its insurance

---

[31] Eric Starkman, *Starkman: Beaumont Cardiac Leaders Warn Hospital Chairman of Compromised Patient Care*, Deadline Detroit (Sept. 18, 2020), https://www.deadlinedetroit.com/articles/26232/starkman_beaumont_cardiac_leaders_warn_hospital_chairman_of_compromised_patient_care.

[32] Eric Starkman, *Beaumont Health's Culture of Deceit and Intimidation Imperils Patient Safety*, Deadline Detroit (Jan. 29, 2021), https://www.deadlinedetroit.com/articles/27237/starkman_beaumont_health_s_culture_of_deceit_and_intimidation_imperils_patient_safety.

coverage while maintaining its dominance vis-à-vis competitors in selling

insurance, and can thus avoid lowering its prices.  By reducing the quality and

quantity of the anesthesiology coverage it offers, without reducing rates

commensurately, BCBSM has increased quality-adjusted prices for health

insurance and for anesthesiology care.

157.   Because BCBSM also possesses monopoly power in the market for

selling health insurance, it has been able to increase prices despite reducing the

quality of the product it offers.  BCBSM dominates, by any measure, the

commercial healthcare market in Michigan.  BCBSM has a 68% or greater share of

the commercial health insurance market in Michigan.[33]  That is an increase over

2019, when BCBSM's market share was 67%.[34]  The next largest commercial

health insurer in Michigan, Spectrum Health, has only 10% of the market.[35]

BCBSM has an even higher share of the market for preferred provider organization

("PPO") insurance plans.  Under PPO insurance, the insurer provides coverage of

both in-network and out-of-network providers.  BCBSM has 78% or more of the

---

[33] *Competition in Health Insurance: A comprehensive study of U.S. markets*, Am. Med. Ass'n 11 (2021).

[34] *Competition in Health Insurance: A comprehensive study of U.S. markets*, Am. Med. Ass'n 14 (2019).

[35] *Competition in Health Insurance: A comprehensive study of U.S. markets*, Am. Med. Ass'n 17 (2021).

PPO market in Michigan.[36]  In total, Michigan's commercial health insurance

market is the *second-least competitive* in the United States, having fallen four

places since 2018, when Michigan was only the sixth-least competitive.[37]

158.   BCBSM's dominance is reflected in the heavy concentration in the

commercial health insurance market in Michigan.  Under the Herfindahl–

Hirschman Index ("HHI"), which the U.S. Department of Justice employs to

measure market concentration, Michigan's commercial insurance market has a

score of 4,648.[38]  HHI increases as competition goes down, and Michigan's 4,648

score is *almost double* the 2,500 point threshold at which markets are deemed

highly concentrated.[39]

159.   As a monopolist in the market for selling health insurance to

Michigan consumers, BCBSM can, and has, raised prices for consumers even as it

reduces the quality of the product if offers.  For example, BCBSM raised its rates

---

[36] *Id.* at 28.

[37] *Compare States with the Least Competitive Commercial Health Insurance Markets*, Am. Medical Assoc. at 1 (2020), https://www.ama-assn.org/system/files/competition-in-health-insurance-commercial-markets.pdf, *with Ten States with Least Competitive Health Insurance Markets*, Am. Med. Assoc. at 1 (Sept. 17, 2019). https://www.ama-assn.org/delivering-care/patient-support-advocacy/10-states-least-competitive-health-insurance-markets.

[38] *Competition in Health Insurance: A comprehensive study of U.S. markets*, Am. Med. Ass'n 17 (2021).

[39] *See Herfindahl-Hirschman Index,* Dep't of Justice (July 31, 2018), https://www.justice.gov/atr/herfindahl-hirschman-index.

by at least 2.5% for 2021 and is planning on raising its premiums by at least 6% for

2022, according to Michigan's Department of Insurance and Financial Services.

According to the Kaiser Family Foundation, Michigan's employer-based health

insurance is the *sixth most expensive in the nation* as measured by plans covering

an employee plus one other person.[40]  BCBSM's actions have thus increased both

the nominal and the quality-adjusted prices for consumers.

160.   Because BCBSM's anticompetitive acts have resulted in BCBSM

underpaying anesthesiologists and overcharging consumers, barring those actions

would benefit both consumers and anesthesiologists.  But for BCBSM's

anticompetitive acts, Michigan consumers would have an increase in the quality

and quantity of anesthesiology services available and a decrease in the quality-

adjusted price of anesthesiology care, even as the rates BCBSM pays high-quality

anesthesiologists go up.  Consumers who prefer lower-cost anesthesiology

providers regardless of quality would still have the option to do so, because instead

of being paid a uniform rate, anesthesiologists would compete at different price

levels.  Whereas today, because of BCBSM's anticompetitive schemes, high-

---

[40] *Average Annual Employee-Plus-One Premium per Enrolled Employee for Employer-Based Health Insurance*, Kaiser Family Foundation, https://www.kff.org/other/state-indicator/employee-plus-one-coverage/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Total%20Annual%20Premium%22,%22sort%22:%22desc%22%7D (last accessed Oct. 11, 2020).

quality providers are being driven out of the state, despite consumer demand for their services, enjoining BCBSM's anticompetitive actions would lead to more high-quality providers being available to meet patient's needs.

### D.   BCBSM Has a History of Entering into Agreements that Unreasonably Restrain Trade and Increase Its Market Power.

161.   BCBSM's conspiracy is not the only example of it entering into agreements to restrain trade while benefiting itself.  In 2010, the U.S. Department of Justice and the State of Michigan filed suit against BCBSM for restraining trade by entering, with Michigan hospitals, agreements containing most-favored nations ("MFN") clauses, pursuant to which BCBSM kept its competitors' costs up. BCBSM entered into agreements containing such clauses with over half of the 131 general acute care hospitals in Michigan.

162.   BCBSM used two types of MFN-clauses.  In one type, the hospital had to promise that it would *charge BCBSM's competitors more than the hospital charged BCBSM* for the same services.  Under the other type of MFN clause, the hospitals promised to charge BCBSM's competitors *at least as much* as the hospital charged BCBSM.  These clauses suppressed competition and innovation in the market for hospital services, by creating an environment where BCBSM's competitors could not lower their costs.  BCBSM's MFN clauses were intended to, and did, give BCBSM market power in the market in which health insurers compete to purchase hospital goods and services.

72

163.   By entering into the MFN scheme, BCBSM entrenched its market power at the cost of its competitors (who had artificially higher costs), consumers (who had artificially higher premiums), and other medical providers who did not have MFN agreements with BCBSM (as higher payments to hospitals with MFN clauses meant that there was less money to pay providers).

164.   While these MFNs were later prohibited under Michigan law, BCBSM's monopolistic and monopsonistic market power—which BCBSM entrenched through the above devices, and others to be uncovered in discovery, in unreasonable restraint of trade—continues unabated.

## VI.  BCBSM Has Acquired Market Power in Each of the Relevant Markets.

165.   BCBSM's anticompetitive conduct spans multiple product markets. Because BCBSM's anticompetitive conduct involves both monopoly and monopsony, the markets affected include both a market of competing sellers and a market of competing buyers.

166.   First, there is the market for the sale of commercial healthcare insurance (excluding Medicare and Medicaid programs).  This is a market of sellers competing for buyers: specifically, health insurers competing to provide health insurance services to individuals or enterprises.  This product market includes the various means of paying or reimbursing for healthcare goods and services other than the direct payment by individuals who are not insured or

indemnified.  This market includes the sale of the full package of healthcare financing services, including insurance, as well as, for self-insured groups, the sale of other healthcare financing services, such as access to a network of healthcare providers at reduced prices and the administration of healthcare-related employee benefit plans, which together form a relevant product market.  This relevant product market can be described as the market for the sale of commercial health insurance.

167.   The purchasers of commercial health insurance do not have reasonable alternatives.  Some employers are required by the Affordable Care Act to offer healthcare benefits to their employees.  Employers who are required to offer these benefits, as well as employers who are not required to offer these benefits but wish to do so, have no reasonable alternative but to purchase commercial health insurance.  For these employers, forgoing coverage or trying to self-supply, in other words managing all aspects of their employees' health benefits on their own, is not feasible.  Therefore, a profit maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a small but significant and non-transitory increase in price.

168.   Second is the market of commercial payers (*i.e.,* commercial health insurers, but not Medicare or Medicaid) competing to buy anesthesiology services in Michigan.  This is a market of buyers competing for sellers: specifically, health

insurers competing to purchase anesthesiologist services.  For providers of anesthesiology services there is no reasonable alternative to accepting payments from commercial health insurers.  Because Medicare and Medicaid use conversion factors that are essentially below cost, an anesthesiology provider cannot limit his or her practice to those public payers.  Likewise, an anesthesiologist generally cannot rely solely on out-of-pocket payments by patients.

169.   For each of these product markets, the relevant geographic market is no larger than the state of Michigan.  Michigan does not accept the medical licenses of other states and vice-versa.  Therefore, a Michigan anesthesiologist is limited to practicing in Michigan unless he or she becomes licensed in another state.  Even if a Michigan anesthesiologist were licensed in a neighboring state, the long hours associated with anesthesiology practice (often 60 hours a week) limit the amount of time an anesthesiologist can spend commuting.  So while some Michigan anesthesiologists close to the Ohio border can and do travel to Ohio to take advantage of the higher conversion rates in that state, commuting is not an option generally available to Michigan anesthesiologists.  Services provided at hospitals, including anesthesiology services, are also, by their nature, primarily local, as people tend to visit hospitals close to where they live and work.

170.   In the alternative, there may be smaller geographic markets within Michigan where the competitive harms from BCBSM's actions are even more severe.

171.   Whether assessed across Michigan or at a smaller level, where appropriate, BCBSM possesses market power in each of the product markets: for purchasing anesthesiology services; and for selling health insurance.  As discussed above, BCBSM has monopoly power as a seller of health insurance and monopsony power as a buyer of anesthesiology services.

172.   A4 reserves the right to further refine its definitions of the relevant product markets and relevant geographic markets as more data and expert analysis become available.

## VII.   There is No Pro-Competitive Benefit Outweighing the Harms of BCBSM's Conduct.

173.   As discussed above, BCBSM's conduct has reduced competition among commercial insurers in Michigan, reduced the quality and quantity of anesthesiology care in Michigan to levels below those needed by consumers, and forced consumers to pay higher quality-adjusted prices.  In contrast to these multiple market harms, BCBSM's conduct has no pro-competitive benefits.

174.   BCBSM cannot claim that its anti-competitive conduct has resulted in lower costs for consumers.  BCBSM has used its monopsony and monopoly power to create surplus for itself at the expense of consumers and anesthesiologists.

76

BCBSM paid its chief executive officer over $19 million in compensation in 2018, more than any other Blue, and more than almost every other insurance company, healthcare or otherwise, for-profit or non-profit.  BCBSM's actions have instead increased costs to consumers by increasing quality-adjusted prices.  Additionally, because BCBSM has maintained high premiums through its monopoly power, eliminating BCBSM's anticompetitive actions could lead to both decreased quality-adjusted prices and decreased nominal prices for consumers, even as the conversion rate for high-quality anesthesiology services increased.

175.    Nor can BCBSM's exclusionary and retaliatory actions be justified as an attempt to prevent balance billing.  A4 had made repeatedly clear to BCBSM that it would not balance bill BCBSM's insureds.  Even before then, BCBSM could have contracted to prevent balance billing without requiring that anesthesiologists accept BCBSM's uniform rate as payment from BCBSM.  Thus, BCBSM could have taken steps to avoid balance billing without imposing any harm to A4.  Moreover, as of 2020, balance billing is effectively barred under state and federal law, eliminating any need for BCBSM to engage in self-help to address balance billing.

## VIII.  A4 Has Suffered Damages from BCBSM's Torts and Antitrust Violations.

176.    A4 has suffered significant and ongoing damages caused by BCBSM's tortious and anticompetitive misconduct.  By tortiously interfering with

the non-solicit and non-compete obligations owed to A4 by Trinity's hospitals and A4's employees, BCBSM has caused A4 to lose employees and to incur increased costs of recruiting and retaining anesthesiologists.

177.   A4 has been paid less for anesthesiology services than it would have received absent BCBSM's violation of the antitrust laws.  But for BCBSM's anticompetitive conduct, A4 would be able to negotiate higher reimbursement rates for anesthesiology services from BCBSM.  Even if A4 were working outside of BCBSM's network, it would be receiving higher payments from BCBSM but for BCBSM's anticompetitive acts, as those actions have pushed down the historic (and current) median price for in-network anesthesiology services at BCBSM, and under state and federal law, that median price is generally how out-of-network payments are calculated.  BCBSM's conduct has also shut out A4 from working in MHSM, in Grand Rapids, and Beaumont, in southeastern Michigan, where A4's BCBSM's artificially low rates are insufficient to cover A4's costs.

178.   BCBSM's conduct is destroying A4's business, including by imposing an artificially low rate on A4 and by interfering with A4's relationships with hospitals.

179.   Absent an injunction against BCBSM's tortious and anticompetitive actions, A4 will continue to be harmed and will eventually have to cease doing business in Michigan.

## CLAIMS FOR RELIEF

### First Cause of Action

### Tortious Interference with Contract Under Michigan Law

180.  A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

181.  In 2019, A4 possessed contracts with MHSM and SJMHS that prevented them from soliciting A4's anesthesiologists to work for MHSM or SJMHS, respectively.

182.  BCBSM was aware of both of the contracts with MHSM and SJMHS and the non-solicit obligations in those contracts.

183.  While BCBSM was aware of those obligations, and without justification, BCBSM coerced and induced MHSM and SJMHS to breach their non-solicit obligations to A4.

184.  A4 suffered damages from those breaches of contract, including increased costs of recruiting and retaining employees, as well as the loss of employees.

### Second Cause of Action

### Civil Conspiracy to Commit Tortious Interference with Contract Under Michigan Law

185.  A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

186.   In 2019, A4 possessed contracts with certain of its anesthesiologists, which contracts included narrow non-compete restrictions.  These restrictions prevented A4's anesthesiologists from leaving A4 to work immediately and directly for the hospitals where that doctor was providing services as part of his or her employment with A4.

187.   BCBSM was aware of A4's contracts with its anesthesiologist employees and aware of the non-compete provisions in those contracts specifically.

188.   BCBSM, acting through and in concert with Trinity (including its MHSM and SJMHS hospitals), induced breaches of those non-compete provisions by causing A4 personnel to leave A4 for Trinity.

189.   A4 suffered damages from these breaches of contract, including from the loss of employees.

**Third Cause of Action**

**Unlawful and Malicious Threats Under Michigan Law**

190.   A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

191.   In retaliation for A4's decision to go out-of-network with BCBSM, BCBSM threatened Trinity and Beaumont that it would boycott their hospitals in Michigan, unless those facilities in turn boycotted A4 and/or forced A4 to comply with BCBSM's demands.

80

192.   BCBSM's threats were unlawful under Michigan law.  *See* Mich. Comp. Laws Ann. § 750.213 (no person "shall orally or by any written or printed communication maliciously threaten any injury to the person or property . . . of another with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do or refrain from doing any act against his will); Mich. Comp. Laws Ann. § 500.2012.

193.   The acts which BCBSM threatened were unlawful under Michigan law and the Sherman Antitrust Act.  *See* Mich. Comp. Laws Ann. § 500.2012 (prohibiting "any concerted action committing, any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of the business of insurance."); 15 U.S.C. §§ 1-2.

194.   BCBSM's threats were made with malicious intent.

195.   Trinity and Beaumont responded to BCBSM's threats by deciding to terminate their agreements with A4, thereby forcing A4 to go in-network with BCBSM to remain in business.

196.   Trinity's and Beaumont's actions against A4 were the intended and proximate result of BCBSM's unlawful threats.

197.   A4 has suffered harm as a result of BCBSM's threats, including increased costs of recruiting and retaining employees, the loss of those employees, lost profits, and reduced rates received for anesthesiology services.

## Fourth Cause of Action

## Duress

198.   A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

199.   In 2019, A4 had independent contractors who contracted individually as in-network providers with BCBSM.

200.   Pursuant to those contracts, BCBSM could not terminate those individuals' provider status without either cause or notice.

201.   When A4 went out of network with BCBSM in 2019, certain of these independent contractors chose to remain in-network.

202.   However, in response to A4's decision to leave BCBSM's network, BCBSM terminated the provider status of these independent contractors without cause and without notice.

203.   BCBSM's terminations constituted breaches of its contracts with those independent contractors.

204.   BCBSM subsequently made clear to A4 that BCBSM would remain in breach of those contracts unless either the individuals ceased working with A4 or A4 went in network.

205. BCBSM's willful breaches placed A4 under unlawful duress to go back in-network with BCBSM, by putting A4 in a position where if it remained out-of-network it risked losing its independent contractors.

206. A4 has suffered harm as a result of BCBSM's duress, including the reduced rates received for anesthesiology services.

### Fifth Cause of Action

### Violation of Section 1 of the Sherman Act (15 U.S.C § 1)

207. A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

208. Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold, or trebled, damages and interest.

209. BCBSM has entered into a horizontal conspiracy with other Blues nationwide. As alleged more specifically above, BCBSM has entered into, as have the other Blues, an "amended license agreement," pursuant to which the Blues have divided the country into geographic markets, referred to as service areas, in which BCBSM and the Blues will, with limited exceptions, not compete with each other. This horizontal conspiracy also requires BCBSM and the other Blues to restrict the amount of revenue generated by their non-Blue subsidiaries. This output restriction thereby ensures that the Blues do not circumvent the geographic restrictions by competing other under brand names. This agreement has no pro-

competitive effect, and to the extent any such effect exists, it is outweighed by the harms to competition from the agreement. This agreement represents a contract, combination, or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

210. As alleged more specifically above, the "amended license agreement" also includes an agreement to fix prices and to boycott out-of-service-area providers. This agreement has no pro-competitive effect, and to the extent any such effect exists, it is outweighed by the harms to competition from the agreement. This agreement represents a contract, combination, or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

211. As a direct and proximate result of BCBSM's continuing violations of Section 1 of the Sherman Act, A4 has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes BCBSM's conduct unlawful. These damages include having been paid less for anesthesiology services, losing employees who go to work in other states where anesthesiology rates are higher than the artificially repressed rates in Michigan, and in increased costs of recruiting and retaining anesthesiologists.

**Sixth Cause of Action**

**Violation of Section 2 of the Sherman Act (15 U.S.C § 2) – Monopsonization**

212.    A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

213.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

214.    As alleged more specifically above, BCBSM has engaged in conduct by which it has created and maintained monopsony power in the market of insurers competing to purchase anesthesiology services in Michigan.

215.    BCBSM created and maintained monopsony power willfully, through anticompetitive acts including conspiring with other Blues to restrain trade.

216.    BCBSM's conduct had the purpose and effect of reducing competition in the market for purchasing anesthesiology services in Michigan.

217.    By willfully creating and maintaining monopsony power, BCBSM has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States."

218.    BCBSM's creation and maintenance of monopsony power have resulted in the quality and quantity of anesthesiology care in Michigan being reduced and increased quality-adjusted prices for consumers.  BCBSM's actions

have no pro-competitive effects, and to the extent any such effect exists, it is outweighed by the harms to competition from those actions.

219.   As a direct and proximate result of BCBSM's continuing violations of Section 2 of the Sherman Act, A4 has suffered and will continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes BCBSM's conduct unlawful. These damages include having been paid less for anesthesiology services, losing employees who go to work in other states where anesthesiology rates are higher than the artificially repressed rates in Michigan, and increased costs of recruiting and retaining anesthesiologists.

### Seventh Cause of Action

### Violation of Section 2 of the Sherman Act (15 U.S.C § 2) – Attempted Monopsonization

220.   A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

221.   Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

222.   As alleged more specifically above, BCBSM has engaged in conduct by which it has attempted to create or maintain monopsony power in the relevant product markets and geographic markets described above.

223.  BCBSM attempted to create or maintain monopsony power willfully, through anticompetitive acts including conspiring with other Blues to restrain trade.

224.  BCBSM's conduct had the purpose and effect of reducing competition in the market for purchasing anesthesiology services in Michigan.

225.  By attempting to create or maintain monopsony power, BCBSM has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Even to the extent BCBSM has not yet created or maintained monopsony power, its conduct has created a dangerous risk of success.

226.  BCBSM's attempts to create or maintain monopsony power have resulted in the quality and quantity of anesthesiology care in Michigan being reduced and increased quality-adjusted prices for consumers.  BCBSM's actions have no pro-competitive effects, and to the extent any such effect exists, it is outweighed by the harms to competition from those actions.

227.  As a direct and proximate result of BCBSM's continuing violations of Section 2 of the Sherman Act, A4 has suffered and will continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes BCBSM's conduct unlawful. These damages include having been paid less for anesthesiology services, losing

employees who go to work in other states where anesthesiology rates are higher than the artificially repressed rates in Michigan, and increased costs of recruiting and retaining anesthesiologists.

## Eighth Cause of Action

## Claim for Injunctive Relief under Section 16 of the Clayton Act (15 U.S.C § 26)

228.   A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

229.   As explained in the Fifth through Seventh Causes of Action, BCBSM is violating Sections 1 and 2 of the Sherman Act.

230.   BCBSM's unlawful conduct threatens to continue to injure A4.  A4 seeks a permanent injunction prohibiting BCBSM from continuing its violations and to take appropriate remedial action to correct those violations, including by eliminating any remaining effects of those violations.

## Ninth Cause of Action

## Claim for Injunctive Relief under Michigan Law

231.   A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

232.   As explained in the First through Fourth Causes of Action, BCBSM is tortiously interfering with A4's contracts; conspiring to commit tortious

88

interference with A4's contracts; and making unlawful and malicious threats aimed at preventing A4 from exercising its rights; and imposing duress on A4.

233.   BCBSM's unlawful conduct threatens to continue to injure A4.  A4 seeks a permanent injunction prohibiting BCBSM from continuing its tortious conduct and to take appropriate remedial action to undo the damage from its actions, including by eliminating any remaining effects of its tortious conduct.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff A4 respectfully requests that this Court:

A.    Permanently enjoin BCBSM from interfering with, or conspiring with others to interfere with, A4's agreements with any medical facility or A4 employee;

B.    Permanently enjoin BCBSM from threatening, directly or indirectly, to boycott or steer work away from any medical facility in retaliation for A4 leaving BCBSM's network;

C.    Permanently enjoin BCBSM from willfully breaching its agreements with A4's independent contractors to impose economic duress on A4;

D.    Permanently enjoin BCBSM from entering into, honoring, or enforcing any agreements that restrain competition among health insurers in Michigan to the detriment of anesthesiology providers.

E.    Permanently enjoining BCBSM from taking anticompetitive actions to create or maintain market power in the above product and geographic markets.

F.      Permanently enjoin BCBSM from retaliating against A4 or any medical facility with which A4 works in response to A4's participation in this litigation or the enforcement of these remedies;

G.      Declare that BCBSM's agreements to limit competition among the Blues are illegal and unenforceable;

H.      Award A4 damages for BCBSM's tortious conduct under Michigan law in an amount to be proven at trial;

I.      Award A4 treble damages for BCBSM's violations of the Sherman Act in an amount to be proven at trial;

J.      Award costs and attorneys' fees to A4;

K.      Award prejudgment interest;

L.      Award punitive damages to A4 in an amount to be determined at trial; and

M.      Award any such other and further relief as may be just and proper.

## JURY DEMAND

A4 demands a trial by jury on all issues so triable.

Date:  October 7, 2022

Respectfully submitted,


*/s/ David Barillari*
BOIES SCHILLER FLEXNER LLP
Jonathan Schiller, Esq. (*admission forthcoming*)
David Barillari, Esq. (*admitted in E.D. Mich.*,
N.Y. Bar No. 5448410)
55 Hudson Yards
New York, NY 10001
(212) 446-2300
jschiller@bsfllp.com
dbarillari@bsfllp.com

Richard A. Feinstein (*admitted in E.D. Mich.*,
D.C. Bar 324848)
1401 New York Ave., NW
Washington, D.C. 20005
(202) 895-5243
rfeinstein@bsfllp.com

RILEY SAFER HOLMES & CANCILA LLP
Gregory L. Curtner (P12414)
Matthew Kennison (P79653)
121 W. Washington Street, Suite 402
Ann Arbor, MI 48104
(734) 773-4900
gcurtner@rshc-law.com
mkennison@rshc-law.com

*Counsel for Anesthesia Associates of Ann Arbor,
PLLC*

91

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on October 7, 2022, he caused a true and correct copy of the foregoing document to be served using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ David Barillari*
BOIES SCHILLER FLEXNER LLP
David Barillari
Admitted in E.D. Mich., N.Y. Bar No. 5448410
55 Hudson Yards
New York, NY 10001
Tel. (212) 446-2300
dbarillari@bsfllp.com